1    JEFFER, MANGELS, BUTLER & MARMARO LLP
     PAUL L. WARNER (Bar No. 54757)
2    Two Embarcadero Center, Fifth Floor
     San Francisco, California 94111-3824
3    Telephone:    (415) 398-8080
     Facsimile:    (415) 398-5584
4

5    PRYOR CASHMAN LLP
     JAMIE M. BRICKELL
6    JUERGEN R. OSTERTAG
     410 Park Avenue
7    New York, New York 10022
     Telephone:    (212) 421-4100
8    Facsimile:    (212) 326-0806

9    Attorneys for Applicant Hans-Dieter Blaser

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                    SAN JOSE DIVISION

13                                    CASE NO.    5:08-mc-80009-JW HRL

14   IN RE APPLICATION OF HANS-DIETER      DECLARATION OF LUTZ SCHORLER,
     BLASER FOR JUDICIAL ASSISTANCE        PARTNER OF SCHORLER &
15   PURSUANT TO 28 U.S.C. § 1782          SUETTERLIN

16                                         Date:       June 24, 2008
                                           Time:       10:00 a.m.
17                                         Courtroom:  2, 5th Floor
                                           Judge:      Magistrate Judge Howard R. Lloyd
18

19

20   Lutz Schorler being duly sworn deposes and says:

21          1.      I am a German attorney and partner of Schorler & Suetterlin, a German law firm (the

22   "German Firm").  I submit this Declaration in support of the accompanying Application of Hans-

23   Dieter Blaser ("Blaser") for Judicial Assistance pursuant to 28 U.S.C. §1782 to obtain discovery

24   from Seagate Technology.  Each of the matters set forth herein is based on my own knowledge

25   except as to those matters alleged on information and belief, which I believe to be true.

26          2.      The German Firm represents Blaser in connection with a legal action that is pending

27   before the Labor Court Munich in Germany entitled "Hans-Dieter Blaser vs. Seagate GmbH" (Open

28   Case Number: 31 Ca 9078/07) (hereinafter, the "German Action").  A true and correct copy of the

PRINTED ON
RECYCLED PAPER

656388v1

1    Messerschmittstrasse 4, 80992 Munich ("Seagate Germany") is attached hereto as Exhibit A.

2         3.      This Declaration is submitted in support of Blaser's application for judicial

3    assistance in aid of discovery pursuant to 28 U.S.C. §1782, and therefore sets forth only those facts

4    from the German Action that are relevant to this Application.

5         4.      The German Firm has prosecuted the action on behalf of Blaser from its inception,

6    and I have been the responsible lawyer at the German Firm. Unless otherwise noted, I have

7    personal knowledge of the facts set forth herein.

8                     **The Parties**

9         5.      Upon information and belief, and based upon the annual report Form 10K filed with

10    the United States Securities and Exchanges Commission on August 27, 2007, Seagate Technology

11    ("Seagate" ) is a Cayman Island Company that is listed on the New York Exchange. According to

12    that Form 10K, Seagate has its principal U.S. executive offices located at 920 Disc Drive, Scotts

13    Valley, CA 95066. Seagate is the ultimate parent company to fifty-six (56) separate subsidiary

14    companies, including Seagate Germany.

15         6.      Hans-Dieter Blaser was, until the first week of July 2007, employed by Seagate

16    Germany as the Executive Director EMEA General Sales and Marketing for the Seagate Group in

17    Munich.

18              **Blaser's Employment and Termination**

19         7.      In or about July of 2007, Hans-Dieter Blaser, along with Mr. Alastair Stewert, at that

20    time Director Channels Eastern EMEA, Ms. Gulfen Cakmakci, at that time sales manager for

21    Turkey and the Middle East for the Seagate Group, and Ms. Ziad Abourahal, at that time Channel

22    Sales for the Middle East for the Seagate Group (collectively, the "Employees") were all terminated

23    by Seagate without notice. Each of the Employees worked for a subsidiary company of Seagate,

24    and each was terminated by their respective subsidiary companies.

25         8.      Upon information and belief, Blaser was employed by Seagate Germany for twenty

26    (20) years, Mr. Stewert was employed by Seagate Technology (Marlow) Limited ("Seagate UK")

27    for ten (10) years, Ms. Cakmakci was employed by Seagate UK for five (5) years, and Ms.

28    Abourahal was employed by Seagate UK for three (3) years.

PRINTED ON
RECYCLED PAPER

JMBM | Jeffer Mangels | Butler & Marmaro LLP

9.      Upon information and belief, and based on the response filed by Seagate Germany in the German Action, the Employees were all terminated based on alleged violations of embargo regulations with respect to Iran, as alleged by Seagate.

10.     Upon information and belief, Mr. Stewart and Seagate UK mediated the dispute arising out of Mr. Stewart's individual termination by Seagate UK (the "UK Mediation"). The UK Mediation concluded with a settlement agreement on December 14, 2007.

11.     Upon information and belief, during the UK Mediation, Mr. Stewart was shown a redacted version of a report filed by Seagate with a United States governmental agency reporting violations of boycott regulations relating to the Republic of Iran (hereinafter, the "Seagate Report"). The Seagate Report made references to the Employees.

12.     Upon information and belief, Blaser's employment agreement with Seagate Germany was terminated, like those of the other individual Employees, in order to obtain a favorable outcome of a review for Seagate by the United States government with respect to Iran boycott regulations.

13.     Upon information and belief, the Seagate Report was filed by Seagate as a publicly listed company in the United States, and the Seagate Report is presently within the custody and control of Seagate which has access to copies of the Seagate Report.

14.     The Seagate Report was never made known to any of the Employees prior to the UK Mediation. In fact, upon information and belief, none of the Employees have been granted access to the Seagate Report outside of Mr. Stewart in the context of the UK Mediation.

15.     Indeed, Hans-Dieter Blaser to this day has not seen a copy of the Seagate Report, nor has he ever been advised of any allegations set forth therein with respect to his alleged actions pertaining to alleged violations of boycott regulations.

16.     Nonetheless, having heard about the existence of the Seagate Report, on August 1, 2007, Blaser requested through the undersigned information about the Seagate Report and a copy of the Seagate Report from Seagate Germany's German counsel. On August 16, 2007, Blaser made through the undersigned the same request to William Hudson, the Executive Vice President, General Counsel and Corporate Secretary of Seagate. Neither request was answered.

DECLARATION OF LUTZ SCHORLER

PRINTED ON
RECYCLED PAPER

1

2                              **Blaser Requires The Seagate Report**

3          18.    Blaser requires discovery of the contents of the Seagate Report, however, in order to

4    prove that the allegations contained therein and in the response filed by Seagate Germany in the

5    German Action are false and therefore his termination by Seagate was without cause.

6          19.    Under German law, cause is required in order for a company to terminate an

7    employee without notice.  The employment agreement by and between Seagate Germany and Hans-

8    Dieter Blaser is subject to German law.

9          20.    By accessing the Seagate Report, Blaser may refute any false allegations contained

10   in the Seagate Report or in the response filed by Seagate Germany in the German Action

11   concerning his alleged involvement in illegal activities.  In so doing, Blaser will thus establish a

12   lack of cause for his termination.

13         21.    Applicable German rules of procedure do not provide for discovery procedures

14   which would allow Hans-Dieter Blaser to obtain a copy of the Seagate Report.  However, if Hans-

15   Dieter Blaser had the Seagate Report available, he would be allowed under applicable German rules

16   of procedure to introduce the Seagate Report as evidence into the German Action.

17         22.    In light of the foregoing, I respectfully request that the Court grant Hans-Dieter

18   Blaser's request for discovery from Seagate as described in the accompanying proposed subpoena,

19   pursuant to 28 U.S.C. §1782.

20         Pursuant to Section 28 U.S.C. §1746, I declare under plenty of perjury under the laws of the

21   United States of America that the foregoing is true and correct.

22                              Executed on January ___, 2008

23                              In Munich, Federal Republic of Germany

24

25                              Lutz Schorler
                                Attorney at Law, Partner
26                               Schorler & Suetterlin

27

28                              Exhibit 1 – Complaint filed with the Labor Court Munich

PRINTED ON
RECYCLED PAPER

                                            - 4 -        DECLARATION OF LUTZ SCHORLER

SCHORLER SÜTTERLIN
KAMMERGRUBER
Rechtsanwälte

Schorler Sütterlin Kammergruber · Marschallstr. 1 · 80802 München

Tina Lechner Schorler
Rechtsanwältin
Fachanwältin für Arbeitsrecht

Dr. Ove Sütterlin
Rechtsanwalt

Dr. Michael Kammergruber
Rechtsanwalt
Dipl.-Betriebswirt (FH)

Marschallstr. 1
Münchner Freiheit
80802 München

Fon: +49 (0)89/38 26 28 - 0
Fax: +49 (0)89/38 26 28 - 28

info@ssk-recht.com
www.ssk-recht.com

Arbeitsgericht München
Winzererstr. 104

80797 München

Bankverbindungen:
Deutsche Bank
Konto 60 25 583
BLZ 700 700 24

Stadtsparkasse München
Konto 901 786 039
BLZ 701 500 00

IBAN DE 28
700 0000 0903 02088
SWIFT (BIC) SSKMDEMM

Partnerschaftsgesellschaft
Register PR 543

Unser Zeichen    254/07LS05  ja  D13548
5.7.2007

In Sachen

**Hans-Dieter Blaser,** Bergstr. 13, 85250 Altomünster

- Kläger -

Verfahrensbevollmächtigte:    Rechtsanwälte
Schorler, Sütterlin, Kammergruber
Marschallstr. 1, 80802 München

gegen

**Seagate Technology GmbH,** vertr. d. d. GF Charles C. Pope,
Messerschmittstr. 4, 80992 München

- Beklagte -

Schorler Sütterlin
Dr. Ove Sütterlin, Sütterlin
Rechtsanwalt / Partner GbR
Marschallstr. 1
80802 München
Fon: +49 (0)89/38 26 28 - 0
Fax: +49 (0)89/38 26 28 - 28

wegen: außerordentlicher Kündigung eines Arbeitsverhältnisses

zeigen wir an, dass wir den Kläger anwaltlich vertreten. Namens und im
Auftrag des Klägers erheben wir Kündigungsschutzklage und werden
beantragen:

# EXHIBIT A



**SCHORLER SÜTTERLIN
KAMMERGRUBER**

I.  Es wird festgestellt, dass das Anstellungsverhältnis zwischen den Parteien durch die außerordentliche Kündigung vom 29.06.2007, zugegangen am 29.06.2007, nicht aufgelöst worden ist.

II. Es wird festgestellt, dass das Arbeitsverhältnis durch die hilfsweise ausgesprochene ordentliche Kündigung vom 29.06.2007, zugegangen am 29.06.2007, nicht aufgelöst wird.

III. Es wird festgestellt, dass das Anstellungsverhältnis auch nicht durch andere Beendigungstatbestände endet, sondern zu unveränderten Bedingungen über den 29.06.2007 und 29.02.2008 hinaus fortbesteht.

IV. Die Beklagte trägt die Kosten des Rechtsstreits.

### Begründung:

Der Kläger ist seit dem 01.04.1987 beschäftigt und bezog zuletzt ein durchschnittliches monatliches Bruttogehalt von € 25.000,00.

**Beweis:**   Arbeitsvertrag vom 01.04.1987

- Anlage K1 -

Mit Schreiben vom 29.06.2007 wurde gegenüber dem Kläger durch die Beklagte eine außerordentliche Kündigung ausgesprochen.

**Beweis:**   Schreiben vom 29.06.2007

- Anlage K2 -



**SCHORLER SÜTTERLIN**
**KAMMERGRUBER**

Zum Zeitpunkt des Zugangs der Kündigung bestand das Anstellungsverhältnis länger als 6 Monate. Der Kläger wurde vor dem 01.01.2004 bei der Beklagten eingestellt. Das Kündigungsschutzgesetz ist anzuwenden, weil die Beklagte regelmäßig mehr als fünf Arbeitnehmer beschäftigte und beschäftigt.

Die Kündigung ist unwirksam, ein wichtiger Grund zur Kündigung des Anstellungsverhältnisses im Sinne von § 626 BGB besteht nicht. Auch ein Grund zur ordentlichen Kündigung ist nicht gegeben. Die Beklagte kann sich weder auf betriebsbedingte noch verhaltens- oder personenbedingte Gründe beziehen.

Schließlich wendet sich der Kläger gegen die Kündigung und macht die fehlende soziale Rechtfertigung der Kündigung geltend. Der Kläger macht dies zum einen mit einer Klage nach § 4 KSchG, zum anderen mit einer allgemeinen Feststellungsklage nach § 256 ZPO, denn er befürchtet weitere, auf Beendigung des Anstellungsverhältnisses abzielende Erklärungen der Beklagten.



Lutz Schorler
Rechtsanwalt

1    JEFFER, MANGELS, BUTLER & MARMARO LLP
     PAUL L. WARNER (Bar No. 54757)
2    Two Embarcadero Center, Fifth Floor
     San Francisco, California 94111-3824
3    Telephone:    (415) 398-8080
     Facsimile:    (415) 398-5584
4

5    PRYOR CASHMAN LLP
     JAMIE M. BRICKELL
6    JUERGEN R. OSTERTAG
     410 Park Avenue
7    New York, New York 10022
     Telephone:    (212) 421-4100
8    Facsimile:    (212) 326-0806

9    Attorneys for Applicant Hans-Dieter Blaser

10                   UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12                        SAN JOSE DIVISION

13                                         CASE NO.     5:08-mc-80009-JW  HRL

14   **IN RE APPLICATION OF HANS-DIETER**      **COMPENDIUM OF CASE AUTHORITY**
     **BLASER FOR JUDICIAL ASSISTANCE**
15   **PURSUANT TO 28 U.S.C. SECTION 1782**     Date:        June 24 2008
                                               Time:        10:00 a.m.
16                                             Courtroom: 2, 5th Floor
                                               Judge:       Magistrate Judge Howard R. Lloyd
17

18

19              Applicant, Hans-Dieter Blaser ("Applicant" or "Blaser") respectfully submits the

20   following case authority cited in the Memorandum of Points and Authorities in Support of

21   Application For Judicial Assistance Pursuant to 28 U.S.C Section 1782:

22              1.      *In re Application of Gemeinshcaftspraxis Dr. Med. Schottdorf,* 2006 WL

23   384464 (S.D.N.Y. 2006), 2006 U.S. Dist. LEXIS 94161, attached hereto as Exhibit 1.

24              2.      *In re Application of Merck & Co., Inc.,* 197 F.R.D. 267 (M.D.N.C., 2000),

25   attached hereto as Exhibit 2.

26              3.      *In re Application of Grupo Qumma, S.A. de C.V.,* 2005 WL 937486,

27   (S.D.N.Y. Apr. 22, 2005), attached hereto as Exhibit 3.

28              4.      Asking for Help: Judicial Assistance in Foreign Discovery under 28 U.S.C. §

1    1782.

2

3    DATED:  May 14, 2008                    JEFFER, MANGELS, BUTLER & MARMARO LLP
                                             PAUL L. WARNER
4

5
                                             By:  /s/ Paul L. Warner
6                                                    PAUL L. WARNER (Bar No. 54757)
                                             Attorneys for Applicant HANS-DIETER BLASER
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER

656430v1

EXHBIT 1

LEXSEE 2006 U.S. DIST LEXIS 94161

**IN RE APPLICATION OF GEMEINSHCAFTSPRAXIS DR. MED. SCHOTTDORF FOR AN ORDER DIRECTING THE PRODUCTION OF CERTAIN DOCUMENTS TO ASSIST A FOREIGN TRIBUNAL PURSUANT TO 28 U.S.C. § 1782**

**Civ. M19-88 (BSJ)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2006 U.S. Dist. LEXIS 94161**

**December 29, 2006, Decided**
**January 4, 2007, Filed**

**JUDGES:** [*1] BARBARA S. JONES, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** BARBARA S. JONES

**OPINION**

**OPINION AND ORDER**

PART I

**BARBARA S. JONES**

**UNITED STATES DISTRICT JUDGE**

**INTRODUCTION**

McKinsey Company, Inc. ("McKinsey") moves to: (1) vacate an order under 28 U.S.C. § 1782, in which this Court granted Gemeinschaftspraxis Dr. Med. Bernard Schottdorf and Partners ("Schottdorf") leave to serve a subpoena upon McKinsey in furtherance of foreign litigation; and (2) to quash the ensuing subpoena. For the reasons below, McKinsey's motion is DENIED.

**BACKGROUND**

**A. The Relationship of the Parties**

Schottdorf is a German partnership. It operates a laboratory that analyses human samples for medical diagnosis, at the volume of about 60,000 tests per day. Under the German national public healthcare system, Schottdorf is paid for its services by an association of physicians ("Physicians Associations") from moneys that these associations have collected from public health insurance companies. The Physicians Associations are all

members of the Kassenarztliche Bundesvereinigung ("Federal Association"), which negotiates the fee schedule [*2] by which the public health insurance companies pay the Physicians Associations.

In 1999, a special committee comprised of members of the Federal Association and the public health insurance companies altered the fees payable to laboratories. As relevant here, a new rule provided for a 20% reduction in fees for all tests conducted by a laboratory exceeding 450,000 within a quarter year (the so-called "20% Rule").

According to the Federal Association, the 20% Rule was wholly or largely based on a study and report by McKinsey, which is a global consulting firm headquartered in New York, New York. The report, which McKinsey prepared in Germany in the German language, allegedly determined that the fee reduction was justified by economies of scale (the "McKinsey Report").

**B. The German Litigation**

**1. The Social Court Action**

Schottdorf responded to the 20% Rule by filing several actions in the Sozialgericht Munchen (the Munich "Social Court") challenging the determination of fees by the Bavarian Physicians Association, which is the regional association responsible for paying Schottdorf. [1] Each action is based, in part, on Schottdorf's assertion that the 20% Rule violates [*3] Schottdorf's right to equal protection under German law. Both the Bavarian Physicians Association and the Federal Association are parties to those actions, which have been held in suspense pending the resolution of a lead action captioned: *Gemeinschaftspraxis Dr. med. Bernd Schottdorf u.s. v.*

EXHIBIT *i*

*Kassenarztliche Vereinigung Bayerns wegan Honorar-bescheid fur das Quartal III/99* (the "Social Court Action").

1    The Social Courts are a special branch of the German judiciary competent to hear, *inter alia*, disputes relating to the compensation paid to physicians participating in Germany's public health system. *See* Affidavit of Prof. Dr. Burkhard Hess, dated November 3, 2006 ("Hess Aff."), P 13.

In that proceeding, the Social Court requested that the Federal Association provide answers to several questions posed by the court concerning McKinsey's role in what became the 20% Rule. In particular, the court made the following request:

It is understood that [sic] basis for the threshold was a McKinsey [*4] opinion. Is that correct? In the case of affirmation, the submission of the opinion is requested. [2]

To which the Federal Association responded :

It is correct that [sic] basis for the laboratory reform was, as already stated above, an opinion of the company McKinsey. The opinion of [McKinsey] concerns intellectual property of [McKinsey], and the Federal Association is prohibited under the commissioning agreement to share this expert opinion with a third party. Hence, the expert opinion has to be requested directly from [McKinsey]. [3]

2    *See* Declaration of Juergen Ostertag, dated August 15, 2006 ("Ostertag Dec."), at 3 (providing translation).

3    *Id.*

The Social Court apparently did nothing further to pursue its request for the McKinsey Report, either from the Federal Association or McKinsey itself.

On March 4, 2004, the Social Court issued a decision upholding the 20% Rule. The court began its analysis by stressing its "restrictive examination authority" in reviewing [*5] fee schedules promulgated by the Federal Association, and explained that:

An intervention by the courts is permissible only if it can be established without a doubt that the Assessment Committee has exceeded its regulatory purview or has abused its valuation authority by placing a minority group of physicians at a disadvantage in their fees, or otherwise identifiably allowing itself to be guided by non-relevant considerations. [4]

The court continued:

[Schottdorf] is unsuccessful with its objection that the [20% Rule] is based upon an insufficient data set. This is because there is no general obligation, even based upon the principles of the rule of law, that material facts must be completely and accurately determined prior to the creation of standards and immediately used as the basis for decisions by issuers of standards in the creation of these standards [citations omitted] . . . . A study was performed by McKinsey prior to implementation of the [20% Rule]. The results of the expert opinion would have ultimately led to a threshold of 450,000 services. Even though it would have been desirable in the view of the court to inspect the expert opinion (submission [*6] of the expert opinion was rejected, with reference to contractual provisions), given a consideration of the aforementioned rulings, this cannot be used as a basis to automatically conclude that the rule is arbitrary. The [Federal Association] has given a detailed presentation in its brief . . . as to how it established that threshold at 450,000 parameters. According to this presentation, in conjunction with considerations of normal service volumes for the physician's fee, and assumption of a maximum of 225,000 parameters per year per physician was assumed. Assuming four physicians in a large joint practice, this would be 125,000 parameters per quarter. If one then doubles this amount to 450,000 parameters in accordance with the fundamental principle cited above, then the unit costs would potentially decrease to at least 20% based on the fundamental principle of rationalization in business economics. In the view of the court, this involves a pertinent and objectively plausi-

ble basis in the sense of Article 3 of the German Basic Law. [5]

[*7]

    4 *See* Hess Aff., Ex. 1 (providing translation).

    5 *Id.* As explained in the Discussion *infra*, the parties vigorously dispute the import and meaning of the Social Court's decision with respect to the relevance, if any, of the McKinsey Report to its holding.

Schottdorf's appeal of this decision is scheduled to be heard by a regional Social Court (the "Appellate Social Court") in March 2007.

**2. The Dusseldorf Action**

Meanwhile, Schottdorf filed a separate action (the "Dusseldorf Action") directly against McKinsey in the German regional court in Dusseldorf (the "Dusseldorf Court"). It appears that the nature of the Dusseldorf Action was for discovery only, although Schottdorf's filings in that court also contemplated that an action for damages might follow -- depending on what the sough-after material revealed.

This effort to obtain the McKinsey Report also failed. On February 22, 2006, the Dusseldorf Court dismissed the action on several grounds, including the absence of legal privity between Schottdorf and McKinsey, and the lack of any viable tort theory to hold McKinsey accountable for Schottdorf's alleged harm. [6] In so holding, [*8] the court also remarked that:

> [T]he production of documents, which is to serve the conduct of litigation in the present case, is finally regulated by §§ 134, 142 ZPO [German Code of Civil Procedure]. If one of the parties to a proceeding refers to this study, and if the Court deems this study to be relevant to its decision, the Court can order this document to be produced. If the existence and the materiality of the document in terms of the decision have been established, there is, to that extent, also no discretion on the part of the Court. It is therefore possible for [Schottdorf] to pursue its rights in the [Social Court Action] pursuant to § 142 ZPO, so that a special claim to information [in the general Dusseldorf regional court] is not required. [7]

    6 *See* Hess Aff., Ex. 2 (providing translation).

    7 *Id.*

Schottdorf appealed the Dusseldorf Court's decision to a higher court, which remains pending.

**C. This Court's *Ex Parte* Order Pursuant [*9] to 28 U.S.C. § 1782 and McKinsey's Motion to Vacate and Quash the Subpoena**

Still empty-handed after exhausting available means in Germany, on August 15, 2006, Schottdorf turned to this Court for assistance under 28 U.S.C. § 1782(a). As explained further below, that provision affords a United States district court the authority to order a person or entity located within its district to provide discovery for use in a foreign proceeding. [8] To this end, Schottdorf filed an *ex parte* application seeking this Court's leave to serve a subpoena on McKinsey requesting production of, *inter alia*, the McKinsey Report and related documents. [9] Judge Scheindlin (Part I) granted the application, and Schottdorf served a subpoena on McKinsey the following day.

    8 Section 1782(a) provides in relevant part:

> The district court of the district in which a person resides or is found may order him to . . . produce a document or other thing for use in a proceeding in a foreign or international tribunal. The order may be made pursuant to . . . the application of any interested person . . . . The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for . . . producing the document or other thing. To the extent that the order does not prescribe otherwise, the . . . document or other thing [shall be] produced[] in accordance with the Federal Rules of Civil Procedure. A person may not be compelled to . . . produce a document or other thing in violation of any legally applicable privilege.

28 U.S.C. § 1782(a).

[*10]

9    Specifically, Schottdorf asked leave to seek production of the following documents from McKinsey: (1) "Reports, analyses, memoranda, or other documents created by McKinsey pursuant to and/or in connection with its retention by the [Federal Association] and concerning the Federal Association's promulgation of [the 20% Rule]"; (2) "Documents that McKinsey relied upon in generating any of the above-referenced documents for the Federal Association"; and (3) Communications with the Federal Association or its representatives concerning the bases or rationales of the 20% Rule or McKinsey's retention by the Federal Association for the above-referenced services." *See* Declaration of Marion B. Johnson, dated November 8, 2006 ("Johnson Dec."), Ex. C.

On or about November 8, 2006, McKinsey filed the instant motion to vacate the § 1782 order and to quash the subpoena. [10] In support of its motion, McKinsey filed, *inter alia*, a memorandum of law and an affidavit from its German legal expert, Professor Dr. Buckhard Hess. In opposition thereto, Schottdorf filed, *inter alia*, a memorandum [*11] of law and supporting declaration by its German legal expert, Professor Dr. Jur Fritjof Haft.

10    Judge Batts, then the Part I Judge, issued a briefing schedule and ordered oral argument for December 26, 2006, the week I assumed Part I duties. I cancelled the argument and decide the matter in this Opinion and Order.

## DISCUSSION

### A. 28 U.S.C. § 1782

"A request for discovery under § 1782 presents two inquiries: first, whether the district court is authorized to grant the request; and second, if so, whether the district court should exercise its discretion to do so." *In re Grupo Qumma, S.A.*, No. M8-85 (DC), 2005 U.S. Dist. LEXIS 6898, 2005 WL 937486, at * 1 (S.D.N.Y. Apr. 22, 2005); *accord Schmitz v. Bernstein, Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83-84 (2d Cir. 2004).

Authorization under 28 U.S.C. § 1782 exists where: (1) the person or entity from whom discovery is sought resides or is found in the district; (2) [*12] the discovery is for use in a proceeding before a foreign tribunal; and (3) the application is made by a foreign or international tribunal or "any interested person." 28 U.S.C. § 1782; *see In re Application of Gianoli Aldunate*, 3 F.3d 54, 58 (2d Cir. 1993).

If these threshold requirements are met, the Court must then exercise its discretion as to whether and what extent to lend its assistance. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264, 124 S. Ct. 2466,

159 L. Ed. 2d 355 (2004); *Metallgesellschaft v. Hodapp (In re An Order Permitting Metallgesellschaft Ag to Take Discovery)*, 121 F.3d 77, 78 (2d Cir. 1997). The Supreme Court has identified at least four discretionary factors relevant to the inquiry:

> (1) Whether the person from whom discovery is sought is a participant in the foreign proceeding, in which case "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad";

> (2) "the nature of the foreign tribunal, the character of proceedings underway abroad, and the receptivity of the foreign government, court, or agency to federal-court judicial assistance"; [*13]

> (3) "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or the United States"; and

> (4) whether the discovery requests are "unduly intrusive or burdensome."

*Intel*, 542 U.S. at 264-65; *accord In re Application of Microsoft Corp.*, 428 F. Supp. 2d. 188, 192-93 (S.D.N.Y. 2006); *In re Grupo Qumma*, 2005 U.S. Dist. LEXIS 6898, 2005 WL 937486 at * 1.

As the Second Circuit has further explained, "district courts must exercise their discretion under § 1782 in light of the twin aims of the statute: 'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts . . . .'" *Schmitz*, 376 F.3d at 84 (quoting *In re Metallgesellschaft*, 121 F.3d at 79).

As explained further below, these considerations counsel heavily in favor of generous federal-court assistance. *See, e.g., Edelman v. Taittinger (In re Edelman)*, 295 F.3d 171, 180 (2d Cir. 2002). And it is from this posture that I now turn to [*14] McKinsey's motion.

### B.    This Court Is Authorized to Grant Schottdorf's § 1782 Application

As a threshold matter, this Court clearly is authorized to grant Schottdorf's § 1782 application because all of the express elements of the statute have been met. Namely, (1) McKinsey maintains its headquarters in

New York, and thus is "found" within this district; (2) the requested discovery is sought for use in a foreign tribunal, to wit, the Appellate Social Court; [11] and (3) Schottdorf is an "interested person" in that proceeding. *See* 28 U.S.C. § 1782(a); *In re Metallgesellschaft*, 121 F.3d at 78-79.

> 11    Schottdorf claims that the Appellate Social Court is authorized under that court's procedural rules to receive and admit new evidence on appeal. *See* Declaration of Martin Imbeck, dated July 20, 2006, P 23. McKinsey does not appear to contest this point, other than to say that the evidence sought to be introduced is irrelevant to the appeal.

[*15] Further, the Court rejects McKinsey's suggestion that § 1782 assistance cannot extend to the production of documents located abroad. [12] There is no such express restriction in the statute, and the Court is unwilling to engraft one onto it.

> 12    While McKinsey raises this argument in connection with the fourth *Intel* discretionary factor, McKinsey's affirmative statement that "Schottdorf is not entitled to discovery of documents located in Germany," coupled with the cases upon which McKinsey relies, *see infra* n.13, is understood by the Court as an argument that the foreign location of the documents operates as an absolute bar to their production. *See* McKinsey's Memorandum of Law, at 15.

Section 1782 requires only that the *party from whom* discovery is sought be "found" here; not that the *documents* be found here. 28 U.S.C. § 1782(a). For this Court to read an implicit document-locale requirement into § 1782 would be squarely at odds with the Supreme Court's instruction [*16] that § 1782 should not be construed to include requirements that are not plainly provided for in the text of the statute. *See Intel*, 542 U.S. at 260. While the issue in *Intel* was whether § 1782 should be construed to categorically bar a district court from ordering production of a document that was non-discoverable abroad, the Supreme Court's reasoning in rejecting such an implied requirement applies with equal force here. ("'If Congress had intended to impose . . . a sweeping restriction on the district court's discretion, at a time when it was enacting liberalizing amendments to [§ 1782], it would have included statutory language to that effect.'") (quoting *In re Gianoli Aldunate*, 3 F.3d at 59); *accord In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992) (refusing to "engraft" a foreign-exhaustion requirement onto § 1782 for similar reasons).

Rather, absent any express statutory language, the location of the documents at issue should at most be a discretionary consideration, which will be considered *infra* in the context of discerning the alleged hardship and burden on McKinsey in obtaining and producing [*17] the requested material. *Cf. Intel*, 542 U.S. at 259-64 (rendering the non-discoverability of documents abroad a discretionary factor); *In re Gianoli Aldunate*, 3 F.3d at 59-60 (same); *In re Malev*, 964 F.2d at 100 (rendering foreign-exhaustion a discretionary consideration). [13]

> 13    Although the Court held in *In re Sarrio S.A.*, No. M9-372 (RPP), 1995 U.S. Dist. LEXIS 14822, 1995 WL 598988, at ** 2-3 (S.D.N.Y. Oct. 11, 1995), that § 1782 does not extend to the discovery of documents located abroad, on appeal the Second Circuit expressly declined to rule on the issue and overruled the district court's decision on other grounds, 119 F.3d 143 (2d Cir. 1997). More recently, in *In re Microsoft*, 428 F. Supp. 2d 188, 192-93 (S.D.N.Y. 2006) (CM), the district court stated in *dicta*, but without analysis, that the scope of § 1782 is limited to domestically located documents. *Id.* at 194 n.5. Although there is some support for this proposition in the legislative history, *see* S.Rep. No. 1580, 88th Cong., 2d Sess. (1964) (stating that the intent of the 1964 amendments to § 1782 was "to clarify and liberalize existing U.S. procedures for assisting foreign and international tribunals and litigants in obtaining oral and *documentary evidence in the United States*") (emphasis added), this passage is at best ambiguous on the issue of whether documents abroad could be obtained through affiliated parties located in the United States, and should not be used to supplant the otherwise non-restrictive language of § 1782. *See Intel*, 542 U.S. at 260; *In re Gianoli Aldunate*, 3 F.3d at 59. Further, while certain policy considerations may counsel in favor of not allowing § 1782 to be used as an instrument to compel discovery of documents located abroad, *see Sarrio*, 1995 U.S. Dist. LEXIS 14822, 1995 WL 598988 at * 2 (noting Professor Hans Smit's concerns that § 1782 would be used to interfere with foreign procedures and place undue burden on United States courts), such considerations cannot supplant the policy expressed by Congress in the plain words of the statute. Rather, for the reasons explained in the text above, such considerations should be weighed on a case-by-case basis along with the other discretionary factors.

[*18]    **C. The Balance of Discretionary Factors Tips In Schottdorf's Favor**

Turning now to *Intel*'s four discretionary factors, the Court finds that they collectively weigh in Schottdorf's favor.

### 1. McKinsey Is Not a Party to the Foreign Litigation for Which Discovery Is Sought

As explained above, the first discretionary factor is whether the party from whom discovery is sought is a party to the foreign litigation at issue. *See Intel*, 542 U.S. at 264. This factor rests on the notion that the "need for § 1782(a) generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad." *Id.*

The foreign litigation at issue is the Social Court Action, to which McKinsey is neither a party nor a participant. While McKinsey was a party to the separate Dusseldorf Action, that is not the foreign litigation for which Schottdorf seeks discovery under § 1782.

McKinsey nevertheless claims that the thrust of *Intel*'s first discretionary factor is *not* the target's status as a party to the foreign litigation, but rather whether the documents sought are within the reach of the foreign tribunal. [*19] McKinsey overstates the matter by placing too much emphasis on the *foreign tribunal*'s need of United States assistance, while ignoring the *interested party*'s need of such assistance. When the target of discovery is not a party the foreign tribunal may be less inclined -- even if it is empowered -- to compel third-party discovery or, more precisely here, to compel the production of material subject to a third-party's confidentiality restrictions. [14]

14    The parties vigorously dispute whether the Social Court is empowered to compel the discovery sought, a matter addressed in Section C.2, *infra.*

Accordingly, the Court finds that the first factor weighs decisively in Schottdorf's favor.

### 2. McKinsey Has Failed to Demonstrate that This Court's Assistance Would Offend Germany or Its Courts

The second discretionary factor concerns the receptivity of the foreign government or its courts to United States federal-court assistance. *See Intel*, 542 U.S. at 264. As relevant [*20] here, this factor separately encompasses considerations of: (1) whether United States assistance would offend the foreign country, *see, e.g., Eu-*

*romepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099-1100 (2d Cir. 1995); and (2) whether the material sought is admissible evidence in the foreign tribunal, *see, e.g., In re Grupo Qumma*, 2005 U.S. Dist. LEXIS 6898, 2005 WL 937486 at * 2; *In re Imanagement Servs.*, No. M05-89 (FB), 2005 U.S. Dist. LEXIS 17025, 2005 WL 1959702, at * 3 (E.D.N.Y. Aug. 16, 2005).

The Second Circuit has instructed this Court to consider "only authoritative proof" in considering these factors. *See Euromepa*, 51 F.3d at 1099-1100; *accord In re Metallgesellschaft*, 121 F.3d at 80; *see also In re Imanagement Servs.*, 2005 U.S. Dist. LEXIS 17025, 2005 WL 1959702 at * 3. Such authoritative proof has been found to exist where the representative of a foreign sovereign has expressly and clearly made its position known. *See Schmitz*, 376 F.3d at 84-85; *In re Microsoft*, 428 F. Supp. 2d at 194. [15]

15    In *Schmitz* for example, the Second Circuit upheld the denial of discovery in aid of a German securities litigation, where the German Ministry of Justice and German prosecutor submitted an *amicus* brief affirmatively opposing such discovery on the ground that it would jeopardize an ongoing German investigation. *See Schmitz*, 376 F.3d at 84-85. And in *In re Microsoft*, this Court (McMahon, J.) rejected a § 1782 application where the foreign tribunal submitted an *amicus* brief expressly opposing the discovery sought and stating that it would not be receptive to United States judicial assistance. *In re Microsoft*, 428 F. Supp. 2d at 194.

[*21] By contrast, proof resting on equivocal interpretations of foreign policy or law generally provides an insufficient basis to deny discovery. *See, e.g., Grupo Qumma*, 2005 U.S. Dist. LEXIS 6898, 2005 WL 937486 at * 3 (granting § 1782 discovery application where the foreign court's receptiveness of the discovery was disputed). Rather, in such cases the Second Circuit has instructed that district courts generally should err on the side of permitting the requested discovery. *See Euromepa*, 51 F.3d at 1101 (2d Cir. 1995) ("[I]t is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief sought."). This liberal construct is owing to the availability of corrective measures abroad; for example, the foreign tribunal may simply choose to exclude or disregard the discovered material should that tribunal find that the district court overstepped its bounds in ordering the discovery. *See Euromepa*, 51 F.3d at 1101; *In re Grupo Qumma*, 2005 U.S. Dist. LEXIS 6898, 2005 WL 937486 at * 3.

Here, McKinsey relies on the [*22] decisions of both the Social Court and Dusseldorf Court -- neither of which compelled production of the McKinsey Report -- to argue that those courts' sovereignty would be undermined, and their decisions effectively overruled, if discovery were now permitted. I am not at all convinced.

The parties sharply dispute both the import and meaning of the Social Court's decision, as well as the Dusseldorf Court's interpretation of it. Relying on the opinion of its legal expert, McKinsey maintains that the Social Court was empowered to, yet declined to, order production of the McKinsey Report because it was "irrelevant" to the disposition of that case. (See Hess Aff., PP 24-27.) Indeed, that is how the Dusseldorf Court appears to have understood the Social Court's decision. Schottorf's legal expert, however, points out that the Social Court in fact requested the document and noted in its decision that it would have been desirable to have it, but was not empowered under the relevant law to compel production of the document. (See Haft Dec., PP 12-24.) He also notes that, to the extent the Dusseldorf Court found otherwise, that court's decision is based on an erroneous interpretation [*23] of the law and has been appealed.

It is unnecessary for me to further explore these polar differences in expert opinion, because after having carefully reviewed the German court decisions and the experts' respective affidavits, in the end the Court is left without an answer as to which expert is correct. And, as the Second Circuit has instructed, the Court is not expected to declare a winner in this "battle-by-affidavit of international legal experts." See In re Euromepa, 51 F.3d at 1099 ("[W]e do not read the statute to condone speculative forays into legal territories unfamiliar to federal judges."). [16]

16    This is not an abdication of the Court's discretionary role; rather, my restraint itself is the exercise of discretion. See Euromepa, 51 F.3d at 1099-1100 (holding that district court abused its discretion in denying § 1782 assistance based on its "speculative foray" into foreign law, and stating that "we do not think that the district court's concern for trespassing upon the prerogatives of French sovereignty should have weighed so heavily in its decision).

[*24]  If in fact the Appellate Social Court opposes United States assistance, that court may simply choose to exclude the discovered material from evidence. See id. at 1101. The availability of that corrective measure assuages any concern I may otherwise have had on the issue. See In re Grupo Qumma, 2005 U.S. Dist. LEXIS 6898, 2005 WL 937486, at ** 2-3 (granting § 1782 discovery application and deferring to Mexican tribunal to

decide admissibility of material where two competing expert affidavits were submitted by the parties concerning the import of prior Mexican court orders and Mexican evidentiary law); In re Imanagement Servs., 2005 U.S. Dist. LEXIS 17025, 2005 WL 1959702 at * 5 (to same effect in connection with Russian litigation).

Accordingly, the second discretionary factor also weighs in favor of permitting the requested discovery.

### 3. Schottdorf Does Not Appear to Be Impermissibly Circumventing Foreign Proof-Gathering Restrictions or Other German Policies

The third discretionary factor aims to protect against abuse of § 1782 as a vehicle to end-run foreign proof-gathering restrictions or other foreign policies. See Intel, 542 U.S. at 265. Here, [*25] McKinsey points to no proof-gathering restriction under German law. Rather, McKinsey claims that production of its report could have been compelled under German law, but was passed over by both the Social Court and Dusseldorf Court because the document was neither relevant nor necessary to the decision in the Social Court Action. Again, these are hotly contested issues that overlap with previously addressed arguments, and do not advance McKinsey's cause for much of the same reasons. See Section C.1 & 2 supra.

To be sure, Schottdorf's § 1782 application is a last resort to acquire discovery that it was unable to obtain abroad. But that is not an "impermissible" use of § 1782 because, in some respects, that is precisely the type of assistance that the statute was designed to afford. See In re Imanagement Servs., 2005 U.S. Dist. LEXIS 17205, 2005 WL 1959702 at * 5 (granting § 1782 application, inter alia, where "resort to § 1782 may be the only avenue by which [the requesting party] can obtain the discovery it seeks.").

It appears that Schottdorf is seeking discovery because it has a good faith belief that it will be able to use the evidence in the Social Court Action. See In re Grupo Qumma, 2005 U.S. Dist. LEXIS 6898, 2005 WL 937486 at * 3 [*26] . Absent any indication of bad faith on Schottdorf's part, the Court is simply unwilling to weigh the request for § 1782 assistance itself as a negative discretionary factor. See id. It is at most a neutral consideration in this case.

### 4. The Subpoena Is Neither Unduly Intrusive Nor Burdensome

Case 5:08-mc-80009-JW    Document 22-2    Filed 05/15/2008    Page 11 of 33

Page 8
2006 U.S. Dist. LEXIS 94161, *

Under the fourth and final *Intel* factor, the Court must consider whether Schottdorf's discovery requests are unduly intrusive or burdensome. *See Intel*, 542 U.S. at 265. As noted above, Schottdorf has subpoenaed the production of: (1) "Reports, analyses, memoranda, or other documents created by McKinsey pursuant to and/or in connection with its retention by the [Federal Association] and concerning the Federal Association's promulgation of [the 20% Rule]"; (2) "Documents that McKinsey relied upon in generating any of the above-referenced documents for the Federal Association"; and (3) Communications with the Federal Association or its representatives concerning the bases or rationales of the 20% Rule or McKinsey's retention by the Federal Association for the above-referenced services." (Johnson Dec., Ex. C.)

These requests appear to be sufficiently [*27] tailored to the litigation issues for which production is sought. The fact that the documents are located abroad, itself, is of little concern. They can easily be shipped to McKinsey's headquarters in New York (or perhaps accessed electronically), and McKinsey does not contend otherwise.

Moreover, any concern that the production would be unduly intrusive can be remedied by an appropriate confidentiality agreement. If the parties cannot reach such an agreement on their own, the Court is willing and ready to assist.

Finally, the Court rejects McKinsey's claim that the production will be unduly burdensome on the ground that the documents will have to be translated from German into English so that they may be reviewed by McKinsey's United States, non-German speaking, counsel. Initially, the Court is not in a position to gauge the extent of this purported burden because McKinsey has not disclosed the volume of documents that are subject to production. In any event, McKinsey's tactical approach to the requested discovery is hardly the type of burden that could weigh in favor of blanket nonproduction. Section 1782 applications, which presuppose that the discovered material will be used [*28] in connection with foreign litigation, may often involve requests for material in a foreign language. Such language differences are inevitable, and may carry added expense for both parties. But these additional burdens are not "undue," and cannot be used as a shield where, as here, the decision to translate and review the documents in the United States is a matter of choice. Accordingly, the fourth and final discretionary consideration weighs in Schottdorf's favor.

## CONCLUSION

For the foregoing reasons, McKinsey's motion to vacate the § 1782 order and quash the resulting subpoena is DENIED. The documents shall be produced by January 31, 2007, under an appropriate confidentiality agreement. I remain available to the parties in the event that the Court's assistance is necessary.

**SO ORDERED:**

**BARBARA S. JONES**

**UNITED STATES DISTRICT JUDGE**

Dated: December 29, 2006

New York, New York

# EXHIBIT 2



197 F.R.D. 267
197 F.R.D. 267
**(Cite as: 197 F.R.D. 267)**

United States District Court,
M.D. North Carolina.
In re Application of MERCK & CO., INC. For
Discovery For Use in an Action
Pending in the High Court of Justice of England and
Wales, Chancery Division,
Patents Court.
**No. 1:00MC17.**

Order Amending Opinion April 28, 2000.
March 3, 2000.

Defendant in English patent suit applied for an order permitting it to take discovery in aid of a foreign proceeding. The District Court, Eliason, United States Magistrate Judge, held that application for issuance of subpoenas *duces tecum* in aid of foreign proceeding would be stayed pending petitioner's notification of all interested parties in the foreign proceeding of the application and order and of their right to file a formal response.

Application stayed.

West Headnotes

**[1] Federal Civil Procedure**  1312
170Ak1312Most Cited Cases
Requirements to obtain an order under statute authorizing discovery for use in foreign proceeding are: (1) the person from whom discovery is sought must reside in the district; (2) the discovery must be for use in a proceeding before a foreign tribunal; and (3) the application can be made either by a foreign or international tribunal or "any interested person." 28 U.S.C.A. § 1782(a).

**[2] Federal Civil Procedure** 1312
170Ak1312Most Cited Cases
A "proceeding" within meaning of statute authorizing discovery in aid of a foreign proceeding includes any proceeding in which an adjudicated function is being exercised or is imminent. 28 U.S.C.A. § 1782(a).

**[3] Federal Civil Procedure** 1312
170Ak1312Most Cited Cases
An "interested person" within meaning of statute authorizing an interested person to apply for an order for discovery in aid of foreign proceeding includes a party to the foreign litigation, whether directly or indirectly involved. 28 U.S.C.A. § 1782(a).

**[4] Federal Civil Procedure** 1312
170Ak1312Most Cited Cases
District court has wide discretion to determine whether to grant discovery in aid of a foreign proceeding, but it possesses equally wide discretion to tailor such discovery to avoid attended problems. 28 U.S.C.A. § 1782.

**[5] Federal Civil Procedure** 1312
170Ak1312Most Cited Cases
When the court approves an application for discovery in aid of a foreign proceeding, it has the authority to require that other parties in the foreign litigation be notified of the request in the same fashion as parties to litigation in federal court are entitled to such notice. 28 U.S.C.A. § 1782(a).

**[6] Federal Civil Procedure** 1312
170Ak1312Most Cited Cases
Court has authority to require notification of other parties in the foreign litigation prior to the issuance of a discovery order in aid of a foreign proceeding to an applicant. 28 U.S.C.A. § 1782(a).

**[7] Federal Civil Procedure** 1312
170Ak1312Most Cited Cases
Application for issuance of subpoenas *duces tecum* in aid of foreign proceeding would be stayed pending petitioner's notification of all interested parties in the foreign proceeding of the application and order and of their right to file a formal response, where parties did not make a joint application, and petitioner did

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT 2

not represent that they consented to the application and proposed discovery order. 28 U.S.C.A. § 1782(a).

[8] Federal Civil Procedure  1312
170Ak1312Most Cited Cases
Court may require an applicant for discovery in aid a foreign proceeding to make a threshold showing that the discovery information would be discoverable in the foreign jurisdiction; normally this does not require the court to determine whether the evidence will be admissible. 28 U.S.C.A. § 1782(a).

[9] Federal Civil Procedure  1312
170Ak1312Most Cited Cases
American court has an interest in making sure that one party to a foreign litigation is not using statute authorizing discovery in aid of foreign proceeding to gain an unfair advantage by conducting discovery of American party to the foreign litigation under the liberal discovery procedures of the United States. 28 U.S.C.A. § 1782(a).

*268 On Amended Order
W. Kearns Davis, Jr., Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, NC, for In re Application of Merck & Co., Inc. for Discovery for Use in an Account Pending in the High Court of Justice of England and Wales, Chancery Division, Patents Court, plaintiff.

Michael E. Ray, Womble, Carlyle, Sandridge & Rice, Winston-Salem, NC, Larry I. Moore, III, Adams Kleemeier Hagan Hannah & Fouts, Greensboro, NC, for Novartis Crop Protection, Inc., Collag Corp., Collag Ltd., movants.

### ORDER

ELIASON, United States Magistrate Judge.

Petitioner Merck & Co., Inc., a New Jersey corporation, has submitted an application *269 pursuant to 28 U.S.C. § 1782(a) for an order permitting it to take discovery in aid of a foreign proceeding. The applicant shows that an action entitled, *Collag Corp. and Collag, Ltd. v. Merck & Co., Inc.* ("Collag") was commenced in the High Court of Justice of England and Wales, Chancery

Division, Patents Court, on or about June 4, 1998. The plaintiffs in that action allege that defendant Merck misappropriated and misused confidential information relating to certain pesticide formulations. Petitioner claims that one aspect of the litigation was plaintiff Collag's claim that Merck provided confidential information to Novartis Crop Protection AG ("Novartis"), a Swiss corporation, which has facilities in Greensboro, North Carolina. Novartis allegedly manufactured or procured the manufacture of a formulation using Collag's alleged confidential information. Petitioner contends that certain Novartis employees located in Greensboro, North Carolina, have information concerning whether Novartis, in fact, performed said acts.

Petitioner Merck asserts that Novartis refuses to voluntarily provide the information for the litigation pending in the United Kingdom and, therefore, it needs to obtain an order to conduct depositions pursuant to 28 U.S.C. § 1782.

In addition to an order permitting Merck to take discovery, it also requests that the Court require certain practices and procedures, to wit:
    (a) The depositions of the Novartis witnesses will be conducted pursuant to the Federal Rules of Civil Procedure and recorded both by sound-and-visual means and by a United States stenographer;
    (b) Stephen Bennett and Thomas Mitcheson—who are attorneys of record in the UK Litigation and, respectively, a solicitor of the Supreme Court of England and Wales and a member of the bar of England and Wales—or, at Merck's option, Merck's U.S. counsel, will be allowed to depose the witnesses on behalf of Merck;
    (c) Collag's English counsel or, at Collag's option, its U.S. counsel will be allowed to cross-examine the Novartis witnesses on behalf of Collag;
    (d) The parties may depose the witnesses by way of videoconference;
    (e) The form of confidentiality undertaking which is being used in the UK Litigation (Exhibit 3) will apply to the depositions of the Novartis witnesses, unless the parties agree to another form of confidentiality agreement; and
    (f) Unless waived by the parties or Novartis, the Novartis witnesses will be permitted to review their transcripts and make changes pursuant to Fed.R.Civ.P. 30(e).
(Application at 4)

Petitioner Merck states that Novartis does not object

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

197 F.R.D. 267
197 F.R.D. 267
(Cite as: 197 F.R.D. 267)

to the depositions and that Merck has requested that Collag agree to the depositions. It further states that it has provided copies of the Application by U.S. Mail and fax to Collag's counsel and to Novartis' counsel. Petitioner wants to take the depositions on March 7 and 8, 2000, in Winston-Salem, North Carolina. The Application was submitted to the undersigned for review on February 28, 2000. The undersigned instructed the Clerk to hold the matter until the other parties in the United Kingdom action had time to file a response. Thereafter, petitioner Merck submitted a letter dated February 29, 2000 wherein it instructed the Court:

I write to clarify that this is an *ex parte* matter under 28 U.S.C. § 1782 to which there are no other parties, so that there is no one entitled to file a response. In that regard, this Application is much like a request for a subpoena to take discovery in another state in state-court litigation.

The Court was further informed by Merck that, in its view, anyone wishing to contest taking the depositions could only do so by filing a motion to quash the subpoenas after issuance. Counsel then added that both counsel for deponents and opposing counsel in the United Kingdom action were consulted about the Application and expressed no objection.

The Court takes issue with Merck's contention that every application made pursuant to 28 U.S.C. § 1782 is an *ex parte* matter in which no other party or person may participate. The Court further takes issue with **\*270** Merck's suggestion that the Court has little, if any, discretion in ruling on a Section 1782 application. Evidently, counsel expects the Court to sign any order for discovery presented to it which otherwise meets the prerequisites of Section 1782. The Court disagrees with this reading of the statute and the Court's powers and responsibilities.

In pertinent part, Section 1782(a) provides:
The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, .... The order may be made ... upon application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.... The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the

document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

[1][2][3] The Second Circuit has indicated that there are three basic requirements to obtain an order under Section 1782: (1) the person from whom discovery is sought must reside in the district; (2) the discovery must be for use in a proceeding before a foreign tribunal; and (3) the application can be made either by a foreign or international tribunal or "any interested person." *Application of Esses,* 101 F.3d 873, 875 (2d Cir.1996). A proceeding includes any proceeding in which an adjudicated function is being exercised or is imminent. *Lancaster Factoring Co., Ltd. v. Mangone,* 90 F.3d 38 (2d Cir.1996). An interested person includes a party to the foreign litigation, whether directly or indirectly involved. *Id.* (agent of Trustee in foreign bankruptcy proceeding).

[4] Contrary to petitioner Merck's assertion, a finding that a Section 1782 application meets the Second Circuit's three-prong test only satisfies the jurisdictional threshold. It does not circumscribe the Court's authority to regulate the application proceeding before it or the issuance and contents of a discovery order. Case law supports the view that not only does the Court have wide discretion to determine whether to grant discovery, but it possesses equally wide discretion to tailor such discovery to avoid attended problems. *Application of Esses,* 101 F.3d at 876. In ruling on Section 1782 applications, district courts are admonished to keep in mind two important aims--(1) to provide an efficient means of assistance to participants in foreign litigation; and (2) to encourage litigation cooperation with and from foreign countries by providing an example through fair discovery orders and by being sensible to special concerns of foreign countries. *See Application ofEsses,* 101 F.3d at 876.

The Court's duty to exercise such discretion in the granting of Section 1782 applications necessarily covers regulating the application procedure itself. Nothing in Section 1782 states that the application is to be made *ex parte,* much less that the Court *must* entertain the application *ex parte.* Moreover, such a reading would seem to be contrary to the purpose of the statute, which is to help promote evenhanded justice and a sense of fair treatment. To that end, the Court need not confine itself to the assertions set out

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

197 F.R.D. 267
197 F.R.D. 267
(Cite as: 197 F.R.D. 267)

in the application. It necessarily has inherent authority to require that other parties to the foreign litigation be notified of the application and be allowed to present their views to the Court. This is also supported by the provisions of Section 1782 which provide the Court with authority to approve the practice and procedure of the discovery, and by virtue of the fact that in absence of any special practice and procedure, the discovery is governed in accordance with the Federal Rules of Civil Procedure. (Those rules require that opposing parties be notified of discovery requests. *See In re Letters Rogatory from Tokyo District Prosecutor's Office,* 16 F.3d 1016 (9th Cir.1994).)

*Ex parte* Section 1782 discovery orders can result in unfairness. In *In re Letters Rogatory from Tokyo,* the party obtained an *ex parte* Section 1782 order, and did not notify **\*271** the other parties to the litigation, resulting in defective discovery, unfairness, and perhaps, irreparable damage to those other parties.

[5] When the Court approves a Section 1782 discovery application, it has the authority to require that other parties in the foreign litigation be notified of the request in the same fashion as parties to litigation in federal court are entitled to such notice. This arises out of the explicit provision of the statute permitting the Court to order special practices and procedures, and because the Federal Rules of Civil Procedure normally requires the same. Therefore, nothing in Section 1782 prevents the Court in any given case from advancing the process by requiring the notification to take place at an earlier time in order to reduce disruption and conserve judicial resources.

[6] Admittedly, the Court could simply issue an order that an applicant may serve deposition subpoenas on third parties with notice to opposing counsel in the foreign litigation as is proposed in the instant application. However, the Court would be derelict in its duty if it were not assured that the other parties had sufficient notice because of the long distance and short time present in this case. Therefore, in any case where the Court has such doubts or for other reasons, it has authority to simply require notification of other parties in the foreign litigation *prior* to the issuance of an order to a Section 1782(a) applicant for subpoenas.

[7] In the instant case, petitioner Merck wants the Court to issue, *ex parte,* a Section 1782 discovery

order which includes certain special practices and procedures. It claims that the other parties to the action in the United Kingdom do not oppose the application. However, those parties have not made a joint application. Nor does Merck represent that they consent to the application and proposed order. In fact, only yesterday, an attorney, identifying himself as representing an interested party in the United Kingdom action, requested that the Court permit time to file a response to the Section 1782 Application. This situation necessarily puts the Court in an awkward position inasmuch as no formal appearance has been made. Such uncertainties are inherent to *ex parte* proceedings and demonstrate the dangers of last minute Section 1782 *ex parte* discovery applications. It is precisely these situations which cause the Court to look with askance and disfavor at *ex parte* applications.

The purported depositions are scheduled to begin in two business days. There is no assurance that the other party or parties could or should be prepared for depositions in such a short time. Granting an order under such circumstances invites upset, chaos, and ill-will. Nor is there any indication that because of some exigent circumstance discovery will be lost without an immediate Section 1782 order. Consequently, in this case, the Court elects to set a formal time for response to the Section 1782 application.

**IT IS THEREFORE ORDERED** that the Application by Merck & Co., Inc. pursuant to 28 U.S.C. § 1782 to issue two subpoenas *duces tecum* for Dr. Peter Schmidt and Mr. Robert Brown is stayed pending petitioner's notification of all interested parties in the United Kingdom litigation of the Application and this Order and of their right to file a formal response, if any, in this Court on or before March 9, 2000. Petitioner Merck shall also immediately submit an amendment to its application resetting the time for the depositions to a later date. Merck shall provide notice and copies of this order to the other parties in the United Kingdom action by telephone and fax, as well as by normal service procedures.

*AMENDED MARCH 27, 2000 ORDER*
On March 3, 2000, this Court entered an order staying the Application by Merck & Co., Inc. ("Merck") for the issuance of two subpoenas pursuant to 28 U.S.C. § 1782. The subpoenas were sought for depositions to be used in a foreign action involving

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

197 F.R.D. 267
197 F.R.D. 267
(Cite as: 197 F.R.D. 267)

Collag Corp., Collag Ltd. (collectively, "Collag") and Merck. The stay was entered to allow other interested parties an opportunity to file a formal response. The Court received two responses.

Collag filed a response and supplemented it with the affidavit of its United Kingdom ("UK") solicitor, Alan Johnson. It does not *272 oppose the depositions of Dr. Schmidt and Mr. Brown under the Federal Rules of Civil Procedure, but requests that the procedures be altered by order of this Court to mimic as closely as possible those which would govern if the witnesses were giving evidence in a UK court. It points out that Section 1782(a) provides that in ordering discovery, "[t]he order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country."

In that regard, Collag points out that UK litigation procedure utilizes a summarization of witness statements, which represent evidence and obviate the need for lengthy direct examination in the UK court. Documents referred to in the witness summaries must be annexed. Collag requests that this procedure be imposed on Merck's deposition application and that prior to the depositions, Merck give full witness summaries in accordance with Rule 32.9 of the UK Civil Procedure Rules. Collag further requests the imposition of Rule 31.17 of the UK Civil Procedure Rules requiring document production from non-parties and/or the UK subpoena *ad testificandum* procedure whereby documents can also be obtained. Collag sets out a list of documents it would like this Court to order Novartis Crop Protection AG ("Novartis") to produce prior to the depositions, as a condition precedent to Merck's application being granted. [FN1]

> FN1. After the filing of this Order on March 17, 2000, Novartis Crop Protection, Inc. filed a motion indicating that it is a Delaware corporation headquartered in Greensboro, North Carolina, and is wholly owned by Novartis Finance Corporation, a New York corporation. It claims Novartis Crop Protection AG is a Swiss corporation which allegedly does not do business in the United States and has no ownership interest, direct or indirect, in Novartis Crop Protection, Inc. Rather, Novartis AG is the ultimate parent holding company of the Novartis Group, including Novartis Crop

Protection, Inc. and Novartis Crop Protection AG.

The role of these parties with respect to the UK litigation is not entirely clear, but this matter need not be ultimately resolved by the Court. It is clear that Dr. Schmidt and Mr. Brown are employees of at least Novartis Crop Protection, Inc. and that Merck intends to take their depositions as individuals, as opposed to Rule 30(b)(6) depositions of their employer. Likewise, with respect to the Court's decision that both Merck and Collag may obtain documents from Novartis, the Court directed that those documents be obtained pursuant to Fed.R.Civ.P. 45. This will require the parties to name a specific corporation. Both Merck and Collag are forewarned concerning the issues now raised by Novartis Crop Protection, Inc. to the effect that it has no connection with their controversy and Merck and Collag may wish to make additional inquiries before issuing any subpoenas.

With respect to the procedure for conducting the depositions, Collag requests that the UK practice be used whereby cross-examination is not limited to matters raised during the direct examination, that the direct examination of both witnesses by Merck take place followed by the cross-examination by Collag, and that there be a one day time gap between direct examination and cross-examination. Collag wants its UK counsel to be permitted to conduct the cross-examination. It does not object to both sound and video recording, nor to video conferencing of the depositions between the United States ("U.S.") and the UK, but requests that Merck pay the cost of any video conferencing. Last, Collag suggests that the confidentiality undertaking entered in the UK litigation be used for the depositions and also that Novartis be required to sign a confidentiality undertaking if it is shown confidential Collag documents.

Novartis, the employer of the two witnesses, also filed a response. It does not object, in principle, to the depositions of its two employees, Dr. Peter Schmidt and Mr. Robert Brown, but does object to several of the conditions sought to be imposed by Collag pursuant to Section 1782. Novartis' position is as follows, it: (1) requests that the Federal Rules of Civil Procedure be used and not the United Kingdom

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

197 F.R.D. 267
197 F.R.D. 267
(Cite as: 197 F.R.D. 267)

("UK") Civil Procedure Rules because Novartis does not have UK counsel; (2) does not oppose both sound and video recording of the depositions; (3) does not object that UK evidentiary rules apply to the proceedings; (4) requests only one counsel per side conduct the examination and cross-examination of each witness; (5) does not object to Collag's request that direct examination of both witnesses take place before the cross-examination; (6) does not oppose *273 video conference depositions; (7) agrees that there be a confidentiality order with respect to the depositions, but does not want to be shown confidential documents by Collag if it is required to sign a confidentiality restriction putting it at risk should it inadvertently make disclosures or make use of Collag's confidential information; and (8) agrees to produce documents which Collag seeks, but requests thirty days to produce them and desires protection if the production would be burdensome.

Merck, pursuant to the Court's direction, filed an Amended Application for discovery under 28 U.S.C. § 1782(a), and also replies to the responses of Collag and Novartis. The matter is ready for ruling.

### Discussion

Before resolving the dispute, the Court notes several general principles which will guide the decision. In rendering assistance to foreign litigation litigants, a U.S. court walks the line between assisting the foreign litigation without offending the foreign tribunal. In a case such as the instant one, where only private party litigants appear before this Court, the Court may have to exercise more caution to avoid affronting a foreign tribunal than if the discovery requests came from a government or the foreign tribunal itself. John Deere Ltd. v. Sperry Corp., 754 F.2d 132, 136 (3d Cir.1985).

[8][9] In general, as a means of balancing the purported needs of the parties for discovery against the desire to avoid decisions offensive to a foreign tribunal, the courts have developed a number of factors for guiding the decision. First, the court may require the applicant to make a threshold showing that the discovery information would be discoverable in the foreign jurisdiction. This normally does not require the court to determine whether the evidence will be admissible. In re Application of Asta Medica, S.A. 981 F.2d 1, 6 (1st Cir.1992); Lo Ka Chun v. Lo To, 858 F.2d 1564 (11th Cir.1988). The applicant has the burden of making this showing of discoverability. In re Application of Asta Medica, S.A. 981 F.2d at 7.

However, this does not mean that a U.S. court must make an extensive examination of foreign law or pretend to be an expert. Euromepa S.A. v. R. Esmerian, Inc., 51 F.3d 1095, 1099 (2d Cir.1995). Rather, the court must keep in mind that the court's best guide may be to strive to achieve a basic sense of fairness and due process by utilizing its power to impose conditions on the discovery, and remembering that the foreign tribunal also can protect itself. Id. at 1101-02. For example, the U.S. court has an interest in making sure that one party to a foreign litigation is not using Section 1782(a) to gain an unfair advantage by conducting discovery of a U.S. party to the foreign litigation under Section 1782 and the liberal discovery procedures of the U.S. In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the High Court of Justice, Chancery Division, England, 147 F.R.D.223 (C.D.Cal.1993).

In the instant case, the Court's task is relatively easy because the parties do not dispute that the information may be discoverable in some fashion in the UK litigation. And, because the information is sought from a non-party, it is not a situation where one party is attempting to obtain an unfair advantage over another party.

Utilizing the above principles, the Court will resolve the issues in the following manner. Because of greater familiarity with its own rules and procedures, the Court will first utilize them in order to be better able to provide even-handed enforcement than if it were trying to enforce unfamiliar foreign procedures. However, the Court will make accommodations to the special concerns of the foreign litigation--to the extent deemed practical and advisable. For example, it will order that certain foreign procedures be utilized, but leave ultimate enforcement to the foreign tribunal. The Court must also balance the interest of the non-party and any difficulty it may have in accommodating unfamiliar or burdensome foreign procedure.

First, Merck expresses concern as to some of the special UK practices proposed by Collag. Merck indicates that it will provide witness summaries, to the extent that it can, without further court order. However, Merck requests that compulsion of witness *274 summaries not be part of this Court's order because of the difficulty this Court would have in policing such a condition due to this Court's unfamiliarity with UK practice. It argues that a UK

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

197 F.R.D. 267
197 F.R.D. 267
(Cite as: 197 F.R.D. 267)

court necessarily will examine the summaries to determine whether they comport with UK law and that this Court should not become embroiled in such a controversy. The Court agrees with Merck's arguments. It will, however, direct that prior to the depositions, Merck provide Collag with witness summaries pursuant to UK law, if such would be required. But, this Court will not enforce further Merck's compliance with that part of the order and will leave such to the UK court should it deem it appropriate. This appears to be a workable compromise that satisfies the needs of the foreign litigation without improperly or impractically injecting this Court into that litigation.

Next, Merck does not object to Collag's request that there be a direct examination of both witnesses and then a one day gap between cross-examination. However, it points out that under UK law, in instances where there is an unwilling witness, said witness is brought before the Court with documents and cross-examination begins immediately after direct examination. Therefore, a gap between examinations is not an absolute under UK law. Merck is also concerned that time constraints, especially those of the non-party witnesses, might not permit a one day gap.

While Section 1782(a) does permit the Court to impose foreign procedures on discovery under that section, the balancing factors are expanded when a non-party is involved. The Court must take into account the burden to the non-party of imposing the foreign procedure on it. The Court concludes that the parties shall follow UK procedure to the extent possible, but because of concern for the Novartis employees' schedules, it may not be possible to give a one day gap between the direct and cross-examination. Therefore, the Court will not order that the break between examinations must be at least one day, but will grant a minimum period of four hours.

With respect to the documents requested by Collag, Merck notes that it has no control over Novartis' production, but does have a concern that Collag's request might interfere with the depositions if the request is too burdensome. The Court rejects Collag's proposal that Merck be required to alter its Fed.R.Civ.P. 45 subpoena to accommodate Collag's document requests even if that would be the procedure in the UK. Such procedure is unfamiliar to this Court and the Rule 45 subpoena process, and would make enforcement problematical and difficult.

Under U.S. procedure, the request unnecessarily interjects Merck into a possible discovery dispute between Collag and Novartis. Collag would be dependent on Merck to enforce the subpoena in the face of any unwillingness by Novartis. The possibility of confusion and accusation is all but certain.

To obviate this possibility, the Court will direct Collag to serve a Rule 45 subpoena *duces tecum,* of its own, on Novartis for the pre-deposition delivery of the documents. This removes, at least initially, both the Court and Merck from endorsing Collag's requests for documents, and is desirable since neither have firm knowledge of the reasonableness of the requests. This procedure also eliminates any controversy between Merck and Collag as to when the documents should be produced. Now Collag can require the documents be produced at any reasonable time prior to the depositions. Moreover, it ensures that Collag will be responsible for the cost of production. This will help ensure that the document request will be reasonable. To the extent Collag may argue that Merck would be responsible for such costs in the UK, the Court directs Collag to make such application to the UK court.

Both Collag and Novartis want the Court to set a deposition date most convenient to them. Merck's position is that it wants to make sure that the depositions take place sufficiently in advance of the June 19, 2000 trial date in England so that it has time to prepare for the trial. The Court notes that Novartis would suggest the following days for the depositions, April 4 and 5, May 2, 3, 5, and 8, and May 24 and 25, 2000. Collag requests that the Court not schedule the *275 depositions before May 16, 2000 because of conflicting trial obligations of its UK counsel, James St. Ville.

The Court first requires all three parties to try and work out a compromise for the deposition dates. For example, if Novartis will produce all the documents sufficiently ahead of time for depositions in April or May, then perhaps Collag and Merck will make necessary accommodations. If Novartis needs more time to produce documents, then the depositions may have to occur later. [FN2]

> FN2. The Court notes that Novartis is not a completely uninvolved non-party. It allegedly was given Collag's secret information by Merck and has utilized the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

197 F.R.D. 267
197 F.R.D. 267
(Cite as: 197 F.R.D. 267)

same. Thus, the Court will not hesitate to demand that Novartis undergo some burden in submitting to the depositions.

Next, Merck and Novartis are especially concerned that Novartis not be required to submit to a confidentiality undertaking with respect to Collag documents unless Novartis agrees to do so. Merck points out that it knows of no authority which would require a non-party to review confidential documents under a confidentiality agreement, because this clearly puts an extra burden on the non-party which it otherwise would not have. The Court agrees and will not order that Novartis be required to review either Merck's or Collag's confidential documents under a confidentiality order.

In exception to Rule 30(e), and in conformance with UK procedure, Collag wants any changes in deposition testimony to be limited to errors in transcription. The Court disallows the request, but will make a slight accommodation, as set out below, to preserve the issue for the UK court. Unless stated otherwise, the depositions shall be conducted pursuant to the Federal Rules of Civil Procedure and this Court's Local Rules.

**IT IS THEREFORE ORDERED** that, pursuant to 28 U.S.C. § 1782(a), the Application of Merck & Co., Inc. to take the depositions of Novartis Crop Protection AG employees Dr. Peter Schmidt and Mr. Robert Brown in an action pending in the High Court of Justice, Chancery Division, Patents Court, entitled, *Collag Corp. and Collag, Ltd. v. Merck & Co., Inc.,* CH 1998 C No. 3129, is granted and the Court prescribes the following practice and procedure which will apply to said depositions.

(1) The depositions shall be conducted in accordance with the Federal Rules of Civil Procedure, except that in accordance with UK procedure, Merck shall give witness summaries, to the extent possible, of the witness' testimony to Collag in appropriate time prior to the depositions. The depositions shall proceed with the direct examination of both witnesses to occur and then the cross-examination. There shall be a gap of not less than four hours between the direct examination and cross-examination. The scope of cross-examination is not limited by the subject of the direct examination. In addition to stenographic deposition, a video deposition may be taken. Any party selecting video conference deposition pays for that cost, except if both parties elect video conference

depositions, they shall cooperate to reduce costs and share the cost of a video conference deposition.

(2) Both Merck and Collag may obtain documents from Novartis. The documents shall be obtained in accordance with Fed.R.Civ.P. 45. Should Collag wish documents, it is responsible for timely and promptly issuing its own Rule 45 subpoena *duces tecum* for pre-deposition production of documents.

(3) Only one attorney for each side may conduct the deposition of each witness. The permitted examining attorneys include both the U.S. and UK counsel for both Merck and Collag.

(4) The form of the confidentiality undertaking in the UK litigation shall apply to the depositions of the Novartis witnesses, unless the parties to the UK litigation and Novartis agree to another form of confidentiality agreement. Novartis and its witnesses are not required to sign any confidentiality undertaking.

(5) The witnesses are permitted to review their transcripts and make changes pursuant to Fed.R.Civ.P. 30(e), but shall note if the changes result from an error in transcription, and the Court specifically leaves to the UK *276 court whether any other changes will be recognized.

(6) The Court sets a tentative deposition time during the month of May 2000, unless the parties otherwise agree. Counsel for all interested parties are directed to immediately confer and agree on a date within twenty days of the date of this Order, and failing to come to agreement, shall submit their positions to the Court for its decision.

197 F.R.D. 267

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# EXHBIT 3



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 937486 (S.D.N.Y.)
**(Cite as: 2005 WL 937486 (S.D.N.Y.))**

Page 1

**C**  Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re APPLICATION OF GRUPO QUMMA, S.A. de
C.V., Fernandez Editores, S.A. de
C.V., and Inmobiliaria Juan Cromberger, S.A. de
C.V. for Judicial Assistance
Pursuant to 28 U.S.C. § 1782.
**No. M 8-85.**

April 22, 2005.
Patterson, Belknap, Webb & Tayler LLP, By:
Stephen P. Younger, Rosa E. Son, New York, New
York, for Applicants.

Loeb & Loeb LLP, By: David B. Eizenman, New
York, New York, for Respondents.

*MEMORANDUM DECISION*

CHIN, J.

**\*1** This is an application by Grupo Qumma, S.A. de
C.V., Fernandez Editores, S.A. de C.V., and
Inmobiliaria Juan Cromberger, S.A. de C.V.
(collectively, "Qumma") for an order of judicial
assistance pursuant to 28 U.S.C. § 1782. Qumma
seeks discovery from certain individuals and entities
who reside or may be found in this District for use in
foreign litigation pending in the Eighteenth Civil
Court of Mexico City, captioned *CIPA Investments,
S.A. v. Grupo Qumma, S .A. et .al.* The individuals
and entities, who are affiliated with Deutsche Bank,
oppose the application.

*DISCUSSION*
A. *Applicable Law*

Qumma's request is brought pursuant to 28 U.S.C. §
1782, which provides in pertinent part:
  The district court of the district in which a person
  resides or is found may order him to give his
  testimony or statement or to produce a document or

other thing for use in a proceeding in a foreign or
international tribunal.... The order may be made
pursuant to a letter rogatory issued, or request
made, by a foreign or international tribunal or upon
the application of any interested person and may
direct that the testimony or statement be given, or
the document or other thing be produced, before a
person appointed by the court....
28 U.S.C. § 1782(a).

A request for discovery under § 1782 presents two
inquiries: first, whether the district court is authorized
to grant the request; and second, if so, whether the
district court should exercise its discretion to do so.
See *Schmitz v. Bernstein Liebhard & Lifshitz, LLP,*
376 F.3d 79, 83-84 (2d Cir.2004); *see also Intel Corp.
v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 124
S.Ct. 2466, 2482 (2004) ("a district court is not
required to grant a § 1782(a) discovery application
simply because it has the authority to do so").

As to the first inquiry, whether a district court is
authorized to grant a request, the courts have applied
a three-part test: (1) the person from whom discovery
is sought resides or is found in the district; (2) the
discovery is "for use" in a proceeding before a
foreign or international tribunal, and (3) the
application is made by a foreign or international
tribunal or "any interested person." 28 U.S.C. §
1782(a); see *Schmitz,* 376 F.3d at 83.

In *Intel,* the Supreme Court clarified that the foreign
proceeding need not be "pending" or even
"imminent"; rather, it need only be "within
reasonable contemplation." 124 S.Ct. at 2480. In
addition, there is no requirement that the requested
materials be discoverable in the foreign proceeding; a
district court is not barred from granting relief under
§ 1782 merely because the requesting party would
not be able to obtain the discovery in the foreign
jurisdiction. *Id.* at 2480-81.

As to the second inquiry, whether the district court
should grant the request when it has the authority to
do so, a number of considerations come into play. In
*Intel,* the Supreme Court identified several: (1)
whether the person from whom discovery is sought
is a participant in the foreign proceeding, in which case

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHIBIT 3

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 937486 (S.D.N.Y.)
**(Cite as: 2005 WL 937486 (S.D.N.Y.))**

"the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad"; (2) "the nature of the foreign tribunal, the character of the proceeding underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) whether the § 1782(a) request conceals an effort to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the discovery requests are "unduly intrusive or burdensome." 124 S.Ct. at 2483. In addition, a district court considering an application under § 1782 must keep in mind "the twin aims of the statute: 'providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." ' *Schmitz*, 376 F.3d at 84 (quoting *In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir.1997) (quoting *In re Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir.1992))).

**\*2** Hence, although the discoverability of the requested evidence in the foreign jurisdiction is not a prerequisite to the granting of a § 1782 request, it is a relevant consideration as a district court decides how to exercise its discretion. *See Schmitz*, 376 F.3d at 84 ("a court may look to the nature, attitude and procedures of [the foreign] jurisdiction as 'useful tool[s]' to inform its discretion.") (quoting *In re Metallgesellschaft*, 121 F.3d at 79-80).

### B. *Application*

#### 1. *Is the Court Authorized to Grant the Request?*

As to the first inquiry, whether this Court is authorized to grant Qumma's request, there is no dispute as to the first and third elements. Respondents reside or are found in this District and Qumma is an "interested person"--it is a participant in the Mexican proceedings. As to the second element, it is undisputed that there is a foreign proceeding--the litigation in the Mexican court--but the parties sharply disagree as to whether the requested discovery is "for use" in that foreign proceeding. Respondents argue that the Mexican court has ruled that no further evidence will be permitted and that therefore the requested discovery cannot be "for use" in that proceeding. Qumma offers a different interpretation of the Mexican court's rulings and contends that there are procedures under Mexican

law by which it can seek to offer additional evidence. [FN1]

> FN1. Although *Intel* considered whether discoverability--as opposed to admissibility--of the evidence in the foreign proceeding was a requirement to relief under § 1782, *see* 124 S.Ct. at 2480, the parties have not argued in this case that this is a distinction of substance.

Respondents' argument is rejected, at least at this step of the analysis. I conclude that I have the authority to grant the request. Qumma will use the requested discovery in the Mexican proceeding, as it will present the evidence to the Mexican court with a request that the evidence be considered. I do not believe that the "for use" requirement is limited to the actual receipt of materials into evidence in the foreign proceeding. It is sufficient that the evidence will be offered by Qumma; that constitutes "for use."

#### 2. *Should the Court Grant the Request?*

The more difficult question is whether the Court should exercise its discretion to grant Qumma's request. Here, the admissibility of the evidence in the Mexican proceedings is a relevant consideration, for, as *Intel* and *Schmitz* make clear, this Court should take into account the "receptivity" of the foreign court to U.S. federal-court assistance and the "nature, attitude and procedures" of the foreign jurisdiction.

Both sides submit multiple affidavits from purported experts on Mexican law as well as copies of numerous orders and decisions issued by the Mexican court in Spanish and translated into English. There are significant disagreements over Mexican law and procedure, the meaning of the orders and decisions, and the accuracy of at least some of the English translations. In particular, respondents argue that a March 18, 2005 order of the Mexican court precludes further evidence by providing "that the evidence period to proffer evidence in this current proceedings expired and that the sole and exclusive missing evidence to be preferred is the foreign testimonial [limited to two depositions on written questions]." (Sepulveda Supp. Decl. ¶¶ 5, 6, 7 & Ex. 2). On the other hand, Qumma submits an affidavit of its own expert in Mexican law who has reviewed the Mexican orders and opines that "the Mexican Court has not ruled that the discovery sought in this

Not Reported in F.Supp.2d                            Page 3
Not Reported in F.Supp.2d, 2005 WL 937486 (S.D.N.Y.)
(Cite as: 2005 WL 937486 (S.D.N.Y.))

proceeding is unable to be used in the Mexican litigation." (Gaxiola Supp. Decl. ¶ 3). The Qumma expert argues that Qumma is continuing to make efforts in the Mexican proceedings to obtain a ruling that it is not precluded from offering additional evidence. (*Id.* ¶¶ 16, 17).

*3 The competing affidavits offered by the parties are contradictory and are difficult to understand. The orders and decisions of the Mexican court, at least as translated, are far from clear. It is precisely this kind of an inquiry that the Second Circuit has sought to discourage district courts from conducting in considering § 1782 applications. As the Second Circuit has observed:

> The record reveals that this litigation became a battle-by-affidavit of international legal experts, and resulted in the district court's admittedly "superficial" ruling on [foreign] law.... We think that it is unwise--as well as in tension with the aims of section 1782--for district judges to try to glean the accepted practices and attitudes of other nations from what are likely to be conflicting and, perhaps, biased interpretations of foreign law ..... [W]e do not read the statute to condone speculative forays into legal territories unfamiliar to federal judges. Such a costly, time-consuming, and inherently unreliable method of deciding section 1782 requests cannot possibly promote the "twin aims" of the statute.

*In re Euromepa S.A., 51 F.3d 1095, 1099-100 (2d Cir.1995)* ("*Euromepa I*").

In light of these observations and the considerations discussed above, I conclude that Qumma's application should be granted.

First, discovery is being sought from individuals and entities who are not participants in the Mexican litigation. This consideration weighs in favor of granting the request.

Second, I have simply not been persuaded that the requested evidence would be inadmissible in the Mexican litigation. Without a more searching inquiry and an evidentiary hearing with witnesses, I would be relegated to making a "superficial ruling" on Mexican law and the meaning of the various Mexican orders and decrees. The Mexican court, rather than this Court, should decide whether the additional evidence is admissible, and it will be in a better position to do so if Qumma is permitted to conduct the requested discovery first. If the § 1782 application were to be

denied, Qumma would be deprived of any opportunity even to try to offer the evidence. I cannot say that I have been presented with "authoritative proof" that the Mexican court would reject the additional evidence. *Euromepa I, 51 F.3d at 1100.*

Third, even assuming I were to agree with respondents that the Mexican court has held that no additional evidence is admissible, Qumma would still have a fair argument that it should be given the opportunity ask the Mexican court to reconsider. Qumma would still use the evidence to try to persuade the Mexican court to change its ruling and accept the evidence as "supervening" evidence.

Fourth, I do not believe, and respondents have not argued, that Qumma is proceeding in bad faith. It appears that Qumma is seeking this discovery because it has a good faith basis for believing that it will be able to use the evidence in the Mexican proceedings. There is no indication of any ulterior motive on its part for seeking this discovery.

*4 Fifth, as for the nature of the foreign tribunal and the character of the foreign proceedings, the case is a commercial case between private parties in a civil court in Mexico. There will be no interference with criminal or governmental proceedings. Deutsche Bank's predecessor invested more than $13 million in Qumma, and sophisticated parties and substantial sums of money are involved. In light of these circumstances, Qumma's desire to seek discovery is reasonable.

Finally, I believe the "twin aims" of § 1782 would best be served by granting the request. Section 1782's "underlying policy should generally prompt district courts to provide some form of discovery assistance." *Euromepa I, 51 F.3d at 1102.* This is not a case like *Schmitz,* where the German government had made plain its "unreceptive[ness]" to judicial assistance from an American court, *376 F.3d at 84,* or *Euromepa,* where the foreign proceeding was on appeal to the French Supreme Court, which does not take and hear evidence. *In re Euromepa, S.A., 154 F.3d 24, 29 (2d Cir.1998).* Rather, the case here is ongoing before a foreign trial court that has the discretion to receive the additional evidence. Even assuming the Mexican court has indeed ruled in the manner suggested by respondents, I do not believe it would be offended by an application by Qumma for reconsideration and the offer of additional evidence. Of course, the Mexican court is free to deny the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 937486 (S.D.N.Y.)
**(Cite as: 2005 WL 937486 (S.D.N.Y.))**

Page 4

application.

### CONCLUSION

Qumma's application for discovery pursuant to 28 U.S.C. § 1782 is granted. Respondents' alternative request that discovery be limited to depositions on written questions is denied.

SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 937486 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

EXHBIT 4

# Asking for Help: Judicial Assistance in Foreign Discovery under 28 U.S.C. § 1782

## By J. Russell B. Pate

28 U.S.C. § 1782 allows foreign tribunals and attorneys to request discovery in the United States in order to assist their foreign action. The United States Congress intended 28 U.S.C. § 1782 to expose other countries to U.S.-style discovery in the hope that foreign countries would in return reciprocate by changing their procedural laws to provide similar assistance to U.S. courts.

## 1.    Statutory text of 28 U.S.C. 1782(a).

The text of 28 U.S.C. § 1782(a) (2005) *Assistance to foreign and international tribunals and to litigants before such tribunals:*

(a) The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the *Federal Rules of Civil Procedure.*

A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege.

## 2.    Scope of Discovery under 28 U.S.C. § 1782?

In the past fours years, courts have continued to broaden the scope of discovery under 28 U.S.C. § 1782 discovery. The court in *Intel Corp. v. Advanced Micro Devices, Inc.* described, "§ 1782(a)'s objective [is] to assist foreign tribunals in obtaining relevant information that the tribunals may find useful."[1] Relevant discovery is defined by the Federal Rule of Civil Procedure 26(b)(1) as information that "appears reasonably calculated to lead to the discovery of admissible evidence." In *In Re Application of Nicholas T.C. Hill,* the court noticed that "the section has become amenable to increasingly broad applicability [and] the Supreme Court has noted that a broad range of discovery under § 1782 is available in civil investigations."[2]

In *In Re Time,* the U.S. District Court for the Eastern District of Louisiana looked to Rule 26 of the Federal Rules of Civil Procedure to evaluate the scope of discovery under § 1782. The court noted, "The qualitative scope of discovery under Rule 26 is broad. It includes 'any matter, not privileged, which is relevant to the subject matter involved in the pending action.'"[3] The privilege exemption in § 1782(a) supersedes the scope of Rule 26, applying privileges afforded under the rules of the foreign tribunal as well all applicable Constitutional, statutory, and common law privileges in the United States. In addition, applicable treaties between the tribunal host country and the United States might supersede, modify, or void § 1782,

---

[1] *Intel Corp. v. Advanced Micro Devices, Inc.,* 542 U.S. 241, 259 (2004).

[2] *In re Application of Nicholas T.C. Hill, et al.,* Misc. No. M19-117 (RJH), 2005 U.S. Dist. LEXIS 10838 at *5,*14 (S.D.N.Y. June 3, 2005).

[3] *In re Time,* Misc. Action No. 99-2916 Section "C," 1999 U.S. Dist. LEXIS 15858 at *20 (E.D.LA. Oct. 6, 1999).

EXHIBIT 4

depending on how each country treats and enforces treaties as law.[4]

### a. Application of 28 U.S.C. § 1782 to Arbitration Agreements.

Due to a host of public policy reasons— for example, arbitral expediency, the fact that non-parties are not bound to the arbitral contract and arbitral injunctions or procedural orders are not fully enforceable—federal courts have refused to grant § 1782 discovery requests. In *NBC v. Bear Stearns,* the U.S. Court of Appeals for the Second Circuit looked at the legislative history to determine the meaning of § 1782. The court found, "The absence of any references to private dispute resolution proceedings such as arbitration strongly suggest that Congress did not consider them in drafting the statute."[5] In the *Republic of Kazakhstan,* the U.S. Court of Appeals for the Fifth Circuit commented, "Empowering arbitrators or...the parties in private international disputes to seek ancillary discovery through the federal courts does not benefit the arbitration process. Arbitration is intended as a speedy, economical, and effective means of dispute resolution. Arbitration's principal advantages may be destroyed if the parties succumb to fighting over burdensome discovery requests."[6]

### 3. Discovery Under 28 U.S.C. § 1782 Must Be Within a "Reasonable Contemplation of Time."

Discovery under 28 U.S.C. § 1782 can be made under a very generous time guideline. It is not necessary to wait on the commencement of the foreign proceeding[7] and no permission from the foreign tribunal is needed before seeking U.S. discovery assistance.[8] In *Intel,* the Supreme Court clarified that foreign proceedings need not be pending or even imminent, but rather only be within reasonable contemplation.[9] The Southern District of New York rejected the argument that it was necessary to wait for the "evidentiary stage" of the foreign proceeding before § 1782 discovery could be exercised: "...in some instances a court may choose to deny an application or stay proceedings until a foreign tribunal has ruled on petitioner's § 1782 discovery request; but this court is not required to do so."[10]

### 4. Three Prima Facie Requirements for Authorization of § 1782 Discovery.

*Is the person, from whom discovery is sought, found in the district?*

If a person is found temporarily in the district while visiting for reasons having nothing to do with the foreign dispute, that person may be served with a subpoena under the traditional principals of personal or "tag" jurisdiction: "It is consistent construction to endow the phrase 'or is found' in § 1782 with the same breadth as that accorded it in *Burnham*[11] which found jurisdiction based on physical presence alone does constitute due process."[12] Under the 1947 Dictionary Act, 1 U.S.C. § 1, the statutory word

---

[4] *In re Request from Canada,* No. 1:00MC00118, 2001 U.S. Dist. LEXIS 12070 at *4 (M.D.N.C. July 30, 2001) (where "mandatory nature of the Treaty preempts the broad discretion granted under the statute [28 USCS §1782]"); *In re Commissioner's Subpoenas,* 325 F.3d 1287, 1299 (2003)(where MLAT provides broader authority than 28 USC § 1782 to issue subpoenas).
[5] *National Broadcasting Co., Inc v. Bear Stearns & Co., Inc.,* 165 F.3d 184, 189 (2nd Cir. 1999).
[6] *Application of The Republic of Kazakhstan v. Biedermann Int'l,* 168 F.3d 880, 883 (5th Cir. 1999).

[7] *In re Application of Servicio Pan Americano,* 354 F. Supp.2d 269, 273, (S.D.N.Y. 2004).
[8] *Intel Corporation v. Advanced Micro Devices, Inc.,* 542 U.S. 241 (2004).
[9] *In re Application of Grupo Qumma, S.A. de C.V.,* M 8-85, 2005 U.S. Dist. LEXIS 6898 at *5 (S.D.N.Y. April 21, 2005).
[10] *In re Application of Servicio Pan Americano,* 354 F. Supp.2d at 275.
[11] *Burnham v. Superior Court of California,* 495 U.S. 604, 645 (1990) ("The short of the matter is that jurisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system that define the due process standard of traditional notions of fair play and substantial justice").
[12] *In re Application of Grabski Inwestycje Finansowe,* M19-117, 2004 U.S. Dist LEXIS 10062 at *2 (S.D.N.Y. June 2, 2004).

Texas Transnational Law Quarterly – December 2005

"person" includes corporations, companies, associations, firms, partnerships, societies, joint stock companies, and individuals.

U.S. Courts have a longstanding presumption that a sovereign government is not a "person," absent some affirmative statutory evidence of inclusionary intent.[13] In *Al Fayed v. CIA*, the U.S. Circuit Court of Appeals for the District of Columbia identified a number of grounds that may overcome the presumption: "Our conventional reading of 'person' may therefore be disregarded if the purpose, subject matter, the context, the legislative history, or the executive interpretation of the statute...indicate an intent by the use of the term, to bring state or nation within the scope of law."[14] Yet, after Al Fayed's showing to compel compliance, the court held that the affirmative evidence was not sufficient enough to disturb the presumption of sovereign exclusion.

*Is the discovery "for use" in a proceeding before a foreign or international tribunal?*

The proceeding must exercise an adjudicatory function in order for the discovery to be classified as "for use."[15] The Southern District of New York found the "for use" requirement satisfied merely by the assertion that the petitioner would offer the evidence for admission before the foreign tribunal.[16] Generally, "for use" evidence must not be collected in order to prove a claim exists, but rather collected to support an existing claim.[17]

*Is the application made by a foreign or international tribunal or any interested person?*

A "tribunal" under §1782 standards must be impartial, without an interest in the outcome, and capable of producing an adjudicatory ruling. The U.S. Supreme Court in *Intel* found that, "Congress opened the way for judicial assistance in foreign administrative and quasi-judicial proceedings."[18] However a French bankruptcy proceeding[19] and a Canadian commission of inquiry[20] were not "tribunals" because of a lack of adjudicative power. An inter-institutional interest in a particular result or ruling is also a disqualification of "tribunal" status. The U.S. Court of Appeals for the Second Circuit found that a Columbian Superintendent of Exchange Control was not a "tribunal" because the inherent concept of a tribunal required impartial adjudication.[21]

The Supreme Court made clear in *Intel* that an interested person does not have to be a party to the action. The Court concluded that "Section 1782(a) plainly reaches beyond the universe of person designated 'litigant.'" The Court broadened the definition of "any interested person" by including "not only litigants before foreign or international tribunals, but also foreign and international officials as well as any other person whether he be designated by foreign law or international convention or merely possess a reasonable interest in obtaining the assistance."[22]

6.    **Must the Evidence Sought be in the United States?**

---

[13] *United States v. United Mine Workers*, 330 U.S. 258 (1947).
[14] *Fayed v. CIA*, 229 F.3d 272, 274 (D.C. Cir. 2000).
[15] *In re Application of Grabski Inwestycje Finansowe*, M19-117, 2004 U.S. Dist LEXIS 10062 at *3 (S.D.N.Y. June 2, 2004).
[16] *In re Application of Grupo Qumma, S.A. de C.V.*, M 8-85, 2005 U.S. Dist. LEXIS 6898 at *3,*7 (S.D.N.Y. April 21, 2005) ("It is sufficient that the evidence will be offered by [petitioner] Qumma.").
[17] *In re Application of Nicholas T.C. Hill, et al.*, Misc. No. M19-117 (RJH), 2005 U.S. Dist. LEXIS 10838, at *12 (S.D.N.Y. June 3, 2005).

[18] *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 244 (2004).
[19] *In re Application of Nicholas T.C. Hill, et al.*, Misc. No. M19-117 (RJH), 2005 U.S. Dist. LEXIS 10838, at *15 (S.D.N.Y. June 3, 2005).
[20] *In re Letters of Request to Examine Witnesses, etc.*, 59 F.R.D. 625, 627 (D.C. Cal.), *aff'd*, 488 F.2d 511 (9th Cir. 1973).
[21] *Fonseca v. Blumenthal*, 620 F.2d 322, 324 (2nd Cir. 1980).
[22] *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 253-254.

The U.S. Court of Appeals for the Ninth Circuit upheld a magistrate's denial of discovery because he did "not view the purpose of § 1782 as encompassing the discovery of material located in foreign countries."[23] The U.S. Second Circuit has also suggested that discovery was intended to reach only evidence located within the physical boundaries of the United States: "On its face § 1782 does not limit its discovery power to documents located in the United States. In finding such a limitation, the district court relied in part on the Senate report asserting that the amendments providing for documentary discovery under the statute were intended to aid in obtaining oral and documentary evidence in the United States."[24] Courts also cite the principal drafter of the final version of the statute, Professor Hans Smit, in finding that "the purpose of the statute is only to provide evidence from witnesses and documents located in the United States."[25]

In *Kestrel Coal v. Joy Global*, Kestrel Coal brought a suit in the Supreme Court of Queensland against Longwall Roof Supports. Using § 1782, Kestrel sought to retrieve documents located in the U.S., Australia, and the U.K. from Longwall's holding company, Joy Global, whose corporate office is located in Milwaukee, Wisconsin. The U.S. Court of Appeals for the Seventh Circuit precluded the issue of document retrieval from outside the U.S. by refusing to pierce the corporate veil between the Australian subsidiaries and their parent corporation. In its decision, the Seventh Circuit recommended to the plaintiff: "the most sensible recourse is a renewed application to the Australian court...and [if] difficult or impossible to obtain through that court's processes, it would make sense to launch an ancillary proceeding in the United States."[26]

A person, as testimonial evidence, may be treated differently than documents. In *In re Application of Edelman*, the U.S. Court of Appeals for the Second Circuit determined that testimonial discovery could be compelled on a non-party French national who, after being served with a subpoena while in New York City, returned to Paris.[27] The Second Circuit broadly held that a person who lives and works in a foreign country cannot escape a properly served subpoena in the United States simply because the discovery order was issued after the person left the U.S. On remand, the district court was ordered to consider the statutory defense that a non-party cannot be compelled to travel more than 100 miles for a deposition in accordance with Federal Rule of Civil Procedure 45(C)(3)(a)(ii).

7.    **Filing a Motion for Discovery under § 1782.**

A motion to conduct discovery under § 1782 should clearly express how granting the discovery request will further the Congressional twin-aims of the statute. First, the motion should state how the discovery of this information will provide efficient and equitable assistance to a foreign case. Secondly, the motion should explain how the granting of such a discovery request may encourage foreign countries, in the spirit of reciprocity, to provide similar assistance to U.S. courts. U.S. Court of Appeals for the Fourth Circuit affirmed a denial of subpoena concluding that the "application did not make clear how the issuance of the subpoena would serve Congress's twin-aims in enacting and amending § 1782."[28]

If a specific discovery procedure is desired to be followed, the motion to conduct discovery under § 1782 should include a detailed account of the rules and procedure to be followed. If the description of the procedure is ambiguous or incomplete, the statute provides for the default application of the Federal Rules of

[23] *Four Pillars Enterprises Co, Ltd. v. Avery Dennison Corp.*, 308 F.3d 1075, 1080 (9th Cir. 2002).
[24] *In re Application of Sarrio, S.A.*, 119 F.3d 143, 147 (2nd Cir. 1997).
[25] *Norex Petroleum Ltd v. Chubb Insurance Co. of Canada, et al.*, Misc. Action No. 04-0281 (CKK), 2005 U.S. Dist. LEXIS 18821 at *15 (D.D.C. May 23, 2005).
[26] *Kestrel Coal Pty. Ltd. v. Joy Global*, 362 F.3d 401, 406 (7th Cir. 2004).

[27] *In re Application of Asher B. Edelman*, 295 F.3d 171, 179 (2nd Cir. 2002).
[28] *In re Mohamed Al Fayed*, 210 F.3d 421, 424 (4th Cir. 2000).

Civil Procedure. If the discovery request is approved, the statute allows the court to appoint someone to assist in administering oaths, taking testimony and receiving documents.

## 8. *Ex parte* Submission of a § 1782 Request.

Most district courts permit an *ex parte* request. Various circuits courts from the Second,[29] Third,[30] Fourth, Ninth[31] and the D.C. Circuit Court of Appeals[32] have affirmed such *ex parte* requests. The U.S. District Court for the District of D.C. stated in *Norex Petroleum v. Chubb Insurance of Canada* that, "Prior notice of the issuance of a subpoena is not required by the Federal Rules, nor prejudicial to [non-movant]."[33] However, the U.S. court in the Middle District of North Carolina refused an *ex parte* request saying, "...nothing in § 1782 states that the application is to be made *ex parte*, much less that the court must entertain the application *ex parte*. Moreover, such a reading would seem to be contrary to the purpose of the statute, which is to help promote evenhanded justice and a sense of fair treatment. This court necessarily has inherent authority to require that other parties to the foreign litigation be notified of the application and be allowed to present their views to the court."[34]

## 9. Denial or Modification of a § 1782 Discovery Request.

Even if the three facie requirements are met, the granting of a § 1782 discovery request is not mandatory. The Supreme Court has cautioned, "The statute authorizes, but does not require a federal district court to provide

assistance."[35] The U.S. Court of Appeals for the Third Circuit found, "The permissive language of § 1782 vests district courts with discretion to grant, limit, or deny discovery... to that end, a district court may refuse to grant a discovery request, or may impose various conditions and protective orders attendant to the production of the requested documents."[36] In tailoring discovery, courts will look to the twin-aims of the statute. Courts may use their discretion to deny a discovery request "that will create obvious confusion or skew the results in the foreign litigation,"[37] contradicting the overarching intent of § 1782 to "provide equitable and efficacious procedures for the benefit of tribunals and litigants."[38] Judicial efficaciousness includes minimizing unfair advantages against opposing parties and preventing attempts to circumvent domestic or foreign procedural interests. For example, to solve a parity problem, the court in *In re Application of the Procter & Gamble Co.* suggested it could modify discovery to contain a confidentiality agreement retained under U.S. jurisdiction to ensure enforceability between the parties.[39]

Courts have a preference to grant discovery, tailoring the request if feasible and needed, before categorically denying the request. The U.S. Court of Appeals for the Second Circuit believes that, "It is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright."[40]

## 10. The Four-Part Discretion/Modification Test.

[29] *National Broadcasting Co., Inc. v. Bear Stearns & Co.*, 165 F.3d 184 (2nd Cir. 1999).
[30] *John Deere Ltd. and Deere Co. v. Sperry Corp.*, 754 F.2d 132 (3rd Cir. 1985).
[31] *In re Letters Rogatory from Tokyo District, Tokyo*, 539 F.2d 1216 (9th Cir. 1976).
[32] *Mohamed Al Fayed v. CIA*, 345 U.S. App. D.C. 308 (D.C. Cir. 2000).
[33] *Norex Petroleum Ltd. v. Chubb Insurance Co. of Canada*, Civil Action No. 04-mc-281 (CKK)(AK), 2005 U.S. Dist. LEXIS 19127 at *7 (D.D.C. March 9, 2005).
[34] *In re Application of Merck & Co.*, 197 F.R.D. 267, 270 (M.D.N.C. 2000).

[35] *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 243 (2004).
[36] *Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 1991 (3rd Cir. 1999).
[37] *In re Application of Asher B. Edelman*, 295 F.3d 171, 181 (2nd Cir. 2002).
[38] *Fayed v. CIA*, 229 F.3d 272, 276 (D.C. Cir. 2000).
[39] *In re Application of the Procter & Gamble Co.*, 334 F. Supp. 2d 1112, 1118 (E.D.W.I. 2004).
[40] *Metallgesellschaft v. Hodapp*, 121 F.3d 77,80 (2nd Cir. 1997).

*In Intel*, the Supreme Court held that the broad ideas of comity and parity governed the exercise of judicial discretion. Both the Southern and the Eastern District of New York apply a four-part discretion test based on the *Intel* case to evaluate whether the discovery request should be granted, modified, or denied.[41] The first two tests deal with comity, while the last two are parity concerns.

> "*Whether the person from whom discovery is sought is a participant in the foreign proceeding.*"

Generally foreign tribunal proceedings will allow, at least, some minimal discovery between the litigating parties. Yet, if discovery is sought from a non-party, the non-party might be outside the tribunal's jurisdictional reach. U.S. courts are more favorable in granting discovery over a non-party that is outside the jurisdiction of the foreign tribunal since there may be no other recourse for obtaining discovery without U.S. judicial assistance.

> "*The nature of the foreign tribunal, the character of the proceeding underway abroad, and the receptivity of the foreign government or the court abroad to U.S. federal-court judicial assistance.*"

The Court in *Intel* viewed the "nature" of the foreign action by whether the court functioned as an administrative, judicial, or quasi-judicial body.[42] Depending on the "nature" of the foreign action, certain discovery may not

permissible. The non-movant holds the burden to authoritatively prove that the foreign tribunal would refuse the evidence."[43] To meet the standard of "authoritative proof," courts look to explicit and clear directives from a country's judicial, executive, or legislative declarations that specifically address the use of evidence gathered under foreign procedures.[44] In *In re Application of Servicio Pan Americano*, Venezuela indicated its receptivity to federal judicial assistance by its signature of treaties facilitating cooperation.[45] In *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, the German government was found unreceptive to judicial assistance when the German Ministry of Justice sent specific requests that the petitioner's discovery request be denied.[46]

> "*Whether the § 1782 request conceals an effort to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States.*"

The court may use its discretion as authorized by *Intel* to deny or narrow discovery so not to disadvantage the opposing party. Yet, just because a request seeks broader discovery than is permitted in the foreign proceeding, it should not be presumed as an attempt to circumvent foreign proof-gathering restrictions.[47] In *In re Application of The Procter & Gamble Co.*, the district court recommended taking expert testimony if a court could not understand the foreign law sufficiently to distinguish a genuine request from a pretextual one.[48]

> "*Whether the discovery requests are unduly intrusive or burdensome.*"

---

[41] *In re Application of Grupo Qumma, S.A. de C.V.*, M 8-85, 2005 U.S. Dist. LEXIS 6898 at *4 (S.D.N.Y. April 21, 2005); *In re Application of Imanagement Services Ltd.*, Case No. Misc. 05-89 (FB), 2005 U.S. Dist. LEXIS 17025 at *9,*10 (E.D.N.Y. August 16, 2005).

[42] *In re Phillips* viewed the nature of the foreign court as compared to similar U.S. proceedings. *In re Phillips*, M 19-96, 2004 U.S. Dist. LEXIS 16426 (S.D.N.Y. Aug. 18, 2004), "Here, the English Action is pending in the High Court of Justice, Chancery Division, a trial court which hears the testimony of witnesses and receives documents in evidence, very much like American courts do. And the nature of the English Actions suggest that discovery [under § 1782] is appropriate to obtain relevant testimony and documents." *Id.* at *6.

[43] *In re Time*, Misc. Action No. 99-2916 Section "C," 1999 U.S. Dist. LEXIS 15858 at *18 (E.D.LA. Oct. 6, 1999).

[44] *In re Application of Imanagement Services Ltd.*, Case No. Misc. 05-89 (FB), 2005 U.S. Dist. LEXIS 17025 at *12 (E.D.N.Y. August 16, 2005).

[45] *In re Application of Servicio Pan Americano*, 354 F. Supp.2d 269, 274 (S.D.N.Y. Dec. 6, 2004).

[46] *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 84 (2nd Cir. 2003).

[47] *In re Application of The Procter & Gamble Co.* 334 F. Supp.2d 1112, 1115 (E.D.Wis. 2004).

[48] *Id.* at 1115.

Rule 26(b)(2) of the Federal Rules of Civil Procedure helps set some discovery parameters in this area. The court shall limit the discovery if it determines that the discovery sought is unreasonably cumulative or duplicative. In addition Rule 45(c)(1) states, "An attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden and expense on a person subject to that subpoena."[49] Though courts have an inclination to tailor a discovery order to eliminate any patent unfairness, the court in *In re Time* denied discovery because the request was "so vast and burdensome that it was... beyond any possible reasonable modification by the court."[50]

The four-part discretionary test set by the Supreme Court is a set of non-inclusive considerations. The Court in maintaining comity, parity and the furtherance of the twin-aims of the statute may deny the request on any number of unenumerated reasons.

## 11.  The Tribunal May Deny the Evidence.

Even if evidence is obtained by U.S. judicial assistance, the host tribunal may refuse to admit the evidence. The U.S. Supreme Court is ambivalent to denial after-the-fact of discovery: "A foreign nation may limit discovery within its domain for reasons particular to its own legal practices, culture, or traditions – reasons that do not necessarily signal objection to aid from United States federal courts."[51]

## 12.  Conclusionary Remarks, Summary.

28 U.S.C. § 1782 has made foreign discovery a powerful tool for gathering additional evidence. Though discovery in the U.S. is much more extensive than in other countries, it is not an overly complicated process. Depending on the specific facts and needs of your case, seeking the assistance of a U.S. law firm may be worth considering.

---

[49] FED. R. CIV. P. 45(c)(1).
[50] *In re Time*, Misc. Action No. 99-2916 Section "C," 1999 U.S. Dist. LEXIS 15858 at *24 (E.D.LA. Oct. 6, 1999); *see also*, FED. R. CIV. P. 44.1.
[51] *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258 (2004).