1  Cynthia L. Jackson  (Bar No. 92340)
   Michael N. Westheimer  (Bar No. 178938)
2  **BAKER & McKENZIE LLP**
   660 Hansen Way
3  Palo Alto, CA  94304-1044
   Telephone: +1 650 856 2400
4  Facsimile:  +1 650 856 9299
   Email:     cynthia.l.jackson@bakernet.com
5             michael.westheimer@bakernet.com

6  Attorneys for Seagate Technology LLC

7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                     SAN JOSE DIVISION

11

12 IN RE APPLICATION OF HANS-DIETER          Case No.  5:08-mc-80009-JW (HRL)
   BLASER FOR JUDICIAL ASSISTANCE
13 PURSUANT TO 28 U.S.C. SECTION 1782        **SEAGATE TECHNOLOGY LLC'S
                                             COMPENDIUM OF AUTHORITIES
14                                           CITED IN OPPOSITION TO  HANS-
                                             DIETER BLASER'S MOTION FOR
15                                           JUDICIAL ASSISTANCE PURSUANT
                                             TO 28 U.S.C. SECTION 1782**
16
                                             Hearing Date:   July 1, 2008
17                                           Time:           10:00 a.m.
                                             Courtroom:      2
18                                           Judge:          Hon. Howard R. Lloyd

19

20        Seagate Technology LLC ( "Seagate LLC") respectfully submits the following compendium

21 of authorities cited in its Memorandum of Points and Authorities in Opposition to Hans-Dieter

22 Blaser's Motion for Judicial Assistance Pursuant to 28 U.S.C. Section 1782.[1]

23        1.      *In re Application of Microsoft Corporation*, 2006 U.S. Dist. LEXIS 24870 (N.D. Cal.,

24 March 29, 2006), attached hereto as Exhibit A.

25        2.      *Kang v. Noro-Moseley Partners*, 246 Fed. Appx. 662 (11th Cir. 2007), attached

26 hereto as Exhibit B.

27 ────────────────

28 [1]  Excluded from this Compendium are Seagate LLC's citations to the United States Code, United
   States Reports, Federal Reporter, Federal Supplement and Federal Rules Decisions.

Baker & McKenzie LLP
660 Hansen Way
Palo Alto, CA  94304
+1 650 856 2400                                     1

PALDMS/362687.1

3.    David P. Leonard, *Codifying a Privilege for Self-Critical Analysis*, 25 Harv. J. on Legis. 113 (1988), attached hereto as Exhibit C.

4.    *Note*, *The Privilege of Self-Critical Analysis*, 96 Harv. L. Rev. 1083 (1983), attached hereto as Exhibit D.

Dated:  June  10, 2008                          BAKER & McKENZIE LLP


By _____
         Michael N. Westheimer
         Attorneys for Seagate Technology LLC

Baker & McKenzie LLP
Palo Alto

PALDMS/362687.1

# EXHIBIT A

LEXSEE 2006 U.S. DIST. LEXIS 24870



Analysis
As of: Jun 10, 2008

**In re Application of MICROSOFT CORPORATION, Applicant.**

**Case No.: C 06-80038 JF (PVT)**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
CALIFORNIA, SAN JOSE DIVISION**

*2006 U.S. Dist. LEXIS 24870*

**March 29, 2006, Decided
March 29, 2006, Filed**

**SUBSEQUENT HISTORY:** Related proceeding at *In re Microsoft Corp., 2006 U.S. Dist. LEXIS 32577 (D. Mass., Apr. 17, 2006)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** After applicant computer company served subpoenas on other companies to obtain discovery for use in enforcement proceedings before the European Commission (EC) in connection with two prior orders of the EC, the subpoenaed companies moved to quash the subpoenas.

**OVERVIEW:** Applicant sought documents for use in EC enforcement proceedings, and the court granted permission to applicant on an ex parte basis to serve subpoenas. After the subpoenaed companies moved to quash, however, the court granted their motions and vacated its prior ex parte order. The court found that the EC qualified as a foreign or international tribunal and applicant qualified as an interested person for purposes of *28 U.S.C.S. § 1782*. Thus, the court had authority to grant applicant's *§ 1782(a)* discovery application, though it was not required to do so. As a matter of comity, the court presumed the neutrality of the EC and the DG-Competition, the European Union's primary antitrust law enforcer, and did not accept applicant's argument that the DG-Competition was an adversary. The court found that the subpoenas constituted an attempt to circumvent specific restrictions that the EC had placed on applicant's right to obtain certain kinds of information. This weighed heavily against allowing the discovery. The EC did not

appear to be receptive to U.S. federal court judicial assistance in the action. Issues of comity also weighed against allowing the discovery.

**OUTCOME:** The court granted the subpoenaed companies' motions to quash and vacated its prior ex parte order granting applicant permission to serve the subpoenas.

**LexisNexis(R) Headnotes**

*International Law > Dispute Resolution > General Overview*
*International Trade Law > Dispute Resolution > General Overview*
[HN1] The European Commission is the executive and administrative organ of the European Communities. The Commission exercises responsibility over the wide range of subject areas covered by the European Union treaty; those areas include the treaty provisions, and regulations thereunder, governing competition. The DG-Competition, operating under the Commission's aegis, is the European Union's primary antitrust law enforcer. Within the DG-Competition's domain are anti-competitive agreements and abuse of dominant market position.

*International Law > Dispute Resolution > General Overview*
*International Trade Law > Dispute Resolution > General Overview*

Case 5:08-mc-80009-JW    Document 32-2    Filed 06/10/2008    Page 3 of 7

Page 2
2006 U.S. Dist. LEXIS 24870, *

[HN2] The European Commission, acting through DG-Competition, enforces European competition laws and regulations. The DG-Competition's overriding responsibility is to conduct investigations into alleged violations of the European Union's competition prescriptions. On a receipt of a complaint, or sua sponte, the DG-Competition conducts a preliminary investigation. This investigation results in a formal written decision whether to pursue the complaint. If the DG-Competition decides to pursue the complaint, it typically serves the target of the investigation with a formal statement of objections and advises the target of its intention to recommend a decision finding that the target has violated European competition law. The target is entitled to a hearing before an independent hearing officer, who then reports back to the DG-Competition. Once the DG-Competition makes its recommendation to the European Commission, the Commission may dismiss the complaint or issue a decision finding infringement.

*Civil Procedure > Discovery > Methods > Foreign Discovery*
*International Law > Dispute Resolution > Evidence > General Overview*
[HN3] District courts are authorized to order persons within their district to produce documents or give testimony for use in a foreign or international tribunal. *28 U.S.C.S. § 1782(a).*

*Civil Procedure > Discovery > Methods > Foreign Discovery*
*International Law > Dispute Resolution > Evidence > General Overview*
[HN4] See *28 U.S.C.S. § 1782(a).*

*Civil Procedure > Discovery > Methods > Foreign Discovery*
*International Law > Dispute Resolution > Comity Doctrine > Procedures > Discretion*
*International Law > Dispute Resolution > Evidence > General Overview*
[HN5] A district court is not required to grant a *28 U.S.C.S. § 1782(a)* discovery application simply because it has the authority to do so. Factors courts consider in ruling on *§ 1782(a)* requests include, among other things, the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance. Another key consideration is whether the *§ 1782(a)* request conceals an attempt to circumvent foreign proof-gathering restrictions. Thus, although the United States Supreme Court has rejected

any categorical foreign-discoverability rule, it has indicated that foreign-discoverability may be considered by a court as a matter of comity in deciding whether to grant discovery in particular cases: comity and parity concerns may be legitimate touchstones for a district court's exercise of discretion in particular cases.

*International Law > Dispute Resolution > General Overview*
[HN6] The European Commission is part of a civil law system which differs in significant ways from the U.S. judicial system. While the U.S. system of justice relies on an adversarial process, civil law systems rely on an "inquisitorial" process in which the judicial officer plays a more active role in gathering evidence. The civil-law system is inquisitorial rather than adversarial and the judge normally questions the witness and prepares a written summary of the evidence.

*Civil Procedure > Discovery > Methods > Foreign Discovery*
*International Law > Dispute Resolution > Comity Doctrine > Procedures > Discretion*
*International Law > Dispute Resolution > Evidence > General Overview*
[HN7] *28 U.S.C.S. § 1782* does not give either foreign tribunals or litigants before them any "right" to assistance. Such assistance is wholly within the discretion of the court.

*Civil Procedure > Discovery > Methods > Foreign Discovery*
*International Law > Dispute Resolution > Comity Doctrine > Procedures > Discretion*
*International Law > Dispute Resolution > Evidence > General Overview*
[HN8] With *28 U.S.C.S. § 1782*, Congress did not seek to place itself on a collision course with foreign tribunals and legislatures, which have carefully chosen the procedures and laws best suited to their concepts of litigation.

**COUNSEL:** [*1] For Microsoft Corporation, Plaintiff: Richard Allen Jones, Covington & Burling, San Francisco, CA; E. Edward Bruce, Joshua David Wolson, William D. Iverson, ovington & Burling, Washington, DC.

For Ronald Alepin Morrison & Foerster, Clifford Chance LLP and Daniel Harris, Oracle Corporation, Daniel Harris, Ronald Alepin, Defendants: Christopher S. Yates, LATHAM & WATKINS LLP, San Francisco, CA.

For Morgan Lewis & Bockius LLP and Jeffrey Kingston, Defendant: James N. Penrod, Diane L. Webb, Morgan Lewis & Bockius LLP, San Francisco, CA.

For Sun Microsystems, Inc., Defendant: James N. Penrod, Morgan Lewis & Bockius LLP, San Francisco, CA.

For The Commission of the European Communities, The Commission of the European Communities, Intervenors: Elizabeth I. Rogers, Wilmer Cutler Pickering Hale and Dorr LLP, Palo Alto, CA.

**JUDGES:** PATRICIA V. TRUMBULL, United States Magistrate Judge.

**OPINION BY:** PATRICIA V. TRUMBULL

**OPINION**

**ORDER GRANTING MOTIONS TO QUASH SUB-POENAS AND VACATING PRIOR ORDER**

On March 27, 2006, a hearing was held before Magistrate Judge Patricia V. Trumbull on motions to quash subpoenas brought by Sun Microsystems, Inc., Morgan, Lewis & Bockius LLP, and Jeffrey Kingston [*2] (collectively "Sun") and Oracle Corporation, Clifford Chance LLP, Daniel Harris and Ronald Alepin (collectively "Oracle") with regard to subpoenas served on them by Microsoft Corporation ("Microsoft"). [1] Based on the briefs and arguments submitted,

> 1 The holding of this court is limited to the facts and the particular circumstances underlying the present motion.

IT IS HEREBY ORDERED that the motions to quash are GRANTED, and this court's prior *ex parte* order granting Microsoft permission to serve the subject subpoenas is VACATED, for the reasons discussed herein.

**I. BACKGROUND**

Microsoft seeks documents from Sun and Oracle for use in enforcement proceedings currently before the European Commission ("EC") in connection with two prior orders of the Commission: 1) the Commission Decision of 24.3.2004 (the "2004 Decision"); and 2) the Commission Decision of 28.07.2005 (the "Trustee Decision"). Those orders were issued at the conclusion of proceedings initiated by a complaint Sun Microsystems, Inc. filed [*3] with the European Commission on December 10, 1998, alleging infringements by Microsoft of Article 82 of the EC Treaty. [2]

2 By way of background, in *Intel Corporation v. Advanced Micro Devices, Inc.*, the Supreme Court described the structure of the European Commission and how it enforces the European Union's competition laws:

> [HN1] "The European Commission is the executive and administrative organ of the European Communities. The Commission exercises responsibility over the wide range of subject areas covered by the European Union treaty; those areas include the treaty provisions, and regulations thereunder, governing competition. The DG-Competition, operating under the Commission's aegis, is the European Union's primary antitrust law enforcer. Within the DG-Competition's domain are anti-competitive agreements and abuse of dominant market position." *Intel Corp., v. Advanced Micro Devices, Inc., 542 U.S. 241, 250, 124 S. Ct. 2466, 159 L. Ed. 2d 355 (2004)* (citations omitted).

The Court explained that [HN2] the European Commission, acting through DG-Competition, enforces European competition laws and regulations. *Id. at 254.* "The DG-Competition's overriding responsibility' is to conduct investigations into alleged violations of the European Union's competition prescriptions. On a receipt of a complaint, or *sua sponte*, the DG-Competition conducts a preliminary investigation." *Ibid.* This investigation results in a formal written decision whether to pursue the complaint. *Ibid.* "If the DG-Competition decides to pursue the complaint, it typically serves the target of the investigation with a formal statement of objections' and advises the target of its intention to recommend a decision finding that the target has violated European competition law." *Ibid.* The target is entitled to a hearing before an independent hearing officer, who then reports back to the DG-Competition. *Id. at 255.* Once the DG-Competition makes its recommendation to the European Commission, the Commission may dismiss the complaint or issue a decision finding infringement. *Id.*

[*4] On November 10, 2005, the European Commission adopted a decision finding that Microsoft had violated the 2004 Decision, and instructing Microsoft to come into compliance by December 15, 2005. Microsoft asserts that it complied by making revised documentation available on December 15, 2005. On about December 21, 2005, the European Commission adopted a Statement of Objection ("SO") charging that Microsoft had failed to comply. The SO triggered for Microsoft a right to access the "file" and a right to a hearing.

By letter dated January 30, 2006, Microsoft requested all documents in the DG-Competition's possession that reflect or pertain to communications between the Commission and third parties such as Sun and Oracle. It also requested documents that reflect discussions which may have taken place between the third parties and the Monitoring Trustee. The matter went to a Commission hearing officer, which held that Microsoft was entitled to many of the requested documents *based on confidentiality waivers* by the third parties, including Sun and Oracle.

On March 3, 2006, Microsoft filed an *ex parte* application in this court requesting permission to serve subpoenas on Sun and Oracle [*5] seeking discovery regarding certain communications between those companies and Trustee and/or the Commission. This court granted the *ex parte* application. *See In re Letters Rogatory from the Tokyo District, Tokyo, Japan, 539 F.2d 1216, 1219 (9th Cir. 1976)* (finding grant of § 1782 request on *ex parte* basis proper, and noting that witnesses can raise objections by moving to quash the subpoenas). On March 15, 2006, Sun and Oracle filed the instant motions to quash.

On March 24, 2006, the hearing officer responded to another request by Microsoft for access to documents provided by third parties to the Trustee and transmitted by the latter to the Commission-including documents sought by the subpoenas at issue here. The hearing officer stated that the Commission is obliged to go back to the information providers for a potential application of the "Akzo" procedure before such information could be disclosed. The hearing officer further stated that Microsoft would be provided with *non-confidential* versions after completion of that procedure.

## II. LEGAL ANALYSIS

[HN3] District courts are authorized to order persons within their district to produce documents or [*6] give testimony for use in a foreign or international tribunal. *See 28 U.S.C. § 1782(a). Section 1782(a)* provides, in relevant part:

[HN4] "The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court."

Under the circumstances of the present case, the European Commission qualifies as "a foreign or international tribunal" for purposes of *Section 1782. Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 257-58, 124 S. Ct. 2466, 159 L. Ed. 2d 355 (2004).* And Microsoft clearly qualifies as an "interested person." Thus, this court has the authority to order Sun and Oracle, both of whom are located in this district, to produce the requested [*7] documents and testimony. However, [HN5] "a district court is not required to grant a § 1782(a) discovery application simply because it has the authority to do so." *Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. at 264.*

Factors courts consider in ruling on § 1782(a) requests [3] include, among other things, "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Ibid.* Another key consideration is "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions." *Id. at 265.* Thus, although the Supreme Court rejected any categorical foreign-discoverability rule, it did indicate that foreign-discoverability may be considered by a court as a matter of comity in deciding whether to grant discovery in particular cases. *See Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. at 243* ("comity and parity concerns may be legitimate touchstones for a district court's exercise of discretion in particular cases.") and *264-65* ("Further, the grounds Intel [*8] urged for categorical limitations on § 1782(a)'s scope may be relevant in determining whether a discovery order should be granted in a particular case"). Taken as a whole, these factors weigh against allowing the requested discovery in this case.

3    Because the order allowing the subpoenas to be served was issued on an *ex parte* basis, this is Sun and Oracle's first opportunity to object to Microsoft's motion for assistance under *Section 1782. See In re Letters Rogatory, 539 F.2d at 1219.* Thus, the court will apply to this motion the standards applicable to requests for assistance under *Section 1782*, and will deem that the burden of showing such assistance is warranted remains on Microsoft. To the extent procedurally necessary, the court deems the motions to quash to be motions for reconsideration of this court's prior order.

[HN6] The European Commission is part of a civil law system which differs in significant ways from the U.S. judicial system. While our system of justice relies on an adversarial [*9] process, civil law systems rely on an "inquisitional" process in which the judicial officer plays a more active role in gathering evidence. *See Societe Nationale Industrielle Aerospatiale v. United States District Court for Southern District of Iowa, 482 U.S. 522, 560, 107 S. Ct. 2542, 96 L. Ed. 2d 461 (1987)* ("The civil-law system is inquisitional rather than adversarial and the judge normally questions the witness and prepares a written summary of the evidence.") Thus, the nature of the tribunal and the procedures for proof-gathering are quite different than in U.S. courts. Microsoft has attempted to cast the DG-Competition as an "adversary." In light of the nature of the European Commission, that label is incorrect. As a matter of comity, this court presumes the neutrality of both the DG-Competition and the European Commission.

The character of the proceedings underway before the European Commission is particularly important in the instant case. The proceedings involve enforcement of the 2004 Decision the European Commission previously issued against Microsoft. The 2004 Decision called for the establishment of a trustee to monitor whether Microsoft complied, or failed to comply, with the requirements [*10] of the 2004 Decision. The Trustee Decision expressly provides that "Confidential Information" [4] obtained by the Trustee in the course of his duties may not be disclosed to anyone other than the Commission. (Trustee Decision, P 5.1.) Any such information the Trustee transmits to the Commission becomes part of the file, and subject to the Commission's procedures for determining whether or not Microsoft is entitled to access to it. This is not a situation involving only a foreign tribunal's general rules and procedures governing proof gathering. This situation involves a tribunal's specific order restricting a specific litigant's ability to gather evidence. Under these circumstances, the subpoenas constitute an attempt to circumvent specific restrictions the European Commission has placed on Microsoft's right to

obtain certain kinds of information. This alone weighs heavily against allowing the requested discovery.

4    This court is not inclined to undertake an analysis regarding whether the information Microsoft seeks constitutes "Confidential Information" as that term is defined in the Trustee Decision. Any such determination is for the European Commission to make.

[*11] Further, on the record before the court, it appears that the European Commission is not receptive to U.S. federal court judicial assistance in this case. [5] Microsoft urges the court to give little weight to this factor, arguing that this factor is only pertinent when a litigant is seeking discovery under *Section 1782* in order to assist the foreign tribunal. At the hearing of the instant motions, Microsoft complained that any reliance on this factor would effectively nullify litigants "right" to assistance under *Section 1782* where they are defendants before that tribunal. To begin with, [HN7] *Section 1782* does not give either foreign tribunals or litigants before them any "right" to assistance. Such assistance is wholly within the discretion of the court. Moreover, this argument assumes that foreign tribunals will always object to litigants seeking assistance under *Section 1782*. There is no basis for that assumption. Finally, this factor is not dispositive. It is only one factor to be considered, which in this case weighs against allowing the discovery.

5    The DG Competition sent a memorandum to Sun's and Oracle's attorneys setting forth his position regarding the discovery Microsoft seeks. In paragraph 23, with regard to communications between third parties and the Trustee related to the current Statement of Objections, he states the subpoenas are "not objectively necessary but rather an attempt to circumvent the established rules on access to file in proceedings before the Commission."

[*12] Finally, issues of comity weigh against allowing the discovery in this case. [HN8] "Congress did not seek to place itself on a collision course with foreign tribunals and legislatures, which have carefully chosen the procedures and laws best suited to their concepts of litigation." *In re Application of Asta Medica, S.A., 981 F.2d 1, 6 (1st Cir. 1992), abrogated* (to the extent it held § 1782 included a categorical foreign-discoverability requirement) by *Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. at 259-262.* As a matter of comity, this court is unwilling to order discovery when doing so will interfere with the European Commission's orderly handling of its own enforcement proceedings.

### III. CONCLUSION

2006 U.S. Dist. LEXIS 24870, *

For all of the reasons discussed herein, the court finds that Microsoft has not established that the discovery it seeks is warranted under *Section 1782*. Thus the court finds it appropriate to quash the subject subpoenas and vacate its prior order.

Dated: *March 29, 2006*

PATRICIA V. TRUMBULL

United States Magistrate Judge

# EXHIBIT B

LEXSEE 246 FED. APPX. 662

**ELIZABETH KANG, Petitioner-Appellant, versus NORO-MOSELEY PARTNERS, Respondent-Appellee.**

**No. 07-10310 Non-Argument Calendar**

**UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

*246 Fed. Appx. 662; 2007 U.S. App. LEXIS 21439*

**September 4, 2007, Decided**
**September 4, 2007, Filed**

**NOTICE:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [**1]
Appeal from the United States District Court for the Northern District of Georgia. D. C. Docket No. 06-02534-CV-TWT-1.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** For Elizabeth Kang, Appellant: Julie Y. Rivchin, Karen L. Hagberg, Sherman W. Kahn, Morrison & Foerster LLP, NEW YORK, NY.

Noro-Moseley Partners, Appellee: Garrett Lee Bradford, Lucas Wade Andrews, Samantha Rose Mandell, Jones Day, ATLANTA, GA.

**JUDGES:** Before BLACK, MARCUS and WILSON, Circuit Judges.

**OPINION**

[*663] PER CURIAM:

Elizabeth Kang appeals the district court's grant of Noro-Moseley Partners's motion to quash subpoena. Kang sought discovery from Noro-Moseley Partners to use in a civil proceeding in Germany pursuant to *28 U.S.C. § 1782*. We review the district court's decision for an abuse of discretion. *In re Clerici, 481 F.3d 1324, 1331 (11th Cir. 2007)*. Our review is extremely deferential and identical to the standard for reviewing ordinary discovery rulings by the district court. *Id.* However to the extent that the district court's decision is based on an interpretation of law our review is *de novo. Id.*

*Section 1782* "authorizes, but does not require, a federal district court to provide assistance to a complainant . . ." *Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 255, 124 S. Ct. 2466, 2478, 159 L. Ed. 2d. 355 (2004).* [**2] Under *§ 1782(a)*, the district court can grant an application for judicial assistance when the following statutory requirements are met: (1) the request must be made "by a foreign or international tribunal," or by "any interested person"; (2) the request must seek evidence, whether it be the "testimony or statement" of a person or the production of "a document or other thing"; (3) the evidence must be "for use in a proceeding in a foreign or international tribunal"; and (4) the person from whom discovery is sought must reside or be found in the [*664] district of the district court ruling on the application for assistance. *28 U.S.C. § 1782(a)*. Once these prima facie requirements are satisfied, the following factors must be considered by the district court in exercising its discretion: (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding," because "the need for *§ 1782(a)* aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court [**3] judicial assistance"; (3) "whether the *§ 1782(a)* request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States"; and (4) whether the request is otherwise "unduly intrusive or burdensome." *Intel, 542 U.S. at 264-65, 124 S. Ct. at 2483.*

Here the district court correctly found that a prima facie case had been met. It then considered the four *Intel* factors finding that the first factor weighed in favor of denying the motion to quash. However, the court found

246 Fed. Appx. 662, *; 2007 U.S. App. LEXIS 21439, **

that this factor was outweighed by the irrelevance of the requested discovery to the nature of the foreign proceedings. A district court can deny discovery where the information sought is irrelevant to the causes of action. *See Burger King Corp. v. Weaver, 169 F.3d 1310, 1320 (11th Cir. 1999)*. Given that the district court properly considered the *Intel* factors in deciding whether to exercise its discretion and has not abused his discretion in determining relevance, we can find no reversible error.

**AFFIRMED.**

# EXHIBIT C

# ARTICLE

## CODIFYING A PRIVILEGE FOR SELF-CRITICAL ANALYSIS

### David P. Leonard[*]

*Organizations often conduct probing self-studies to review internally existing policies and procedures. Despite an increasing social need for these studies, legislatures have not yet constructed a general privilege for self-critical analysis. This hesitation is attributable in large part to the fact that the establishment of evidentiary privileges restricts the flow of information in the litigation process.*

*In this Article, Professor Leonard examines the public interest in a privilege for self-critical analysis, as well as other considerations which have prompted some courts to create a limited privilege and most state legislatures to enact protective legislation for mandated medical review of patient care in hospitals. After concluding that existing privileges do not offer sufficient protection for self-critical analysis, Professor Leonard proposes model legislation to ensure that organizations will continue to conduct self-evaluative studies. Professor Leonard then analyzes each provision in the Model Statute, offering alternative constructions for adoption. Finally, he considers the admissibility of self-critical analyses at trial. Professor Leonard's Model Statute offers guidance to both courts and legislatures as they engage in continuing review of rules governing the litigation process.*

In the last decade, there has been substantial debate concerning the wisdom of establishing a new privilege for self-critical analysis, the internal review of a major policy or procedure conducted by or on behalf of an organization.[1] If the primary

---

[*] Professor of Law, Indiana University School of Law—Indianapolis. B.A., University of California at San Diego, 1974; J.D., UCLA School of Law, 1977. I wish to thank the Corporate Counsel Center of the Northwestern University School of Law for its generous research support. Appreciation is also owed to Professor Ronald J. Allen for suggesting the project and to third-year law student Kristen Mulholland for her research assistance.

[1] The academic literature contains several treatments of this privilege. *See, e.g.,* Allen & Hazelwood, *Preserving the Confidentiality of Internal Corporate Investigations,* 12 J. Corp. L. 355 (1987); Crisman & Mathews, *Limited Waiver of Attorney-Client Privilege and Work-Product Doctrine in Internal Corporate Investigations: An Emerging Corporate "Self-Evaluative" Privilege,* 21 Am. Crim. L. Rev. 123 (1983); Flanagan, *Rejecting a General Privilege for Self-Critical Analysis,* 51 Geo. Wash. L. Rev. 551 (1983); Murphy, *The Self-Evaluative Privilege,* 7 J. Corp. L. 489 (1982); Weiss, *Who's Watching the Watchdog?: Self-Evaluative Privilege and Journalistic Responsibility in* Westmoreland v. CBS, Inc., 7 Comm./Ent. L.J. 149 (1984); Note, *The Privilege of Self-Critical Analysis,* 96 Harv. L. Rev. 1083 (1983) [hereinafter Harvard Note]; Note, *The Attorney-Client Privilege, the Self-Evaluative Report Privilege, and* Diversified Industries v. Meredith, 40 Ohio St. L.J. 699 (1979) [hereinafter Ohio State Note]; Note, *Discovery of Internal Corporate Investigations,* 32 Stan. L. Rev. 1163 (1980) [hereinafter Stanford Note]; Comment, *Corporate Self-Investigations Under the Foreign Corrupt Practices Act,* 47 U. Chi. L. Rev. 803 (1980) [hereinafter Chicago

function of the litigation process is to search for truth about past events,[2] then the value and efficacy of such protection against forced disclosure should be carefully assessed. All exclusionary rules of evidence prevent tribunals from learning pertinent facts, and among the rules thought to impede most seriously upon the search for truth are those which establish privileges.[3] The perceived need for "everyman's evidence" motivated Wigmore to suggest stringent criteria for the creation of privileges,[4] and in recent decades courts and legislatures have generally restricted rather than expanded the scope of these rules.[5]

This view of the effect of privileges does not demand, however, that all privileges be eradicated from the law of evidence. Privileges deserve recognition when public interest favors the

---

Comment]; Comment, *Civil Procedure: Self-Evaluative Reports—A Qualified Privilege in Discovery?*, 57 MINN. L. REV. 807 (1973) [hereinafter MINNESOTA Comment]; *see also* Block & Remz, *The Confidentiality of Corporate Internal Investigations*, 18 REV. SEC. & COM. REG. 61 (1985); Comment, *Preventing Unnecessary Intrusions on University Autonomy: A Proposed Academic Freedom Privilege*, 69 CALIF. L. REV. 1538 (1981) [hereinafter CALIFORNIA Comment].

Of these works, Professor Murphy's article is noteworthy because, like this Article, it contains proposals for the legislative creation of a privilege for self-critical analysis. However, because I did not wish to be influenced by the specific language of his proposals, I chose not to review those proposals while researching and writing this Article.

[2] *See* In re Dinnan, 661 F.2d 426, 427 (5th Cir. 1981), *cert. denied*, 457 U.S. 1106 (1982); Leonard, *The Use of Character to Prove Conduct: Rationality and Catharsis in the Law of Evidence*, 58 U. COLO. L. REV. 1 (1987).

[3] McCormick wrote that the effect of privileges "is clearly inhibitive; rather than facilitating the illumination of truth, they shut out the light." C. MCCORMICK, EVIDENCE § 72, at 171 (3d ed. 1984) (footnote omitted).

[4] Wigmore proposed that in order to be recognized, a proposed privilege should satisfy "four fundamental conditions":

    (1) The communications must originate in a *confidence* that they will not be disclosed.

    (2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

    (3) The relation must be one which in the opinion of the community ought to be sedulously *fostered*.

    (4) The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation.

8 J. WIGMORE, EVIDENCE § 2285 (J. McNaughton rev. ed. 1961) (emphasis in original). Wigmore believed that the attorney-client relationship satisfies these conditions, but that the relationship between physician and patient fails to satisfy both the second and fourth requirements. *Id.*

[5] The scope of the physician-patient privilege, for example, has been narrowly defined by some states. *See, e.g.*, CAL. EVID. CODE §§ 996–1007 (West 1986 & Supp. 1987) (setting forth numerous exceptions to the privilege). The Proposed Federal Rules of Evidence provisions concerning privileges, which Congress later rejected, did not include a specific privilege for communications between physician and patient. *See* FED. R. EVID. 504, advisory committee note (Proposed Draft 1969); *see also* Trammel v. United States, 445 U.S. 40 (1980) (narrowing the application of the common law privilege against adverse spousal testimony).

maintenance of confidentiality in a particular setting,[6] and recent decades have seen the flowering of some privileges[7] and the reaffirmation of other common law privileges by legislatures.[8] Also, privileges exist to foster important values other than the promotion of the free flow of information in certain relationships. For example, privileges often serve a perceived need for privacy—a sense that in some relationships, people have a right to be left alone, even by institutions as fundamentally important as the courts.[9] Privileges also serve to ensure that people have incentives to engage in conduct thought to have important social value. Thus, in an era of diminishing privileges, one must continue to scrutinize the law of privileges to determine if it is sufficiently broad to serve social objectives.

This Article will propose a legislative model for a privilege for self-critical analysis. Part One will discuss the need for the privilege, its underlying purpose, and its place among existing doctrines. Part Two will provide the specific statutory language for the privilege. Part Three will offer commentary on each provision set forth by the Model Statute. Part Four will consider the admissibility of self-critical analyses into evidence at trial. And, finally, the Article will suggest that the Model be adopted by legislatures in order to ensure the continued use of self-evaluative studies by organizations.

---

[6] 4 J. MOORE, J. LUCAS & G. GROTHEER, JR., MOORE'S FEDERAL PRACTICE ¶ 26.60[3] (2d ed. 1986). The United States Supreme Court has recognized that privileges can be justified when there is "a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel*, 445 U.S. at 50.

[7] While the physician-patient privilege has been narrowly construed, the psychotherapist-patient privilege has gained wide recognition in recent decades. *See, e.g.*, In re Lifschutz, 2 Cal. 3d 415, 467 P.2d 557, 85 Cal. Rptr. 829 (1970), where the California Supreme Court stated: "[A] growing consensus throughout the country, reflected in a trend of legislative enactments, acknowledges that an environment of confidentiality of treatment is vitally important to the successful operation of psychotherapy." *Id.* at 422, 467 P.2d at 560–61, 85 Cal. Rptr. at 832–33. Proposed Rule 504 of the Federal Rules of Evidence contains a fairly broad psychotherapist-patient privilege. FED. R. EVID. 504 (Proposed Draft 1969).

[8] *See* CAL. EVID. CODE §§ 911–1060 (West 1986 & Supp. 1987) (codifying many privileges, such as those relating to lawyer-client communications, adverse spousal testimony, marital communications, and physician-patient communications). Congress' rejection of specific rules of privilege in the Federal Rules of Evidence may not represent a view that privileges should be restricted. Indeed, some believe that Congress' intent in enacting Rule 501 was to invest courts with the power to create new privileges. *See* CALIFORNIA Comment, *supra* note 1, at 1540–42.

[9] *See* Louisell, *Confidentiality, Conformity and Confusion: Privileges in Federal Court Today*, 31 TUL. L. REV. 101 (1956); MINNESOTA Comment, *supra* note 1, at 820. Of course, privacy has less social importance in certain settings than in others. Corporations, for example, probably cannot validly claim a right of privacy. Allen & Hazelwood, *supra* note 1, at 356–57.

## I. THE NEED FOR A SELF-EVALUATIVE PRIVILEGE

### A. *The Public Interest Aspect of Self-Critical Analysis*

In recent years, it has become increasingly common for corporations and other organizations to engage in critical self-evaluation.[10] To some extent, the increase in self-critical studies can be attributed to a general social movement toward greater corporate accountability in light of disclosures of illegal corporate practices.[11] Such studies, however, do not always arise from fears that the business may have engaged in illegal conduct. Businesses may simply believe that a full and frank self-evaluation of their operations will be in the public interest.

For example, administrators of a hospital might learn that the institution suffers from a greater than average rate of post-operative mortality. Concerned officials might then decide to conduct an investigation to determine whether hospital personnel are adequately trained in post-operative care, whether policies and procedures are properly designed to meet the acute needs of patients following surgery, and whether hospital personnel adhere to those procedures. To be sure, the study would serve a financial purpose—if the hospital can reduce its post-operative death rate to at least a level which is average for similar institutions, the hospital's potential exposure to tort liability will be minimized. However, the investigation will not only help to limit the cost of delivering medical care, but also will serve a broader social purpose: the adoption and execution of hospital procedures which result in *better* patient care.[12]

If the true purpose of self-evaluation is to uncover all relevant information, including subjective evaluations which could be damaging to the business if revealed, it is natural to inquire whether the legal environment provides sufficient incentives to

---

[10] *See* Block & Remz, *supra* note 1, at 61–62; Crisman & Mathews, *supra* note 1, at 124; *cf.* Sporkin, *SEC Enforcement and the Corporate Board Room*, 61 N.C.L. REV. 435 (1983).

[11] This has been particularly true as corporations during the 1970's were found to have made illegal bribes to foreign officials and engaged in other illegal activities both inside and outside the country. *See, e.g.*, Upjohn Co. v. United States, 449 U.S. 383 (1983); In re Grand Jury Investigation (Sun Oil), 599 F.2d 1224 (3d Cir. 1979); Diversified Indus., Inc. v. Meredith, 572 F.2d 596 (8th Cir. 1977) (en banc).

[12] This is not to say that society does not generally benefit from having more profitable (or at least financially viable) hospitals. The stronger the institution's financial status, the more capable it will be of controlling charges for medical care.

full and frank self-evaluation, or at least does not provide substantial disincentives for businesses to conduct such studies and for persons possessing relevent information to come forward. A number of courts[13] and commentators,[14] and have concluded that at least in some circumstances the possibility that the results of a critical self-study could be discoverable in litigation would chill the self-evaluative process, and that the law should therefore erect at least a partial shield in the form of a discovery privilege. In *Bredice v. Doctors Hospital, Inc.*, which is generally considered to be the first case to recognize the privilege explicitly, the court acknowledged:

> Confidentiality is essential to effective functioning of these [medical review committee] meetings; and these meetings are essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care. To subject these discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations. Constructive professional criticism cannot occur in an atmosphere of apprehension that one doctor's suggestion will be

---

[13] Although federal courts have led the way in the recognition of a privilege for self-critical analysis, *see infra* notes 15–22, some state courts have also recognized the privilege. *See, e.g.*, Tucson Medical Center, Inc. v. Misevich, 113 Ariz. 34, 37–38, 545 P.2d 958, 961–62 (1976); Posey v. District Court, 196 Colo. 396, 398–99, 586 P.2d 36, 37–38 (1978); Dade County Medical Ass'n v. Hlis, 372 So. 2d 117, 118–20 (Fla. Dist. Ct. App. 1979); Oviatt v. Archbishop Bergan Mercy Hosp., 191 Neb. 224, 226–27, 214 N.W.2d 490, 491–92 (1974); Palmer v. City of Rome, 120 Misc. 2d 558, 559–60, 466 N.Y.S.2d 238, 239–40 (Sup, Ct. 1983); Wiener v. Memorial Hosp. for Cancer & Allied Diseases, 114 Misc. 2d 1013, 1015–16, 453 N.Y.S.2d 142, 143–44 (Sup. Ct. 1982). Although most state cases recognizing the privilege have arisen in the limited context of statutes protecting the deliberations of medical review committees, the cases rely heavily on the important public policy of encouraging frank and candid review, and reflect concern that an absence of protection could lead to a significantly impeded review process.

In other cases courts have not been as receptive to the creation of a privilege for self-critical analysis. *See, e.g.*, Jolly v. Superior Court, 112 Ariz. 186, 190–91, 540 P.2d 658, 662–63 (1975); Nazareth Literacy & Benevolent Inst. v. Stephenson, 503 S.W.2d 177, 178–79 (Ky. 1973); Davison v. St. Paul Fire & Marine Ins. Co., 75 Wis. 2d 190, 203–06, 248 N.W.2d 433, 440–42 (1977). Even though some courts have declined to create a privilege, only a small number of state courts have considered the issue, and it is too soon to discern a general trend toward either acceptance or rejection of the concept.

[14] *See, e.g.*, Allen & Hazelwood, *supra* note 1; Block & Remz, *supra* note 1; Murphy, *supra* note 1; Weiss, *supra* note 1; OHIO STATE Note, *supra* note 1; HARVARD Note, *supra* note 1; CALIFORNIA Comment, *supra* note 1; CHICAGO Comment, *supra* note 1.

Other authors have been more skeptical about the need for such a privilege. *See* Flanagan, *supra* note 1; STANFORD Note, *supra* note 1; MINNESOTA Comment, *supra* note 1.

used as a denunciation of a colleague's conduct in a malpractice suit.[15]

One author identified two distinct chilling effects which the spectre of disclosure may have on the self-evaluative process:

> First, if a plaintiff obtains discovery, there may be a direct chilling effect on the institutional or individual self-analyst; this effect operates to discourage the analyst from investigating thoroughly and frankly or even from investigating at all. . . .
>
> Second, courts should be concerned about the ability of the self-analyst to gather the information that it needs to make its evaluation. Knowledge that a final report may be disclosed will often discourage individuals from coming forward with relevant information.[16]

This rationale has led some courts to declare the existence of a limited privilege in several contexts, including reviews of medical procedures and patient care,[17] post-accident investigations by a railroad company,[18] police department investigations of arrests and shootings,[19] affirmative action studies,[20] confidential peer reviews in the academic setting,[21] and investigations con-

---

[15] 50 F.R.D. 249, 250. It has been suggested that one court in a case prior to *Bredice* recognized a possible privilege in this area. In Richards v. Maine Cent. R.R., 21 F.R.D. 593 (D. Me. 1957), plaintiff sued a railroad for the death of an employee in a crossing collision. Plaintiff requested production of documents resulting from investigations made by defendant railroad and filed with the state's Public Utilities Commission pursuant to statute. The court shielded these documents from discovery on the basis that "to require the production of such reports would clearly violate the public policy evidenced by [the statute mandating those reports]. . . ." *Id.* at 594.

[16] HARVARD Note, *supra* note 1, at 1091–92.

[17] In addition to *Bredice*, 50 F.R.D. at 249, see Mewborn v. Heckler, 101 F.R.D. 691 (D.D.C. 1984); Gillman v. United States, 53 F.R.D. 316 (S.D.N.Y. 1971); Dade County Medical Ass'n v. Hlis, 372 So. 2d 117, 118–20 (Fla. Dist. Ct. App. 1979).

[18] *See* Richards v. Maine Cent. R.R., 21 F.R.D. 593 (D. Me. 1957). *But cf.* Jolly v. Superior Court, 112 Ariz. 186, 190–91, 540 P.2d 658, 662–63 (1975) (court refused to create a privilege for safety inspections).

[19] Elliot v. Webb, 98 F.R.D. 293 (D. Idaho 1983); Kott v. Perini, 283 F. Supp. 1 (N.D. Ohio 1968).

[20] Among the many cases which have recognized a privilege in this context are O'Conner v. Chrysler Corp., 86 F.R.D. 211 (D. Mass. 1980); Stevenson v. General Elec. Co., 18 Empl. Prac. Dec. (CCH) ¶ 8777, at 5148 (S.D. Ohio 1978); Rodgers v. United States Steel Corp., 11 Empl. Prac. Dec. (CCH) ¶ 10,666, at 6815 (E.D. Pa. 1975); Sanday v. Carnegie-Mellon Univ., 12 Fair Empl. Prac. Cas. (BNA) 101 (N.D. Pa. 1975); Banks v. Lockheed-Georgia Co., 53 F.R.D. 283 (N.D. Ga. 1971). *But see* Emerson Elec. Co. v. Schlesinger, 609 F.2d 898 (8th Cir. 1979); Reynolds Metals Co. v. Rumsfeld, 564 F.2d 663 (4th Cir. 1977), *cert. denied*, 435 U.S. 959 (1978); Note, *A Balanced Approach to Affirmative Action Discovery in Title VII Suits*, 32 HASTINGS L.J. 1013, 1024–31 (1981).

[21] EEOC v. University of Notre Dame Du Lac, 715 F.2d 331 (7th Cir. 1983); Gray v. Board of Higher Educ., 692 F.2d 901 (2d Cir. 1982) (recognizing a privilege but holding it inapplicable under the facts of the case); Keyes v. Lenoir Rhyne College, 552 F.2d 579, 581 (4th Cir.), *cert. denied*, 434 U.S. 904 (1977); Zaustinsky v. University of Cal.

ducted pursuant to a Securities and Exchange Commission program of voluntary disclosure of information.[22] Although application of the privilege has thus far been limited to cases falling roughly into these areas,[23] there is no reason to suspect that the privilege should be, or will be, so limited in the future.

In addition, widespread concern about the effective functioning of federally mandated medical review of patient care[24] has caused almost all states to enact protective legislation in recent years. Some statutes provide civil immunity to participants in such reviews for their actions as committee members, some provide that certain aspects of the committees' work is not discoverable, and some do both.[25] The scholarly literature also

at Santa Cruz, 96 F.R.D. 622 (N.D. Cal. 1983), *aff'd,* 782 F.2d 1055 (9th Cir. 1985); McKillop v. Regents of Univ. of Cal., 386 F. Supp. 1270 (N.D. Cal. 1975). *But see* In re Dinnan, 661 F.2d 426 (5th Cir. 1981).

[22] Diversified Indus., Inc. v. Meredith, 572 F.2d 596 (8th Cir. 1977) (en banc); In re LTV Sec. Litig., 89 F.R.D. 595 (N.D. Tex. 1981); Byrnes v. IDS Realty Trust, 85 F.R.D. 679 (S.D.N.Y. 1980); In re Grand Jury Subpoena Dated July 13, 1979, 478 F. Supp. 368 (E.D. Wis. 1979). Although *Diversified Industries* and *In re Grand Jury Subpoena* were technically decided under the attorney-client privilege, the rationale they employed supports the privilege for self-critical evaluation. *See infra* notes 97–106 and accompanying text.

[23] For general discussion of the factual patterns in which the privilege has thus far been applied, see Allen & Hazelwood, *supra* note 1, at 362–63; Crisman & Mathews, *supra* note 1, at 172; Flanagan, *supra* note 1, at 552; HARVARD Note, *supra* note 1, at 1088–90.

[24] *See* 42 U.S.C. § 1320c-1 to -22 (1982). This legislation requires the establishment of a national network of physician groups to review the care rendered to certain groups of patients. *See* A. GOSFIELD, PRSO's: THE LAW AND THE HEALTH CONSUMER 8–10 (1975). The Joint Commissions on Accreditation of Hospitals (JCAH) created the medical review committees, which seek to improve patient care and treatment. The JCAH's view is that such improvements are facilitated by assuring that hospitals conduct thorough and continuing reviews of their patient treatment. *See* JOINT COMMISSION ON ACCREDITATION OF HOSPITALS, BULLETIN NO. 3, STANDARDS FOR HOSPITAL ACCREDITATION (August 1958).

[25] Those statutes providing civil immunity include: ALASKA STAT. § 18.23.020 (1986); ARIZ. REV. STAT. ANN. § 36-445.02 (1986); ARK. STAT. ANN. § 82-3202 (1976); COLO. REV. STAT. § 12-43.5-103 (1985 & Supp. 1986); GA. CODE ANN. § 31-7-132 (1982); HAW. REV. STAT. § 663-1.7 (1976 & Supp. 1984); IDAHO CODE § 39-1392c (1985); ILL. ANN. STAT. ch. 111 1/2, para. 151.2 (Smith-Hurd Supp. 1986); IND. CODE ANN. § 34-4-12.6-3 (West 1983 & Supp. 1986); KAN. STAT. ANN. § 65-442 (1980); ME. REV. STAT. ANN. tit. 32, § 3293 (1978); MASS. GEN. LAWS ANN. ch. 231, § 85N (West 1985 & Supp. 1986); MINN. STAT. ANN. § 145.63 (West Supp. 1986); MISS. CODE ANN. § 41-63-5 (1972 & Supp. 1986); N.H. REV. STAT. ANN. § 507:8-c (1984); N.J. STAT. ANN. § 2A: 84-22.10 (West Supp. 1986); N.M. STAT. ANN. § 41-9-4 (1986); OHIO REV. CODE ANN. § 2305.25 (Anderson 1981 & Supp. 1986); PA. STAT. ANN. tit. 63, § 425.3 (Purdon Supp. 1986); S.C. CODE ANN. § 40-71-10 (Law. Co-op. 1986); S.D. CODIFIED LAWS ANN. § 36-4-25 (1986); UTAH CODE ANN. § 58-12.43(8) (1986); VT. STAT. ANN. tit. 26, § 1442 (Supp. 1986); VA. CODE ANN. § 54-321.2:1 (Supp. 1986); WASH. REV. CODE ANN. § 4.24.240 (Supp. 1987); W. VA. CODE § 30-3C-2 (1986); WIS. STAT. ANN. § 146.37 (West Supp. 1986); WYO. STAT. § 35-17-103 (1977).

Those statutes preventing discovery include: ALA. CODE § 34-24-58 (1985); ALASKA STAT. § 18.23.030 (1986); ARIZ. REV. STAT. ANN. § 36-445.01 (1986); ARK. STAT. ANN.

contains at least one legislative proposal for a "self-evaluative privilege,"[26] and several proposals have been considered by various committees of the American Bar Association.[27]

## B. *The Need for a Separate Privilege*

Although some materials which would be protected by the privilege for self-critical analysis would also be covered by the attorney-client privilege or the work product doctrine, neither accords sufficient protection to the types of evaluations covered by the proposed Model Statute below.

The attorney-client privilege protects from disclosure any confidential communications between attorney and client relating to the legal matters for which the attorney was consulted.[28] When its foundational requirements are satisfied, and when the client has not waived it, the privilege is absolute; no showing of exceptional need, even on the basis that the information contained in the confidential communication cannot be learned

---

§ 82-3204 (1976); CAL. EVID. CODE § 1157 (West Supp. 1987); GA. CODE ANN. § 31-7-133 (1982); HAW. REV. STAT. § 624-25.5 (1976 & Supp. 1984); IDAHO CODE § 39-1392b (1985); IND. CODE ANN. § 34-4-12.6-2 (West 1983 & Supp. 1986); KAN. STAT. ANN. § 65-4915 (Supp. 1984); ME. REV. STAT. ANN. tit. 32, § 3296 (1978); MINN. STAT. ANN. § 145.64 (West Supp. 1986); MISS. CODE ANN. § 41-63-9 (1972 & Supp. 1986); NEB. REV. STAT. § 25-12,123 (1985); NEV. REV. STAT. § 49.265 (1985); N.H. REV. STAT. ANN. § 829:29 (1984 & Supp. 1986); N.J. STAT. ANN. § 2A: 84A-22.8 (West 1976 & Supp. 1986); N.M. STAT. ANN. § 41-9-5 (1986); N.D. CENT. CODE § 31-08-01 (1976 & Supp. 1985); OHIO REV. CODE ANN. § 2305.251 (Anderson 1981 & Supp. 1986); PA. STAT. ANN. tit. 63, § 525.4 (Purdon Supp. 1980); S.C. CODE ANN. § 40-71-20 (Law. Co-op. 1986); S.D. CODIFIED LAWS ANN. § 36-4-26.1 (1986); UTAH CODE ANN. § 58-12.43(7) (1986); VT. STAT. ANN. tit. 26, § 1443 (Supp. 1986); W. VA. CODE § 30-30-8 (1986); WIS. STAT. ANN. § 146.38 (West Supp. 1986); WYO. STAT. § 35-17-105 (Supp. 1986).

Those statutes which both provide civil immunity and prevent discovery include: CONN. GEN. STAT. ANN. § 38-19a (West Supp. 1986); DEL. CODE ANN. tit. 24, § 1768 (1981 & Supp. 1986); FLA. STAT. ANN. § 768.40 (West 1986); IOWA CODE § 147,135 (Supp. 1986); KY. REV. STAT. ANN. § 311.377 (Michie/Bobbs-Merrill 1983); LA. REV. STAT. ANN. § 13:3715.3 (West Supp. 1987); MICH. COMP. LAWS ANN. § 333.16244 (West 1980 & Supp. 1986); MO. REV. STAT. § 537.035 (Supp. 1987); MONT. CODE ANN. § 37-2-201 (1985); N.Y. EDUC. LAW § 6527 (McKinney 1985 & Supp. 1987); N.C. GEN. STAT. § 131E-95 (1986); OKLA. STAT. ANN. tit. 63, § 1-1709 (West 1984); R.I. GEN. LAWS § 23-17-25 (1986); TENN. CODE ANN. § 63-6-219 (1986); TEX. REV. CIV. STAT. ANN. art. 4447d (Vernon 1976 & Supp. 1987); WASH. REV. CODE ANN. § 4.24.250 (Supp. 1987). Only Maryland and Oregon do not have statutes either providing civil immunity or preventing discovery.

For a discussion of the effect of this legislation, see Note, *The Legal Liability of Medical Peer Review Participants for Revocation of Hospital Staff Privileges*, 28 DRAKE L. REV. 692 (1979).

[26] Murphy, *supra* note 1.

[27] *See* Crisman & Mathews, *supra* note 1, at 173-74.

[28] 8 J. WIGMORE, *supra* note 4, § 2292.

by other means, can overcome the privilege.[29] As with most other privileges, the primary theory supporting the need for an evidentiary privilege is instrumental. Without such a privilege, the argument states, there will not be full and frank discussion of all facts in the course of the attorney-client relationship.[30] Although one most often thinks of such a relationship as existing between a single attorney and a single client, it is now clear that the privilege also exists for entities such as corporations.[31] If a corporation relates the results of a self-critical study to its attorney, an opponent in litigation cannot force disclosure of this communication.

Nonetheless, the attorney-client privilege protects only the confidential communication itself. Both the facts learned and the subjective evaluations made in the course of a self-critical study (or the study itself when it is not in fact a communication to the attorney) are therefore not protected by the privilege.[32] Moreover, the self-critical study often will be conducted by outside investigators who might not be considered attorneys for purposes of the attorney-client privilege, even if the investigator is in fact an attorney. This would place all communications made to such individuals outside the scope of the privilege.[33]

There may be times, however, when the somewhat broader work product doctrine will protect self-critical evaluations. That doctrine, which was first recognized by the Supreme Court in *Hickman v. Taylor*,[34] protects from discovery the product of an

---

[29] In Diversified Indus., Inc. v. Meredith, 572 F.2d 596 (6th Cir. 1977) (en banc), the court referred to the "long established rule that confidential communications between an attorney and his client are absolutely privileged from disclosure against the will of the client." *Id.* at 601. There is even a restriction on a court's right to view privileged matter. *See* FED. R. EVID. 104(a). However, there are some signs of erosion in the long-standing concept that the attorney-client privilege is absolute. Several years ago, the New Jersey Supreme Court stated that the attorney-client privilege will yield when the evidence is relevant, when there is a legitimate need for it, and when that information cannot be secured from a less intrusive source. Nat'l L. J., March 26, 1979, at 2.

[30] 8 J. WIGMORE, *supra* note 4, § 2291.

[31] *See* Upjohn Co. v. United States, 449 U.S. 383 (1981). Although the Court did not clearly enunciate the contours of the privilege, it did explicitly reject the limited form of privilege usually called the "control group test." For an explanation of the control group test, see City of Philadelphia v. Westinghouse Elec. Corp., 210 F. Supp. 483, 485 (E.D. Pa.), *mandamus and prohibition denied sub nom.* General Elec. Co. v. Kirkpatrick, 312 F.2d 742 (3d Cir. 1962), *cert. denied*, 372 U.S. 943 (1963). Other courts have adopted a more expansive role of the privilege, implementing a "subject matter test." *See* Harper & Row Publishers, Inc. v. Decker, 423 F.2d 487 (7th Cir. 1970), *aff'd per curiam by an equally divided Court*, 400 U.S. 348 (1971).

[32] C. MCCORMICK, *supra* note 3, § 89, at 214.

[33] STANFORD Note, *supra* note 1, at 1169–74.

[34] 329 U.S. 495 (1947).

attorney's trial preparation. As the work-product doctrine was designed in large part to maintain the integrity of the adversary process, the material that it covers can be discovered only in the face of a demonstration of compelling need.[35] If, therefore, a client acting at the request of an attorney for purposes of trial preparation conducts a self-critical study, any information learned as a result of the study, any subjective evaluations emanating from that study, and any report issuing from the work, might be protected from discovery. However, if the study was not prepared in anticipation of litigation, or if preparation for litigation was not the dominant purpose of the study, the work product doctrine will not protect its confidentiality.[36]

Therefore, neither the attorney-client privilege nor the work product doctrine will protect a self-critical evaluation in all cases. While the attorney-client privilege is absolute, it covers only confidential communications. The work product doctrine, by contrast, casts a broader net of coverage, but applies only to work prepared in anticipation of litigation, and gives way in the face of a showing of great need. Yet the policy reasons for encouraging self-critical studies argue for the invocation of a doctrine which offers more protection.[37]

Although courts may possess the power to create new privileges,[38] the increasingly broad recognition of this particular privilege, together with the need for a more uniform approach to its definition and application, suggests the need for the legislative development of the self-evaluative privilege.

---

[35] Rule 26(b)(3) of the Federal Rules of Civil Procedure provides that attorney work-product may be discovered "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." FED. R. CIV. P. 26(b)(3). *See also* 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2025 (1970).

[36] OHIO STATE Note, *supra* note 1, at 724; STANFORD Note, *supra* note 1, at 1174–76. *See also* In Re Grand Jury Investigation (Sun Oil), 599 F.2d 1224, 1226–27 (3d. Cir. 1979); United States v. Upjohn Co., 600 F.2d 1223, 1224–25 (6th Cir. 1979), *rev'd*, 449 U.S. 383 (1981).

[37] For a general discussion of weaknesses in attempting to apply the attorney-client and work product privileges to cases involving self-critical analyses, see Crisman & Mathews, *supra* note 1; *see also* OHIO STATE Note, *supra* note 1.

[38] Privileges first arose at common law, and the courts' power to create privileges is still recognized. *See* Weiss, *supra* note 1, at 153–54. In addition, Rule 501 of the Federal Rules of Evidence has been interpreted as granting to federal courts the power to create new evidentiary privileges. CALIFORNIA Comment, *supra* note 1, at 1540–42.

## II. Proposed Model Statute

The Model Statute proposed in this Article narrowly defines the privilege in order to ensure that its enforcement does not unduly impede the search for truth in the judicial process. However, as the proposed statute and its commentary make clear, the language used to establish the privilege can be neither so narrow nor so focused as to cover all possible situations in which it might appropriately be applied. That is, the Model Statute cannot create a privilege whose application will be entirely clear upon enactment, and it is expected that the statute's breadth will be defined by judicial application. As is the case with many evidentiary rules,[39] the terms of the rule require the judge to balance specific factors and to reach a conclusion based at least in part on the propriety of applying the privilege under the circumstances of the case. As courts apply the rule over a period of time, its reach will become increasingly clear and the results of its application more predictable.

Bracketed material within the text of the Model Statute constitutes an alternative to the immediately preceding language.

### QUALIFIED PRIVILEGE FOR SELF-CRITICAL ANALYSIS

**Section (a). (Definitions.) As used in this Statute:**

1. **"Business" includes a business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.**

2. **"Self-critical analysis" is an internal review of a major policy or procedure, conducted by or on behalf of a business' management, and which contains subjective evaluations concerning the policy or procedure.**

3. **"Holder of the privilege" is (A) the business if it is in existence at the time that disclosure is sought; or (B) a successor, assign, trustee, agent, receiver, or any similar representative of the business if the business is no longer in existence at the time that disclosure is sought.**

---

[39] *See, e.g.,* Fed. R. Evid. 403 (allowing the court to exclude relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence"); Fed. R. Evid. 609(a)(1) (allowing the use of certain prior convictions to impeach a witness' credibility when the court finds "that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant").

Section (b).  (Qualified privilege; general rule.) Subject to Section (c), if discovery of a self-critical analysis is sought by any party, the holder, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, any subjective evaluations contained in the self-critical analysis.

Section (c).  (Qualified privilege; order compelling disclosure.) If a claim of privilege is made pursuant to Section (b), the party seeking disclosure may move the court for an order compelling production of the self-critical analysis.

  1.  Ruling on motion; burden of business against which discovery is sought. The business against which discovery is sought shall have the burden of demonstrating (A) that the document satisfies the definition of self-critical analysis set forth in Subsection (a)(2); and (B) that the self-critical analysis concerns matters which directly serve the public interest.

  2.  Ruling on motion; burden of party seeking discovery. The party seeking discovery shall have the burden of demonstrating (A) that the information contained in the report is not of a type whose flow would be curtailed if discovery were allowed; and (B) that the party's need for the information in the preparation of the case [substantially] outweighs the public benefit from non-disclosure.

  3.  Disclosure to court. Should the court find it necessary in order to rule on a motion to compel discovery pursuant to this Subsection, it may require that the holder make available for in camera inspection the self-critical analysis and any related documents sought by the adverse party. Disclosure to the court for this purpose shall not constitute a waiver of the privilege.

Section (d).  (Waiver.)

  1.  General Rule. The privilege is waived to the extent that the holder voluntarily discloses a significant part of the self-critical analysis or consents to such disclosure by anyone, except as necessary to further the goals of the investigation. Consent to disclosure shall be found if the holder acts in a manner inconsistent with an intention to maintain the privilege.

  2.  Voluntary disclosure to governmental agency. Disclosure of a self-critical analysis to a governmental agency pursuant to a voluntary program of disclosure shall not constitute a waiver of the privilege with respect to other persons or other governmental agencies unless the holder, by conduct or otherwise, manifests an intention not to maintain the privilege. [Voluntary disclosure of a self-critical analysis

to any governmental agency pursuant to a voluntary program of disclosure shall constitute a waiver of the privilege.]

**Section (e). (Exception: crime or fraud.) There is no privilege pursuant to this rule if the business undertakes the self-critical analysis in furtherance of an illegal or fraudulent activity.**

## III. COMMENTARY TO THE MODEL STATUTE

### A. *Title*

The title chosen for the privilege, Qualified Privilege for Self-Critical Analysis, reflects two essential aspects of its application. First, the privilege resembles the work product doctrine (which provides protection unless the party seeking disclosure is able to demonstrate a particularly great need) more than the attorney-client privilege (which, once satisfied, does not yield no matter how great the need). Second, the privilege extends only to a business' candid self-evaluation. Other titles for the privilege have been suggested,[40] but the title chosen appears to describe best both its general nature and one of its primary limitations.

Although most authors have used the term "privilege" to describe the nascent doctrine providing qualified protection for self-critical analyses, at least two commentators have suggested caution when using such terminology. One author, writing early in the development of protection for self-critical analyses, stated:

> [T]here are several reasons the protection granted such materials should not be labeled a privilege. First, the problem surrounding self-evaluative reports has arisen almost exclusively in the discovery context. Thus, stating the protection in terms of a privilege may cause confusion because privi-

---

[40] The Model Statute derives its name largely from that suggested in HARVARD Note, *supra* note 1, at 1086 n.14. That author used the name "privilege of self-critical analysis," and noted some of the many names which have been used to describe the privilege: the "privilege against disclosure of self-evaluative documents" (Emerson Elec. Co. v. Schlesinger, 609 F.2d 898, 907 (8th Cir. 1979)); "qualified privilege for self-evaluative documents" (Reynolds Metals Co. v. Rumsfeld, 564 F.2d 663, 667 (4th Cir. 1977)); "privilege of 'self-critical' analysis" and "defense of self-critical analysis" (Webb v. Westinghouse Elec. Corp., 81 F.R.D. 431, 433 (E.D. Pa. 1978)); and "self-evaluative report privilege" (OHIO STATE Note, *supra* note 1, at 723). Professor Murphy simply uses the term "self-evaluative privilege." Murphy, *supra* note 1.

leges apply equally at both trial and discovery. Second, the policies supporting restriction of discovery are not always congruent with those supporting the recognition of a privilege at trial.[41]

Another author carefully sought to differentiate between "evidentiary privileges" and "discovery privileges":

> An evidentiary privilege that will prevent admission of certain material at trial operates to prevent discovery as well. . . . A privilege barring pretrial discovery of certain evidence, however, does not compel the exclusion of that evidence at trial. Moreover, the courts apply evidentiary privileges in a more rigid and automatic fashion than discovery privileges whose use depends more on the particular facts of each case.[42]

This author argues that the emerging doctrine would best be labeled a "qualified immunity from discovery," making it analogous to the work product rule.[43] He concludes by noting that "the self-evaluative privilege is not an evidentiary privilege, but rather an exercise in discretionary protection founded in the court's power over discovery."[44]

Although these points are well taken, the general use of privilege terminology in connection with the protection of self-critical analyses, together with careful delineation of the method of its application, suggests that using the privilege label will not cause confusion.

## B. *Section (a): Definitions*

Section (a) defines three terms which are central to the application of the privilege. Subsection (a)(1) defines "business"

---

[41] Minnesota Comment, *supra* note 1, at 817.

[42] Flanagan, *supra* note 1, at 553 n.12. Professor Flanagan argues that the doctrine has been applied in only limited circumstances and should not be labeled a privilege:

> At most, the coalescing doctrine of the privilege for self-critical analyses provides some protection for self-critical, subjective conclusions such that they need not be produced in civil litigation if sought by private litigants to support claims that the subject of the review acted improperly in the matter under consideration. . . . Given its limited protection, its many exceptions, the undeniable relevance of its information, and the access of the discovering party to its underlying facts, the privilege appears to have an insignificant effect on discovery. Characterizing it as a qualified privilege is a misnomer. To date, the privilege has been asserted only during discovery, and there is no judicial support for its application, as a matter of evidence law, to prevent the admission of self-critical studies at trial.

*Id.* at 573.

[43] *Id.* at 575.

[44] *Id.* at 576.

broadly, adopting language found in the business records exception to the hearsay rule of the Federal Rules of Evidence.[45] By employing this broad definition, the Model Statute makes clear that businesses of any kind, whether or not organized as corporations, and whether or not formed for purposes of making profit, will be permitted to claim the privilege in appropriate circumstances. This definition seems particularly appropriate given the historical development of the privilege for self-critical analysis. As discussed above,[46] the privilege was first explicitly recognized in connection with peer reviews conducted by hospitals,[47] which are often not-for-profit enterprises. The definition would also encompass other types of entities to which the privilege for self-critical analysis has thus far been applied, including educational institutions.

Subsection (a)(2) defines self-critical analysis in a manner intended to make clear that the privilege is at once both broad and narrow in scope. On the one hand, it is broad enough to cover self-critical analysis in widely varying contexts; on the other hand, it is narrow, as not all self-critical analyses will qualify for the privilege. For prima facie qualification, the self-analysis must satisfy three major criteria: (1) it must be internally conducted by or on behalf of management, (2) it must review a major policy or procedure, and (3) it must contain subjective evaluations concerning the policy or procedure being studied.[48]

Several aspects of the definition bear discussion. Often, the self-critical study will be conducted or ordered by top management, but the definition does not require this for several reasons: (1) determination of which persons constitute top management under particular circumstances is often difficult, (2) rejection by the Supreme Court of the control group test for attorney-client privilege[49] suggests that the Court does not believe that the privilege should depend on the precise position of the corporate

---

[45] Rule 803(6) of the Federal Rules of Evidence defines "business" to include "business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit." FED. R. EVID. 803(6).

[46] *See supra* notes 15 & 17 and accompanying text.

[47] Bredice v. Doctors Hosp., Inc., 50 F.R.D. 249 (D.D.C. 1970), *aff'd*, 479 F.2d 920 (D.C. Cir. 1973).

[48] This definition of self-critical analysis generally tracks the suggestion of Professor Flanagan, who defined a self-critical study "as a review of a major policy or procedure, conducted by or for top management to permit the evaluation and improvement of an organization's operations." Flanagan, *supra* note 1, at 556.

[49] *See* Upjohn Co. v. United States, 449 U.S. 383, 393 (1981).

employee whose communication is at issue, and (3) cases will arise in which a person who clearly does not fit within the category of top management nonetheless has the authority to order or conduct a self-critical study sufficiently important to merit protection. Thus, the term "management" in the definition should be interpreted liberally.

The self-critical study must also concern a major policy or procedure. This part of the definition will ensure that businesses do not impede the discovery process by claiming privileges for studies of minor importance.

Finally, the definition requires that the self-critical analysis contain subjective evaluations of the matter in question. As Section (b) makes clear, only subjective evaluations may be privileged; no protection extends to the data on which such evaluations are based.[50]

Of course, not all self-analyses which satisfy the definition contained in Subsection (a)(2) will necessarily be protected by the privilege. In order to be accorded protection, the provisions of Section (b) must also be satisfied.

Subsection (a)(3) defines the holder of the privilege as the business, if it is in existence when disclosure is sought, or a successor, assign, trustee, agent, receiver, or other representative, if the business itself no longer exists.[51] The holder concept is essential to the law of privilege. However, persons other than the holder may claim the privilege on behalf of the holder. Indeed, as claims of privilege under the Model Statute will primarily arise in the course of discovery proceedings, it will generally be the duty of the attorney to claim the privilege on behalf of the business. Nonetheless, only the holder may waive his right to the privilege.[52]

## C. *Section (b): Qualified Privilege; General Rule*

This section sets forth the basic rule of privilege. The rule vests in the holder of the privilege the right both to refuse to

---

[50] To qualify as a self-critical analysis, the study need not contain information or subjective evaluation which would tend to reflect negatively on the business. While businesses will often have little objection to releasing studies which reflect well on their operations (and the privilege is thus not as likely to be asserted in these cases), the privilege does extend to such studies.

[51] The terminology is largely drawn from California's definition of the holder of the attorney-client privilege. *See* CAL. EVID. CODE § 953 (West 1986 & Supp. 1987).

[52] This general concept applies to all privileges. *See, e.g.,* C. McCORMICK, *supra* note 3, § 93, at 223 (attorney-client privilege).

disclose and to prevent another from disclosing the privileged material.[53] The rule makes clear, however, that the privilege does not embrace an entire self-critical analysis, but only the subjective evaluations contained within. This limitation parallels the case law to date,[54] and has been embraced in the academic literature.[55] Several rationales have been raised in support of the limitation:

> Because the quality of the facts and statistics compiled has no real relationship to the confidentiality fostered by the [privilege], and because their accuracy is readily verifiable and often available notwithstanding the privilege, the rationale behind the privilege is not applicable to this objective type of information. Furthermore, the public has a much greater interest in the disclosure of relevant facts than in gaining access to the subjective evaluations of a source of confidential information.[56]

One reason for protecting only subjective evaluations thus appears to be that the primary purpose behind the privilege—to foster the kind of critical self-evaluations which might not be conducted in the absence of an assurance of confidentiality—applies to subjective evaluation but not to facts. As one author writes, the "chilling effects of disclosure often operate on facts as well as evaluations."[57] Although this criticism appears largely valid, other reasons support the distinction. Principal among them is that the party seeking disclosure may have a great need for particular factual data, which may not be otherwise available. In *Gillman v. United States*,[58] for example, a widow

---

[53] The precise language discussed closely parallels that used to create privileges in the California Evidence Code. *See, e.g.,* CAL. EVID. CODE § 954 (West 1986 & Supp. 1987) ("the client, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer. . . .").

[54] *See, e.g.,* Webb v. Westinghouse Elec. Corp., 81 F.R.D. 431, 433–34 (E.D. Pa. 1978); Dickerson v. United States Steel Corp., 14 Fair Empl. Prac. Cas. (BNA) 1448, 1449 (E.D. Pa. 1976); Wright v. Patrolmen's Benevolent Ass'n, 72 F.R.D. 161, 164 (S.D.N.Y. 1976); Gillman v. United States, 53 F.R.D. 316, 319 (S.D.N.Y. 1971).

[55] Weiss has stated that "[a] general rule has developed which provides that only subjective conclusions are protected . . . and that statistics and other factual material compiled for the self-evaluation should be disclosed. While it has been criticized, the rule is well established and not without justification." Weiss, *supra* note 1, at 161 (footnotes omitted); *see also* Allen & Hazelwood, *supra* note 1, at 372.

[56] Weiss, *supra* note 1, at 161.

[57] HARVARD Note, *supra* note 1, at 1094. This author also noted that the distinction between facts and evaluation is often vague, and that courts have sometimes drawn the line between the two improperly. *Id.* at 1095–96. In addition, when documents contain both facts and evaluation, excising the evaluative portions can prove complex and costly. *Id.* at 1096.

[58] 53 F.R.D. at 316.

brought suit against the government following the suicide of her husband, who was a patient in a government-run facility. The plaintiff sought production of various documents, including ones which contained factual accounts of the incident by hospital personnel. Denying protection for these documents, the court wrote:

> The statements of Hospital personnel as to what actually happened are important to the plaintiff in her discovery of the facts and to forestall recent contrivance. Statements taken shortly after an occurrence are unique and can never be duplicated precisely. . . . That the decedent is not here to testify or help counsel is also a factor weighing in favor of the plaintiff.[59]

Because the need for factual information may be great, the Model Statute limits the privilege to the subjective elements of a self-critical analysis.[60]

### D. *Section (c): Qualified Privilege; Order Compelling Disclosure*

#### 1. General Principle

Modern procedural reforms permit most routine discovery to take place without substantial court involvement. When documents are sought from a party, the party seeking discovery generally need only serve a request on the other party. Procedural rules then provide for a specified number of days either to produce the materials or to make appropriate objections.[61] Although discovery of documents from a non-party technically requires some court involvement, that involvement is usually very limited. Parties may generally take the depositions of non-

---

[59] *Id.* at 319 (citations ommitted).

[60] *See supra* note 54, for cases in which courts have distinguished between subjective and factual material. In some cases a distinction has also been drawn between routine deliberations and analyses conducted in reponse to a particular crisis. The courts adopting this latter distinction have sanctioned protection only for the routine deliberations largely on the basis that they are conducted with an expectation of confidentiality and that such routine reviews might not be conducted if discovery were generally allowed. *See, e.g.,* Bredice v. Doctors Hosp., Inc., 50 F.R.D. 249, 250 (D.D.C. 1970), *aff'd*, 479 F.2d 920 (D.C. Cir. 1973); *see also* CHICAGO Comment, *supra* note 1, at 820–21. The Model Statute does not specifically embrace this standard, but instead, contemplates that a court will weigh the factors in each case. This approach probably will lead to the same results reached by use of the *Bredice* distinction.

[61] *See, e.g.,* FED. R. CIV. P. 34.

parties without formal court order,[62] and if the party taking the deposition wishes the deponent to produce specified documents at the deposition, such production can be compelled by means of a subpoena duces tecum, which the court most often issues as a matter of course.

Only when the party seeking discovery believes that the production was inadequate will the court become wholly involved in the discovery process. To force production, the party must move the court for an order compelling discovery.[63] Both sides will be given an opportunity to present argument on the question of whether discovery should be compelled, and the court will issue an appropriate order.

Section (c) of the Model Statute is intended to track the familiar procedure for seeking and compelling discovery. This Section takes effect when the business which has prepared a self-critical analysis has claimed its privilege pursuant to Section (b) and the party seeking discovery wishes to invoke the court's authority to compel disclosure. Section (c) sets forth the burdens which must be satisfied both by the party seeking discovery and the business against whom discovery is sought. The primary burden rests on the party seeking discovery.

2. Burden on Party that Prepared the Self-Critical Analysis

Subsection (c)(1) sets forth the burden of proof which the business preparing the self-critical analysis must satisfy. The business must meet two conditions. First, under Subsection (c)(1)(A), the business must establish that the document for which it claims a privilege satisfies the definition of self-critical analysis found in Subsection (a)(2). This burden most appropriately falls upon the business, as it prepared the study and therefore has the easiest access to information about the methods of its preparation and the kind of information it contains. Second, under Subsection (c)(1)(B), the business must establish "that the self-critical analysis concerns matters which directly serve the

---

[62] *See, e.g.*, FED. R. CIV. P. 30. That rule requires reasonable notice, but does not require leave of court to take the deposition of "any person" except in limited circumstances applicable only to the defendant. Of course, attorneys commonly seek issuance of a subpoena to compel the deponent's attendance, but the rule does not require such a practice. Rule 34(c) of the Federal Rules of Civil Procedure also allows an "independent action" against a non-party for production of documents, though this procedure is not employed very often. FED. R. CIV. P. 34(c).

[63] *See, e.g.*, FED. R. CIV. P. 37(a).

public interest." All evidentiary and procedural devices which shield information from a party, particularly privileges, potentially impede the truth-seeking function of the trial.[64] This is the primary reason behind Wigmore's argument that evidentiary privileges should be created for particular kinds of relationships only where stringent criteria can be satisfied.[65] Although self-critical analyses generally will not arise from the sort of relationships that have given rise to existing privileges,[66] the primary issue raised by both the traditional privileges and the privilege for self-critical analysis remains the same: whether the overall social gain from invoking the privilege overrides the adversary's need for the materials being sought. On this question the courts which have established the privilege for self-critical analysis have been clear.[67] While protecting such studies from disclosure may mean the loss of possibly critical evidence for a litigant,[68] the public gain from preventing disclosure may far outweigh that cost.

It is difficult to generalize about those situations in which a self-critical analysis directly serves the public interest. One criterion may be that the primary purpose of the study must not have been to improve the efficiency of the business.[69] That is, the privilege functions primarily to encourage businesses to conduct self-critical studies which directly serve the public interest.[70] However, because the privilege shields potentially important information from disclosure, it should be available only when absolutely necessary. If, then, the study's primary purpose is to improve the efficiency or profitability of the business, that study will generally be conducted even without protection from subsequent disclosure. The privilege is therefore not needed in such cases.

---

[64] *See supra* notes 1–5 and accompanying text.

[65] *See supra* note 4.

[66] Most privileges are designed to protect particularly described relationships, such as husband-wife or clergyman-penitent. *See* FED. R. EVID. 505, 506 (Proposed Draft 1969). The privilege for self-critical analysis, however, does not precisely concern a relationship or status between two persons or entities.

[67] *See* cases cited *supra* notes 13–22.

[68] When the court fully serves its truth-seeking function, both the litigant and the public in general benefit. To deny a litigant access to potentially relevant information not only hurts that litigant, but also erodes society's view of the legitimacy of the courts as institutions which adequately and fairly resolve disputes. *Cf.* Leonard, *supra* note 2.

[69] *See, e.g.,* HARVARD Note, *supra* note 1, at 825.

[70] *See supra* notes 10–27 and accompanying text.

Self-critical studies that do not primarily concern the efficiency of business operations, on the other hand, are far less likely to be conducted without protection. Indeed, these studies may conclude that the business should devote additional resources to matters such as safety which are beneficial to the public. Rather than improving profitability, such steps may adversely impact the business' financial position. Therefore, businesses need confidentiality to ensure the free flow of information and of self-critical conclusions which might result from an analysis. Arguably, society would be in a worse position if such studies were never conducted than it would be if a qualified privilege were accorded to the subjective conclusions reached in the study.[71] Of course, if the primary purpose of a self-critical study is to analyze a matter of public concern, protection will be called for even if the study might have had a secondary effect of making the business more efficient.

The requirement that the study be shown to serve the public interest "directly" is not intended to create a significant hurdle for the business. Nevertheless, a mere secondary salutary effect on the public interest will not suffice. A study primarily intended to make a company's production process more efficient, for example, may well lead to lower consumer prices for the product. Although this may be in the public interest, the achievement of lower consumer prices could be treated as a mere indirect effect of the study, and the business then could not successfully demonstrate that the study directly serves the public interest.

Safety-related studies, such as those designed to improve the safety of a business' products or manufacturing process, or those relating to the quality of care provided to persons who place themselves in the care of the business,[72] will generally satisfy the test of Subsection (c)(1)(B). Because a business' efforts to comply with the law also serves the public interest, self-critical analyses of this aspect of a business' operations will generally satisfy the test as well. Included would be studies of a business' compliance with anti-discrimination laws[73] and other legislation designed to protect individual rights.[74] Beyond these

---

[71] If self-critical studies are not conducted, "materials *outside the scope of the privilege* are also not collected." Weiss, *supra* note 1, at 159 (emphasis in original; footnote omitted).

[72] *See* cases cited *supra* note 17.

[73] *See* cases cited *supra* note 20.

[74] *See* cases cited *supra* note 19.

general categories, the determination of whether a self-critical evaluation directly serves the public interest will require a case-by-case analysis. Judicial application of the standard will clarify its meaning and boundaries.

For the same reasons that the business must show that its study satisfies the definition of self-critical analysis, it also should bear the burden of demonstrating that its study directly serves the public interest. The business itself can best explain the purposes and uses of the study and has the easiest access to information about the study's likely impact. The business, however, need only demonstrate that the self-critical analysis is of a type which directly serves the public interest. Then the party seeking disclosure will have the burden of demonstrating that its need for the information in the preparation of its case outweighs the public interest in non-disclosure.

### 3. Burden on Party Seeking Disclosure of Self-Critical Analysis

Subsection (c)(2) establishes the burden which rests with the party seeking production (the moving party). The moving party must make two showings, each of which closely adheres to requirements developed in the case law applying the privilege for self-critical analysis. First, under Subsection (c)(2)(A), the moving party must demonstrate "that the information contained in the report is not of a type whose flow would be curtailed if discovery were allowed." This burden is placed on the party seeking production once the business has shown that the study directly serves the public interest. Such a burden will create neither an insuperable obstacle to the moving party, nor one which forces the moving party to guess the contents of the study. Most likely, the moving party will present general information demonstrating that businesses would conduct similar studies despite the absence of a guarantee of confidentiality. Among the many factors which might be considered in determining whether the moving party has made this showing are whether the report is mandated by legislation or regulation,[75] in which case some

---

[75] Some cases recognizing the privilege for self-critical analysis have concerned government-required reports. Affirmative action studies, which are required by federal law and regulation in numerous instances, are one example. For cases recognizing a privilege in this context, see *supra* note 20. *See also* HARVARD Note, *supra* note 1, at 1089.

reporting would still occur,[76] and whether the report contains
extremely sensitive information, such as frank evaluations of
the competency of co-workers or other personnel.[77] Other fac-
tors are likely to emerge from judicial application of the test.

  The second condition set out by Subsection (c)(2)(B) requires
that the party seeking discovery demonstrate that its "need for
the information in the preparation of the case [substantially]
outweighs the public benefit from non-disclosure." This is per-
haps the primary showing which must be made by the moving
party in order to overcome the claim of privilege, and will
require the application of a case-by-case analysis in light of the
facts at issue, the nature of the claim, and the particular self-
study involved. Although the lack of specificity in discretionary
standards can lead to inconsistent application,[78] the flexibility
afforded by such standards allows the courts greater opportunity
to view each case in light of its own facts and circumstances
and to reach decisions consistent with the goals of justice and
the needs of the litigants. Moreover, discretionary standards do
not grant unbridled discretion to the trial court. An adjudicable
discretionary standard carefully sets forth the factors which

---

[76] That the report may be required does not mean, however, that the flow of infor-
mation would not be curtailed. If confidentiality is not assured, persons interviewed by
the business in the preparation of the report may not be as forthcoming as they otherwise
would be, and the report's depth will be seriously affected. HARVARD Note, *supra* note
1, at 1091–93. In such cases, the court could find that the flow of information indeed
would be curtailed by requiring disclosure of the study.

[77] Such sensitive information is often found in cases involving denial of tenure to
university teachers. The privilege for self-critical analysis has been recognized in this
context. *See supra* note 21.

[78] The Supreme Court has noted that in order for the purposes of the attorney-client
privilege to be served, "[t]he attorney and client must be able to predict with some
degree of certainty whether particular discussions will be protected. An uncertain
privilege, or one which purports to be certain but results in widely varying applications
by the courts, is little better than no privilege at all." Upjohn Co. v. United States, 449
U.S. 383, 393 (1981). The Court then noted that the test for attorney-client privilege in
the corporate setting which had been used by the lower court had resulted in "disparate
decisions" which illustrated the test's "unpredictability." *Id. See also* Murphy, *supra*
note 1, at 496. The arguments for certainty in application appear to be strong with
regard to privileges, and per se rules are designed to be applied with the least variation.
Nevertheless, the work product doctrine, which operates much like a privilege, has
long been constructed as a balancing test. *See* FED. R. CIV. P. 26(b)(3).
  Discretionary standards in substantive areas of law, particularly tort law, have also
been criticized. *See* Henderson, *Expanding the Negligence Concept: Retreat from the
Rule of Law*, 51 IND. L.J. 467 (1976). Others, however, have suggested that properly
constructed discretionary standards can be applied consistently. *See* Leonard, *The Good
Samaritan Rule as a Procedural Control Device: Is It Worth Saving?*, 19 U.C. DAVIS
L. REV. 807 (1986); Twerski, *Seizing the Middle Ground Between Rules and Standards
in Design Defect Litigation: Advancing Directed Verdict Practice in the Law of Torts*,
57 N.Y.U. L. REV. 521 (1982).

must be balanced as well as the burdens which must be satisfied by the litigants. With appropriate guidelines, application of discretionary tests is neither insurmountably difficult nor wholly unpredictable. Finally, trial courts are especially familiar with the application of balancing tests in evidentiary and other procedural contexts. Rules of evidence contain numerous provisions requiring trial courts to determine the admissibility of evidence according to such balancing tests,[79] and doctrines such as that protecting attorney work product require similar analysis.[80]

Application of the privilege for self-critical analysis particularly calls for the use of a discretionary standard. The need for caution in the application of a rule excluding relevant evidence, the infinite variety of factual situations in which cases might arise, the unforeseeable circumstances in which claims of privilege will be made, and the peculiar evidentiary posture of each case strongly suggests the need for flexible application. In this respect, the considerations presented by the privilege for self-critical analysis resemble those presented by the work product doctrine.

Under the Federal Rules of Civil Procedure, an attorney's work product will be protected "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."[81] Subsection (c)(2)(B) of the Model Statute, however, is even more specific than the work product standard: in addition to requiring that the party show need for the information, the rule explicitly states that the court must balance that need against the interests of the business. As such, the standard should be relatively easy to apply. The primary task of the moving party will be to demonstrate to the court the degree to which the subjective conclusions in the self-critical analysis, the only parts of the analysis subject to the privilege, are needed. Such a showing could be made by demonstrating the centrality of the information to the issues in the case and the unavailability of other evidence which could ade-

---

[79] *See, e.g.,* FED. R. EVID. 403, 609; *see also supra* note 39.
[80] FED. R. CIV. P. 26(b)(3).
[81] *Id.*

quately substitute for the otherwise privileged material.[82] Once this has been established,[83] the court will balance the need against the public benefit to be derived from non-disclosure, keeping in mind that the burden rests with the moving party. Some courts applying the privilege for self-critical analysis have embraced similar variations of the balancing test,[84] and such a test has found support in the academic literature.[85]

Subsection (c)(2)(B) offers two alternative standards by which the trial court would measure the moving party's offer. Without adoption of the bracketed word "substantially," the moving party would only have to convince the court that its need for the subjective evaluations slightly outweighs the public benefit from non-disclosure. This test would be analogous to applying the familiar "preponderance of the evidence" standard in the trial of civil cases; the party with the burden need only tip the scales slightly in its favor.[86] The Model Statute favors this stan-

---

[82] One commentator has also noted that the showing of need cannot be satisfied by demonstrating only that the information would be "useful" or "helpful," even though such a standard is common in other procedural rules. CALIFORNIA Comment, *supra* note 1, at 1563. The Tenth Circuit, considering the privilege for gathering news, stated that disclosure should be compelled if the party seeking disclosure has been unable to obtain the material from another source, if the information "goes to the heart of the matter," and if it is of "certain relevance." Silkwood v. Kerr-McGee Corp., 563 F.2d 433, 438 (10th Cir. 1977).

[83] A balancing test could be constructed to require separate analysis of the availability of alternative sources of the information. For example, a separate Subsection (c)(2)(C) could be created which requires that the party seeking discovery demonstrate that the information contained in the report cannot reasonably be obtained by means other than disclosure of the self-critical analysis. The Model Statute did not adopt this option because the availability or non-availability of alternative evidence is one of the factors which helps to establish the degree of the moving party's need for disclosure.

[84] *See, e.g.,* Gray v. Board of Higher Educ., 692 F.2d 901 (2d Cir. 1982), *cert. denied,* _____ U.S. _____, 106 S. Ct. 2288 (1986); Jepsen v. Florida Bd. of Regents, 610 F.2d 1379 (5th Cir. 1980); Skibo v. City of New York, 109 F.R.D. 58 (E.D.N.Y. 1985). A balancing test has been at the core of the privilege from its earliest application. In a more general context, Judge Weinstein has enunciated a balancing test for determining when the need for disclosure outweighs the value of confidentiality. United States v. King, 73 F.R.D. 103, 105 (E.D.N.Y. 1976).

[85] *See* CALIFORNIA Comment, *supra* note 1, at 1564. *See also* MINNESOTA Comment, *supra* note 1, at 824 ("[t]he strength of the public interest in non-disclosure depends on both the importance to the public of the evaluative process which is sought to be protected and the extent to which disclosure would impair that process"). There the author suggested that in order to determine the negative effect of disclosure, the court should consider: "1) the magnitude and nature of the requested intrusion; 2) whether there are sufficient independent incentives to undertake self-evaluation even when confidentiality cannot be assured; and 3) the prejudicial effect disclosure would be likely to have on the outcome of the case." *Id.*
At least one author, however, has cautioned against the use of balancing tests both for this privilege and for consideration of the moving party's need. HARVARD Note, *supra* note 1, at 1097–1100.

[86] One treatise defines the "preponderance of the evidence" standard as follows: "[E]vidence preponderates when it is more convincing to the trier than the opposing

dard in recognition of the need for caution in framing rules which might impede the process of truth-determination.

Some jurisdictions may conclude, however, that there is a decreased incentive for self-critical analysis when a business cannot predict with a great degree of certainty whether the privilege would be applicable to a given study. One way to provide greater certainty about the privilege's application would be to increase the burden of proof which must be satisfied by the moving party in order to compel discovery. The Model Statute therefore offers an alternative which provides that the moving party must demonstrate that its need for the subjective evaluations in the study *substantially* outweighs the public benefit from non-disclosure. Application of such a standard would not be a novel task for trial courts, which utilize similar approaches in ruling on certain evidentiary matters.[87] Although such an alternative does not remove all uncertainty from the application of the privilege, it should increase confidence among businesses that subjective evaluations contained in any proposed self-critical studies will remain confidential.

### 4. A Fundamentally Different Alternative Regarding Burdens of Proof

Some legislatures still may not be convinced that the guided discretionary approach to motions to compel will lead to consistent and predictable results. In such instances, the following language may be substituted for Subsections (c)(1) and (c)(2) of the Model Statute:

1. **Ruling on motion. The court shall grant the motion to compel production only if:**
   (A) the business does not demonstrate (i) that the document satisfies the definition of self-critical analysis set forth in Subsection (a)(2), and

---

evidence. . . . The most acceptable meaning to be given to the expression . . . seems to be proof which leads the jury to find that the existence of the contested fact is more probable than its nonexistence." C. MCCORMICK, *supra* note 3, § 339, at 957.

In ruling on procedural and evidentiary matters (such as preliminary questions of fact), courts do not often refer to the quantum of proof which the moving party must offer. However, it is generally understood that unless otherwise specified, the party must only convince the court by evidence and argument satisfying the preponderance standard. 1 D. LOUISELL & C. MUELLER, FEDERAL EVIDENCE § 35 (1977); 1 J. WIGMORE, EVIDENCE § 17 n.20 (P. Tillers rev. ed. 1983).

[87] *See, e.g.,* FED. R. EVID. 403; *supra* note 39.

(ii) that the self-critical analysis concerns matters which directly serve the public interest; and

(B) the moving party demonstrates that the information contained in the report is not of a type whose flow would be curtailed if discovery were allowed.

In some respects, this alternative would operate similarly to the preferred version of the Model Statute. Under both versions, the business would have the burden of showing that the material satisfies the definition of self-critical analysis and concerns matters which directly serve the public interest. Also, the moving party retains the burden of demonstrating that the information contained in the study is not of the type whose flow would be curtailed if discovery were allowed.

In one respect, however, this alternative fundamentally changes the nature of the privilege. The language of Subsection (c)(2)(B), which set forth the essential balance between the moving party's need for the information and the public benefit from non-disclosure, has been removed entirely from the alternative Subsection (c). This change eliminates much of the court's discretion to review the application of the privilege in light of the particular circumstances of the case.

It is unlikely that different courts would reach varying conclusions about whether a document satisfies the definition of self-critical analysis or whether it concerns matters which directly affect the public interest. And while there may be some disagreement among courts over whether disclosure of a particular type of study would impede the flow of information, this determination does not demand the kind of specific, detailed review of the precise circumstances of the case — including the context in which discovery is sought — which is required in applying the balancing test in the preferred version.

Adoption of the alternative Subsection (c) would thus have both positive and negative consequences. On the one hand, it may have the salutary effect of creating more certainty about the privilege's application, presumably allowing business managers to make more informed decisions about the legal effects of conducting self-critical analyses. On the other hand, however, the court would not have the authority to weigh the circumstances of the case in order to determine the degree of the moving party's need for the information and the public's interest in non-disclosure of a particular study.

Because the alternative Subsection (c) does not require the moving party to demonstrate that its need for the information outweighs the public interest in non-disclosure, application of the alternative Subsection (c) would probably lead courts to compel production more frequently than under the original Subsection (c). Jurisdictions more concerned with the loss of evidence occasioned by the application of privileges may therefore favor the alternative Subsection (c).

### 5. Disclosure to Court

In some situations, the court may find that it cannot render an informed decision on a motion to compel production without inspecting the documents in question. In these cases, the Model Statute provides that the court may require the holder to make the documents available for in camera inspection. This procedure is commonly employed with regard to privileges[88] and has been implemented in several cases involving the privilege for self-critical analysis.[89]

There may be several reasons why the court would find it necessary to conduct an in camera inspection. Such a review might be necessary in order to determine whether the prima facie elements of the privilege have been satisfied, including whether the documents meet the definition of self-critical analysis and whether the documents concern matters which directly serve the public interest. In addition, the court might find it necessary to review the documents in order to determine the strength of the competing considerations specified in Subsection (c)(2). Thus, the court might require review in order to determine the importance of the documents to the party seeking disclosure, as well as the sensitivity of the information and other factors relevant to determining the degree to which non-disclosure would serve the public interest. In some cases in which the court has determined that the privilege applies, in camera inspection may be necessary in order to distinguish subjective evaluations entitled to the privilege from non-privileged mate-

---

[88] *See, e.g.,* Kerr v. United States Dist. Court, 426 U.S. 394, 406 (1976); United States v. Nixon, 418 U.S. 683, 714 (1974); Dykes v. Morris, 85 F.R.D. 373, 377 (N.D. Ill. 1980). *See also* 2 D. LOUISELL & C. MUELLER, FEDERAL EVIDENCE § 231 (1978).

[89] EEOC v. University of Notre Dame Du Lac, 715 F.2d 331, 338 (7th Cir. 1983), *cert. denied,* _____ U.S. _____, 106 S. Ct. 2288 (1986); O'Connor v. Chrysler Corp., 86 F.R.D. 211, 218 (D. Mass. 1980); Rosario v. New York Times Co., 84 F.R.D. 626, 631 (S.D.N.Y. 1979).

rial.[90] Whenever the court believes that it is unable to render an adequate decision without reviewing the material, such an inspection should be made.[91]

### E. *Section (d): Waiver*

#### 1. General Rule

As with all privileges, as well as other procedural and evidentiary rights, the privilege for self-critical analysis can be waived. Section (d) specifies the kinds of circumstances in which waiver will occur.

Subsection (d)(1) provides that the privilege is waived if the holder voluntarily discloses or consents to the disclosure of all or a significant part of the self-critical study, except as necessary to further the goals of the investigation. The rule provides further clarification by stating that consent to disclosure will be found when the holder "acts in a manner inconsistent with an intention to maintain the privilege." This rule accords with commonly applied principles of waiver.[92]

As with other privileges, issues will arise concerning whether any disclosure by the business will constitute a waiver. In order to conduct a thorough self-evaluation, businesses must often disclose the results of an ongoing investigation, or a completed study, to various persons for comment and evaluation. If such disclosure takes place to further the goals of the investigation, the court should not hold that the privilege has been waived. Finding a waiver in such circumstances would defeat the goal

---

[90] In these latter situations, in camera inspection may well be requested by the party which prepared the self-critical analysis in order to protect it from too broad a disclosure order.

[91] For discussion of the use of in camera inspection in the context of the privilege for self-critical analysis, see Weiss, *supra* note 1, at 161–62; CALIFORNIA Comment, *supra* note 1, at 1567.

[92] *See, e.g.,* CAL. EVID. CODE § 912 (West 1986 & Supp. 1987), providing that a privilege is waived

> if any holder of the privilege, without coercion, has disclosed a significant part of the communication or has consented to such disclosure made by anyone. Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which the holder has the legal standing and opportunity to claim the privilege.

If enacted, Proposed Rule 511 would have provided that a holder waives the privilege if he "voluntarily discloses or consents to disclosure of any significant part of the matter or communication." FED. R. EVID. 511 (Proposed Draft 1969).

of promoting frank, complete self-critical evaluation. In order to prevent such findings, Subsection (d)(1) states that disclosure "necessary to further the goals of the investigation" does not waive the privilege. Businesses, however, cannot invoke the privilege while disclosing portions of a study for commercial or other advantage: "[e]ither the material must be kept completely confidential and undisclosed, except for purposes of furthering the goals of the investigation, or the risk of disclosure must be accepted."[93]

Subsection (d)(1) should be interpreted in light of developing case law with respect to other privileges, especially cases analyzing waiver of the attorney-client privilege upon disclosure to persons outside of the business. In one case involving the attorney-client privilege, the court held that disclosure of an internal investigation to an accounting firm and outside counsel for an underwriter constituted a waiver of the attorney-client privilege.[94] Unless the self-critical analysis was disclosed in order to further the goals of the investigation, the court might also have held that such disclosure waived the privilege for self-critical analysis. By contrast, when an accountant is retained to assist a lawyer in rendering legal services to a business, the attorney-client privilege extends its protection to include confidential communications between the business and the accountant concerning the legal matter.[95] Accordingly, application of the privilege for self-critical analysis should follow this reasoning; waiver should not be found under these circumstances.[96]

### 2. Voluntary Disclosure to a Governmental Agency

Subsection (d)(2) provides that unless the business manifests an intention not to maintain the privilege, voluntary disclosure of the self-critical analysis to a governmental agency will not constitute a waiver of the privilege with respect to other governmental agencies or persons. There has been much contro-

---

[93] Allen & Hazelwood, *supra* note 1, at 379 ("no commercial use of self-evaluative privilege materials").

[94] In re John Doe Corp. (Southland) v. United States, 675 F.2d 482, 488–89 (2d Cir. 1982). *See also* United States v. El Paso Co., 682 F.2d 530, 541–42 (5th Cir. 1982), *cert. denied*, 466 U.S. 944 (1984).

[95] United States v. Kovel, 296 F.2d 918, 922 (2d Cir. 1961).

[96] For a discussion of waiver of the attorney-client privilege in this context, see Block & Remz, *supra* note 1, at 65–67; Crisman & Mathews, *supra* note 1, at 153–58.

versy over this issue,[97] particularly with respect to the waiver
of the attorney-client privilege. This issue also received much
attention when the Securities and Exchange Commission (SEC)
established a program of voluntary disclosure during its inves-
tigation of illegal corporate payments to foreign officials. Com-
panies under investigation were encouraged to conduct inde-
pendent self-studies of their practices and to disclose the results
of those investigations to the SEC. In return, the government
offered lenient treatment for past violations and an opportunity
to avoid extended investigation and litigation.[98] Following dis-
closure to the SEC, however, it was common for others, in-
cluding civil plaintiffs seeking damage awards against the cor-
porations, to demand disclosure of these studies. In response,
courts have reached varying conclusions as to whether disclo-
sure to the SEC waived any privilege.

Some courts developed a doctrine of limited waiver, providing
that disclosure to the SEC of investigations which would have
been protected by the attorney-client privilege does not operate
as a waiver of the privilege in other contexts.[99] This conclusion
was based primarily on the view that granting a waiver might
discourage cooperation with the SEC.[100] Other courts, however,
have refused to recognize the limited waiver doctrine, holding
that disclosure to the SEC constitutes a complete waiver of the
attorney-client privilege.[101] A few courts have taken a less ex-
treme approach, holding that disclosure constitutes a complete

---

[97] *See* Allen & Hazelwood, *supra* note 1, at 363–67; Block & Remz, *supra* note 1, at
66–67; Crisman & Mathews, *supra* note 1.

[98] For a more detailed description of the program, see In re Sealed Case (Tesoro
Petroleum), 676 F.2d 793, 800–01 (D.C. Cir. 1982); Crisman & Mathews, *supra* note 1,
at 123–26.

[99] The first case to apply this doctrine was Diversified Indus., Inc. v. Meredith, 572
F.2d 598 (8th Cir. 1977) (en banc) (discussed in detail in OHIO STATE Note, *supra* note
1). Other courts have followed the Eighth Circuit's lead. *See, e.g.,* Byrnes v. IDS Realty
Trust, 85 F.R.D. 679 (S.D.N.Y. 1980); In re Grand Jury Subpoena Dated July 13, 1979,
478 F. Supp. 368 (E.D. Wis. 1979).

[100] Some courts have reached the same conclusion employing the work product doc-
trine instead of the attorney-client privilege. *See, e.g.,* In re Grand Jury Investigation
(Sun Oil), 599 F.2d 1224, 1228–33 (3d Cir. 1979). In that case, which was decided prior
to Upjohn Co. v. United States, 449 U.S. 383 (1981), the court applied the control group
test for attorney-client privilege and decided that no privilege existed. It thus examined
and found limited protection under the work product doctrine. *See also* In re Grand
Jury Subpoena (John Doe, Inc. [Sterling Drug]) v. United States, 599 F.2d 504 (2d Cir.
1979).

[101] *See* Permian Corp. v. United States, 665 F.2d 1214 (D.C. Cir. 1981); *see also* In
re Sealed Case (Tesoro Petroleum), 676 F.2d at 824.

waiver unless at the time that disclosure was made the company specifically reserved the right to claim the privilege.[102]

In one case, the court refused to uphold the attorney-client privilege, but stated that permitting discovery of a document previously disclosed to the SEC would run counter to the public interest, as it would discourage the kind of candid internal investigations that the SEC desires.[103] This analysis appears to be an implicit application of the limited waiver doctrine in the context of the privilege for self-critical analysis.[104]

Whether analyzed in terms of the attorney-client privilege, the work product doctrine, or the privilege for self-critical analysis, much confusion currently exists regarding the proper rule for waiver when a business discloses a self-critical study to a governmental agency. Although the Supreme Court's decision in *Upjohn Co. v. United States*[105] can be interpreted as an implicit endorsement of the limited waiver doctrine,[106] the Court did not address the issue, and the law thus stands in a state of discord.

Given these varying views of the waiver question when a business discloses a self-critical study to a governmental agency, the Model Statute proposes two alternatives. The preferred alternative would be to adopt a limited waiver theory.[107] The

---

[102] Teachers Ins. and Annuity Ass'n of Am. v. Shamrock Broadcasting Co., 521 F. Supp. 638, 644–45 (S.D.N.Y. 1981); *see also* Schnell v. Schnall, 550 F. Supp. 650, 653 (S.D.N.Y. 1982).

[103] In re LTV Sec. Litig., 89 F.R.D. 595, 619 (N.D. Tex. 1981).

[104] *See* Allen & Hazelwood, *supra* note 1, at 365, who suggest that *LTV Securities Litigation* "bridged the gap between the privilege for internal self-evaluation and the decisions employing the attorney-client privilege. . . ." *See also* Crisman & Mathews, *supra* note 1, at 149, characterizing *LTV Securities Litigation* as having "devised a novel 'hybrid' privilege to protect the materials from civil discovery. . . ."

[105] 449 U.S. 383 (1981).

[106] In reference to *Upjohn v. United States*, Block and Remz state:

The government had clearly raised the issue of waiver by reason of Upjohn's disclosures to the SEC and IRS. By refraining from holding that the disclosure constituted a general waiver of all communications on the subject, the Court may be seen as endorsing, sub silentio, the limited waiver concept in cases of voluntary disclosure.

Block & Remz, *supra* note 1, at 67 (footnote omitted). Crisman and Mathews agree that the Court impliedly condoned the limited waiver theory. Crisman & Mathews, *supra* note 1, at 143.

[107] The director of the Division of Enforcement of the SEC proposed legislation that would codify the limited waiver rule, at least with regard to the attorney-client and work product contexts. *See* John J. Fedders, *Roundtable: Attorney-Client Privilege in SEC Investigations*, Address at the Annual Meeting of the ABA Section of Corporation, Business and Banking Law (Aug. 8, 1982), *reprinted in* Fed. Sec. L. Rep. (CCH) ¶ 93,242 (1982). In addition, various American Bar Association committees and subcommittees have considered legislative proposals designed for the same purpose. *See* Crisman & Mathews, *supra* note 1, at 173–75, 176–77. In 1984, the SEC proposed legislation to

bracketed alternative provides for the opposite result. Jurisdictions adopting this alternative provision would find waiver whenever a business voluntarily discloses a self-critical analysis to any governmental agency pursuant to a voluntary program of disclosure.[108]

The rationale for this bracketed provision was perhaps most clearly stated in *Permian Corp. v. United States*,[109] the primary case rejecting the limited waiver theory. The *Permian* court appeared to rest its reasoning at least in part on a rationale particularly geared to the attorney-client privilege:

> Voluntary cooperation with government investigations may be a laudable activity, but it is hard to understand how such conduct improves the attorney-client relationship. If the client feels the need to keep his communications with his attorney confidential, he is free to do so under the traditional rule by consistently asserting the privilege, even when the discovery request comes from a "friendly" agency.[110]

The court also rested its conclusion on the ground that businesses should not be able to decide selectively to whom they will disclose otherwise confidential information and when they will claim the privilege for matters that they have already disclosed for their own commercial benefit.[111] Although the court stated at least one other reason for its ruling,[112] one source has

---

Congress which specified that production of otherwise privileged materials to the SEC would not constitute waiver of the attorney-client privilege. *See* Block & Remz, *supra* note 1, at 67 n.46 (noting that the SEC proposal had not made headway in Congress, but encouraging the adoption of legislation codifying the limited waiver theory).

[108] Of course, involuntary disclosure to a governmental agency pursuant to a requirement of law should not be treated as a waiver of the privilege. Subsection (d)(1) of the Model Statute makes clear that only voluntary disclosure constitutes a waiver.

[109] 665 F.2d 1214 (D.C. Cir. 1981).

[110] *Id.* at 1221.

[111] The *Permian* court stated:
> The client cannot be permitted to pick and choose among his opponents, waiving the privilege for some and resurrecting the claim of confidentility to obstruct others, or to invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit. . . . The attorney-client privilege is not designed for such tactical employment.
*Id. See also* In re Subpoena Duces Tecum (Fulbright & Jaworski, Vinson & Elkins, and Tesoro Petroleum Corp.), 738 F.2d 1367 (D.C. Cir. 1984).

[112] The court also wrote that no policy inherent in the SEC disclosure program requires changing traditional waiver doctrine: "Important though the SEC's mission may be, we are aware of no congressional directive or judicially-recognized priority system that places a higher value on cooperation with the SEC than on cooperation with other regulatory agencies. . . ." 665 F.2d at 1221.

stated that the corporate manipulation may be the "real basis" for the decision.[113]

The first rationale for rejecting a limited waiver theory, resting on the purposes behind the attorney-client privilege, does not apply to the privilege for self-critical analysis. The self-critical analysis privilege is designed not to foster any particular kind of relationship, but to serve the public interest by encouraging frank self-critical analysis. Moreover, if a governmental agency sees fit to establish a program of voluntary disclosure which carries a reward of avoiding at least some serious sanctions, there is every reason to believe that it has weighed the benefit to be gained from the program against the loss of those sanctions and determined that the benefit of truly frank self-evaluation carries the greatest weight. Although businesses faced with possible governmental sanction in the form of fines or penalties may find it in their best interest to conduct the self-investigations which are part of voluntary disclosure programs, it is doubtful that such studies will be as probing and candid without some assurance of confidentiality as they would be in an environment of limited protection. If another governmental agency determines that a program of voluntary disclosure would be socially beneficial, presumably it can establish such a program. Also, because the Model Statute creates a qualified rather than an absolute privilege, litigants seeking disclosure of self-critical evaluations will have an opportunity to argue that their need for the study outweighs the public benefit to be gained from non-disclosure. Thus, a rule which adopts the limited waiver theory adequately protects the interests of both private litigants and other governmental agencies. Finally, if a company has attempted to manipulate the self-critical analysis privilege for its own commercial purposes, a finding of waiver is justified.

Of course, there will be occasions when a business' conduct in connection with voluntary disclosure does not demonstrate an intention to maintain the privilege. In such cases, as with the general rule of waiver provided in Subsection (d)(1), the court should find that a waiver has occurred. One way in which a business can seek to establish its intention to maintain the privilege as to other parties would be to enter into a stipulation of

---

[113] "Implicit in the court's decision was its conviction that the Permian Corporation was trying to manipulate the privilege for its own profit," and this can be identified as a major reason for its rejection of the limited waiver theory. Allen & Hazelwood, *supra* note 1, at 867.

confidentiality when disclosing the self-critical study to the governmental agency.[114]

## F. *Section (e): Exception: Crime or Fraud*

Just as there is no legal basis for protecting a party who has consulted an attorney for the purpose of furthering the commission of or helping to conceal a crime or fraud,[115] there is no basis for providing such protection when a self-critical evaluation is prepared for such an improper purpose. Therefore, the Model Statute provides that there is no privilege when the self-critical analysis is undertaken "in furtherance of an illegal or fraudulent activity."[116] Interpretations of the crime or fraud exceptions to the attorney-client and other privileges should guide courts in their application of the exception to the self-critical analysis privilege.

The rationale of *In re Sealed Case (Tesoro Petroleum)*,[117] which analyzed the crime or fraud exception to a privilege in light of the work product doctrine, applies to the privilege for self-critical analysis as well. In *Sealed Case*, corporate officials had conspired to bribe foreign officials and to make illegal domestic campaign contributions. The corporation took part in the

---

[114] Allen and Hazelwood suggest that "agreements of confidentiality should be obtained in advance, and materials should not be released without reserving the right to exercise relevant privileges at a later date. These agreements should be as strict as possible, prohibiting disclosure not only to the public, but to other governmental agencies as well." Allen & Hazelwood, *supra* note 1, at 378 (footnotes omitted). Allen & Hazelwood also note that in In re Sealed Case (Tesoro Petroleum), 676 F.2d 793, 824 (D.C. Cir. 1982), the court stated that a governmental agency can agree to limit disclosure of the results of an investigation. Allen & Hazelwood, *supra* note 1, at n.197. *See also* Block & Remz, *supra* note 1, at 70, where the authors suggest that, if possible, the business should either require that the agency return the documents after it has completed its inquiry or that the agency never actually take possession of the documents.

[115] The California Evidence Code provides: "There is no privilege under this article if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud." CAL. EVID. CODE § 956 (West 1986 & Supp. 1987). As proposed to Congress, the Federal Rules of Evidence would have contained an exception providing that there is no privilege "[i]f the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud. . . ." FED. R. EVID. 503(d)(1) (Proposed Draft 1969).

[116] A specific crime or fraud exception may not be needed because, in such cases, the business would not be able to meet its burden under Subsection (c)(1)(B) of showing that the study directly serves the public interest. Nevertheless, because of its importance and the familiarity which courts and lawyers have with the crime or fraud exception to the attorney-client privilege, the Model Statute contains such an explicit exception.

[117] 676 F.2d 793 (D.C. Cir. 1982).

SEC's voluntary disclosure program, but the government alleged that in conducting its internal investigation, the corporation consulted the lawyers for the purpose of furthering a crime or fraud.[118] The court determined that in order to apply the crime or fraud exception, a two-step inquiry was required: "First, there must be a *prima facie* showing of a violation sufficiently serious to defeat the work product privilege. Second, the court must find some valid relationship between the work product under subpoena and the *prima facie* violation."[119] The court found that the first part of the test could be satisfied with evidence that

> if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed when the work product was prepared. A specific showing of the client's intent in consulting the attorney or the attorney's intent in performing his or her duties is not required. . . .[120]

This first element was satisfied by the possibility that the chairman of the company lied to or tried to mislead the Internal Revenue Service.[121] In reference to the second requirement, the court said that "[a] finding that the work product reasonably relates to the subject matter of the possible violation should suffice,"[122] and that in this case, parts of some unproduced documents related directly to possible criminal violations.[123] The court's analysis in *Sealed Case* provides an accurate roadmap to interpretation of the crime or fraud exception to the privilege for self-critical analysis.[124]

There may be situations in which the conduct of the business in preparing the self-critical analysis does not satisfy the crime or fraud exception but where the public interest would not be served by a recognition of the privilege. In such cases, courts should find that the party seeking production has met its burden under Subsection (c)(2) of the Model Statute.

---

[118] *Id*. at 813.
[119] *Id*. at 814–15 (emphasis in original; footnotes omitted).
[120] *Id*. at 815 (footnotes omitted).
[121] *Id*.
[122] *Id*.
[123] *Id*. at 815–16.
[124] *See also* In re John Doe Corp. (Southland) v. United States, 675 F.2d 482, 491 (2d Cir. 1982). For discussion of the application of the crime or fraud exception to self-critical analyses, see Allen & Hazelwood, *supra* note 1, at 369–70; Block & Remz, *supra* note 1, at 68–69; Crisman & Mathews, *supra* note 1, at 158–65.

## IV. The Admissibility of Self-Critical Analyses

A court's decision to compel disclosure of all or part of a self-critical analysis will not determine the admissibility of that document at any subsequent trial or other evidentiary hearing. The standards for discoverability and admissibility at trial are different. In the discovery context, "[i]t is not a ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."[125] Thus, the standard for admissibility is more stringent than that for discoverability. To be admissible at the request of either party, the self-critical evaluation must satisfy other evidentiary rules.

There has been little analysis of the admissibility of self-critical evaluations.[126] While a party may seek to introduce a study that is relevant to the issues in the case,[127] several evidentiary rules will probably prevent the admission of self-critical analyses at trial. For example, most courts prohibit the admission of evidence of "subsequent remedial measures," often defined as "measures . . . which, if taken previously, would have made the event less likely to occur."[128] Because many self-critical studies are designed to review past accidents or conditions and to suggest means by which they can be minimized in the future, this rule will apply quite often. While the rule only prohibits the use of such evidence to prove "negligence or culpable conduct," and allows the evidence to be offered to prove such things as "ownership, control, or feasibility of precaution-

---

[125] FED. R. CIV. P. 26(b)(1). This rule does not apply to privileged material; if an item is privileged, it is neither discoverable nor admissible at trial. However, the trial court's decision to grant a motion to compel discovery in this context also determines that the self-critical analysis is not privileged.

[126] In 1983, one commentator noted that the privilege had been asserted only during discovery, and that there was no judicial support for its application at trial. Flanagan, *supra* note 1, at 573.

[127] *See id.* at 558 ("Any evaluation of the self-critical report and its status during discovery must start with the fact that it is undeniably relevant and of assistance in resolving the case."). At times, however, courts have suggested that subjective conclusions in self-critical studies are not relevant. *See* Bredice v. Doctors Hosp., Inc., 50 F.R.D. 249, 251 (D.D.C. 1970), *aff'd*, 479 F.2d 920 (D.C. Cir. 1973) (quoting Richards v. Maine Cent. R.R., 21 F.R.D. 590, 592 (D. Me. 1957)). Such analysis appears to be incorrect.

[128] *See, e.g.,* FED. R. EVID. 407. *But see* ME. R. EVID. 407 (reversing the general rule and allowing the admission of evidence of subsequent precautions). For a discussion of the application of the subsequent remedial measures rule to self-critical analyses, see MINNESOTA Comment, *supra* note 1, at 821–23.

ary measures" or to impeach a witness,[129] self-critical studies generally will be offered at trial to prove negligence or culpable conduct. Therefore, they probably will often be inadmissible.

Another evidentiary rule which will operate to prevent the admission of many self-critical studies concerns the use of prior accidents or other similar events to prove either culpable conduct or the existence of a particular condition at a time relevant to the trial. It has been held that parties wishing to offer proof of a prior similar event must demonstrate "substantial identity in the circumstances" between that prior event and the one at issue.[130] Because many self-critical analyses will contain data concerning various accidents or conditions which have existed or occurred over a period of time (as well as suggestions for changes which would minimize future harm), this rule will apply to many studies argued to be privileged.

Related to the "similar happenings" principle are rules designed to prevent the use of character evidence to prove conduct on an occasion of relevance to the case. Courts generally exclude such evidence in civil cases,[131] and admit it only under limited circumstances in criminal cases.[132] Although one generally does not think about the character of a business, the prohibition of character evidence to prove conduct may nevertheless come into play in some situations. For example, in a suit against a corporation for allegedly making illegal payments to foreign officials, plaintiffs may seek discovery and admission of the corporation's self-critical study of its practices. That study may contain factual and evaluative data concerning numerous other actions and, to the extent that the corporation made illegal payments in those situations, the risk exists that the trier of fact will conclude that its past practices continued. If this conclusion can be used as a basis for a finding of liability, the prohibition of character evidence to prove conduct will have been violated. Courts must therefore be aware of possible character-based

---

[129] FED. R. EVID. 407.

[130] Robitaille v. Netoco Community Theatres of North Attleboro, 305 Mass. 265, 266, 25 N.E.2d 749, 750 (1940). The court also held that the party seeking admission must show that "the danger of unfairness, confusion or undue expenditure of time in the trial of collateral issues reasonably seems small to the trial judge." *Id.* at 268, 25 N.E.2d at 750. For general discussion of the admissibility of other accidents and injuries, see C. McCORMICK, *supra* note 3, § 200.

[131] *See* FED. R. EVID. 404(a).

[132] *Id.*

inferences from data and conclusions contained in self-critical analyses.

Sometimes, evidence of prior conduct demonstrates such consistency that it rises to the level of "custom" or "habit." In such cases, evidentiary rules generally permit its admission.[133] It is thus possible that parties seeking admission of certain self-critical analyses will be able to demonstrate that the discussion of incidents or conditions other than those directly at issue would not contravene the rule against offering character evidence to prove conduct.

Other evidentiary rules may provide barriers to the admission of self-critical studies at trial. Trial courts and counsel must be cautioned that a ruling which requires the disclosure of the study for purposes of discovery does not ensure its admissibility; it is anticipated that more often than not the trial court will find the study inadmissible.

## V. CONCLUSION

Even in an era of increasing scrutiny of evidentiary rules restricting the flow of information to adverse parties and triers of fact, creation of rules which limit the availability of information can sometimes be justified. A carefully crafted privilege for self-critical analysis would satisfy both the law's concern for loss of information and a business' need for confidentiality in its most sensitive reflective acts. If a rule of law affording some protection for self-critical analysis makes corporations more willing to conduct self-evaluative studies, then both the litigation process and society in general will benefit from the existence of such a privilege. Corporations will conduct studies implicating important social goals, such as promotion of safety and conformity to law, and opposing parties will still have the benefit of the objective results of those studies. Additionally, opposing parties may gain complete access to self-evaluative studies upon

---

[133] *See, e.g.,* FED. R. EVID. 406. The line between character and habit is often difficult to draw. One treatise states that "[c]haracter is a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance, or peacefulness. Habit . . . is more specific. It denotes one's regular response to a repeated situation. . . . The doing of the habitual act may become semi-automatic." C. McCORMICK, *supra* note 3, § 195, at 574–75. Evidence of a business' customary practices, if they are reasonably regular and uniform, may be admissible in some courts to an even greater extent than evidence of habit. *Id.* at 576.

the requisite showing of need.[134] The very foundation upon which the privilege rests therefore provides comfort even to those most concerned with the potential loss of data in the trial process.

This Article has attempted to construct a model privilege for self-critical analysis which would serve equally the need for free flow of information in the business setting and in the litigation process. Legislatures are urged to consider adoption of this Model as they engage in continuing review of rules governing the formal adjudication of disputes.

---

[134] One commentator has written:
> Implicit in any application of the privilege is an acknowledgement of the self-defeating nature of allowing discovery of frank self-analysis: in the long run, denying protection will stifle more information than will applying the privilege. Refusing to recognize the privilege will thus hinder the flow of information not only to parties seeking protection, but also to the courts themselves. Long-term accessibility to vital information must not be sacrificed on the altar of immediate discovery needs.

HARVARD Note, *supra* note 1, at 1087–88.

# EXHIBIT D

# THE PRIVILEGE OF SELF-CRITICAL ANALYSIS

Institutions and individuals are called upon to make critical self-evaluations for a variety of different reasons.[1] For example, federal law requires certain government contractors to analyze frankly their past performance in providing equal employment opportunity. Similarly, police departments and railroad companies regularly investigate mishaps in which their employees are involved. After any of these internal investigations has been completed, an outsider may seek discovery of the resulting analysis. In recent years, those from whom such information has been sought have successfully balked at disclosure. As a result, a privilege of self-critical analysis has developed to shield certain institutional self-analyses from discovery.

Part I of this Note examines the nature of this privilege and some important background principles applicable to discovery privileges in general; these background principles largely dictate the shape of the privilege for self-critical analyses. Part II identifies the three primary types of documents to which the privilege is applied: minutes of hospital committee meetings, reports of internal disciplinary investigations, and title VII compliance documents. Finally, Part III delineates the ways in which courts have applied the privilege in each of these areas, and examines the three principles that constitute the majority approach. Although this Note attempts primarily to trace the outline of this discovery privilege, it also offers criticism of certain features of the majority approach.

## I. DEVELOPMENT OF THE PRIVILEGE

The Federal Rules of Civil Procedure explicitly recognize the role of privileges in discovery.[2] Yet parties asserting a nascent privilege — such as that of self-critical analysis — during discovery must counter the strong tendency of courts to scrutinize claims of privilege[3] because of the general rule

---

[1] This Note refers generally to the individuals and institutions making critical self-evaluations as "self-analysts."

[2] The Federal Rules of Civil Procedure limit the scope of permissible discovery to "any matter, not privileged, which is relevant to the subject matter involved in the pending action." FED. R. CIV. P. 26(b)(1). The claim of privilege is but one useful protective device available to the self-analyst's counsel. See FED. R. CIV. P. 26(c). This Note focuses on issues of privilege, not on broader notions of nondiscoverability.

[3] See Nazareth Literary & Benevolent Inst. v. Stephenson, 503 S.W.2d 177, 179 (Ky. Ct. App. 1973); see also United States v. Nixon, 418 U.S. 683, 710 (1974) (privileges "are not lightly created nor expansively construed, for they are in derogation

that the public "'has a right to every man's evidence.'"[4]  The
way in which the public need for all available evidence bal-
ances against the public interest in confidentiality determines
whether a developing privilege has any merit.  Some commen-
tators have translated these conflicting policies into factors to
be considered in determining whether a developing privilege
deserves recognition.[5]  Privileges have historically been rec-
ognized when, as is true in the case of self-critical analysis,
the public interest weighs heavily in favor of confidentiality.[6]

Because the term "privileged" in the Federal Rules of Civil
Procedure refers to privileges as they arise under the law of
evidence,[7] federal courts must look to the Federal Rules of
Evidence for guidance in both developing and applying dis-
covery privileges.  Rule 501,[8] which governs the development
of privileges in federal courts, embodies a congressional intent
that privilege doctrine be fluid rather than static.[9]  Courts

---

of the search for truth").  Some courts also tend to construe statutory privileges strictly.
*See, e.g.,* Young v. King, 136 N.J. Super. 127, 129–30, 344 A.2d 792, 794 (Law Div.
1975) (refusing to extend to other hospital committees protection granted to utilization
review committees).

[4] United States v. Bryan, 339 U.S. 323, 331 (1950) (quoting 8 J. WIGMORE,
EVIDENCE § 2192 (3d ed. 1940)).

[5] *See, e.g.,* 8 J. WIGMORE, WIGMORE ON EVIDENCE § 2285 (J. McNaughton ed.
1961).

[6] *See* 4 J. MOORE & J. LUCAS, MOORE'S FEDERAL PRACTICE ¶ 26.60[3] (2d ed.
1982) ("The public interest may be a reason for not permitting inquiry into particular
matters by discovery."); James, *Discovery,* 38 YALE L.J. 746, 748 n.20 (1929) (the
public interest was one ground for resisting discovery in Chancery practice).

[7] *See* United States v. Reynolds, 345 U.S. 1, 6 (1953); Campbell v. Eastland, 307
F.2d 478, 485 & n.6 (5th Cir. 1962), *cert. denied,* 371 U.S. 955 (1963); Handgards,
Inc. v. Johnson & Johnson, 413 F. Supp. 926, 929 (N.D. Cal. 1976); FED. R. EVID.
1101(c) ("The rule with respect to privileges applies at all stages of all actions, cases,
and proceedings.").  Arguably, these authorities could stand only for the proposition
that, if a matter is privileged at trial, it will be protected from discovery — not for
the proposition that, if a matter is privileged from discovery, it necessarily is privileged
at trial.  Because an evidentiary privilege implies a discovery privilege, however, the
relationship that courts have recognized shows that the principles of rule 501 of the
Federal Rules of Evidence, *see infra* note 8, apply to discovery privileges, a proposition
sufficiently broad for the purposes of this Note.

[8] Rule 501, as adopted in 1975, reads as follows:

> Except as otherwise required by the Constitution of the United States or
> provided by Act of Congress or in rules prescribed by the Supreme Court
> pursuant to statutory authority, the privilege of a witness, person, government,
> State, or political subdivision thereof shall be governed by the principles of the
> common law as they may be interpreted by the courts of the United States in
> the light of reason and experience.  However, in civil actions and proceedings,
> with respect to an element of a claim or defense as to which State law supplies
> the rule of decision, the privilege of a witness, person, government, State, or
> political subdivision thereof shall be determined in accordance with State law.

FED. R. EVID. 501.

[9] The evidence rules governing privileges that were recommended by the advisory
committee and approved by the Supreme Court explicitly listed matters to be privi-

therefore need not feel unduly constrained in developing previously unrecognized privileges. Rule 501 is also crucial to application of the privilege because it gives primacy to state law in the federal courts, at least in cases in which state law provides the rule of decision.[10] The privilege of self-critical analysis, unlike many other privileges, has been the subject of state legislation;[11] federal courts thus cannot make the often valid assumption that practically identical state and federal common law doctrines govern privileges.[12] Moreover, even

---

leged. *See* 2 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶¶ 501–509 (1982). Congress balked, however, and the present rule 501 was the result: "Rule 501 amounts to a total rejection of the approach taken by the Advisory Committee and Supreme Court on the matter of privileges — a rejection not only of the specific proposals made by the Committee and the Court, but also of the basic premises underlying the proposal." 2 D. LOUISELL & C. MUELLER, FEDERAL EVIDENCE § 200, at 400 (1978). As enacted, rule 501 calls on the courts to apply privileges as they had done before its passage. *See supra* note 8. Because the public interest was a valid justification for applying a privilege at common law, *see* James, *supra* note 6, at 748 n.20, that factor should continue to be relevant. A public interest justification might not have been relevant had Congress approved the rules as they were submitted. The suggested list of nine bases for privileges did not contain a "public policy" privilege and might well have been interpreted as an exhaustive list of permissible privileges. *See* 2 J. WEINSTEIN & M. BERGER, *supra*, ¶ 501[1], at 501-13.

[10] *See supra* note 8. Rule 501 settled the debate that had raged for years in federal courts over the appropriate law of privilege in a diversity case. *Compare* Gaison v. Scott, 59 F.R.D. 347, 351 (D. Hawaii 1973) (federal law of privilege applies in discovery), *with* Hill v. Huddleston, 263 F. Supp. 108, 110 (D. Md. 1967) (state law of privilege applies in discovery). *See generally* 2B W. BARRON & A. HOLTZOFF, FEDERAL PRACTICE AND PROCEDURE WITH FORMS § 967 (C. Wright rev. 1961) (noting controversy among jurisdictions); C. WRIGHT, LAW OF FEDERAL COURTS § 93, at 460–61 (3d ed. 1976) (same). Rule 501 now states explicitly that state laws of privilege apply "with respect to an element of a claim or defense as to which State law supplies the rule of decision." FED. R. EVID. 501. Together with the principle that the law of evidence governs discovery privileges, this passage establishes that state law principles apply to an asserted privilege during discovery if state law will supply the substantive rule of decision at trial. *See* 4 J. MOORE & J. LUCAS, *supra* note 6, ¶ 26.60[7], at 26-255.

[11] *See, e.g.,* NEB. REV. STAT. § 71-2048 (1981); WIS. STAT. ANN. § 146.38 (West Supp. 1982).

[12] As a practical matter, federal courts see the conduct of discovery as their domain and rarely mention state law when addressing discovery privileges. As applied to the privilege of self-critical analysis, this approach probably results from the fact that questions concerning the privilege tend to arise in the context of interlocutory rulings on discovery requests. This tendency has three implications. First, the privilege of self-critical analysis is currently being formulated almost exclusively by trial court judges, a fact that leads to inconsistent application of the doctrine. Second, because the scope of a trial judge's discretion on interlocutory orders is considerable, the privilege will continue to be developed largely by trial courts. Finally, much of the law of privilege is probably unreported, a fact that inhibits development of a coherent doctrine. Therefore, the practitioner may find that the privilege of self-critical analysis is controlled by a federal common law, and should direct his attention accordingly.

*HARVARD LAW REVIEW*

the common law governing the privilege of self-critical analysis may vary widely among the states.[13]

If one party seeks discovery of a self-critical analysis in federal litigation, the other party may object by claiming that the information is privileged under the Federal Rules of Civil Procedure. Courts have responded to this objection by developing a privilege for such analyses[14] that shields from discovery information meeting three criteria: first, the information must result from a critical self-analysis undertaken by the party seeking protection; second, the public must have a strong interest in preserving the free flow of the type of information sought; finally, the information must be of the type whose flow would be curtailed if discovery were allowed.

Although the breadth of the "public interest" criterion will largely determine the breadth of the privilege of self-critical analysis, the concept of a public interest is difficult to define, particularly at this early stage in the development of the privilege. If the concept is defined too broadly, it will threaten to preclude discovery completely, because much of the information sought in discovery satisfies the other two criteria. If the concept is defined too narrowly, however, the privilege will be largely eviscerated. As the privilege is applied in more instances, courts and legislatures will delineate more fully the extent of the public interest in the kinds of information to which the privilege is relevant.

Although most privileges are based on a desire to protect the flow of socially useful information,[15] the privilege of self-

---

[13] *Compare* Oviatt v. Archbishop Bergen Mercy Hosp., 191 Neb. 224, 214 N.W.2d 490 (1974) (approving the privilege for hospital committees), *with* Shibilski v. St. Joseph's Hosp., 83 Wis. 2d 459, 266 N.W.2d 264 (1978) (disapproving the privilege for hospitial committees).

[14] This privilege has been given a variety of names by courts and commentators. *See* Emerson Elec. Co. v. Schlesinger, 609 F.2d 898, 907 (8th Cir. 1979) ("privilege against disclosure of self-evaluative documents"); Reynolds Metals Co. v. Rumsfeld, 564 F.2d 663, 667 (4th Cir. 1977) ("qualified privilege for self-evaluative documents"); Webb v. Westinghouse Elec. Corp., 81 F.R.D. 431, 433 (E.D. Pa. 1978) ("privilege of 'self-critical' analysis" and "defense of self-critical analysis"); Note, *A Balanced Approach to Affirmative Action Discovery in Title VII Suits*, 32 HASTINGS L.J. 1013, 1024 (1981) ("public policy privilege"); Comment, *The Attorney-Client Privilege, the Self-Evaluative Report Privilege, and* Diversified Industries, Inc. v. Meredith, 40 OHIO ST. L.J. 699 (1979) ("self-evaluative report privilege").

[15] *See* Upjohn Co. v. United States, 449 U.S. 383, 389 (1981) (attorney-client privilege); Hickman v. Taylor, 329 U.S. 495, 511 (1947) (work-product doctrine); United States v. Reserve Mining Co., 21 Fed. R. Serv. 2d (Callaghan) 796, 799 (D. Minn. 1976) (offers of settlement); Pilar v. SS Hess Petrol, 55 F.R.D. 159, 163 (D. Md. 1972) (informer's privilege); Olsen v. Camp, 328 F. Supp. 728, 731 (E.D. Mich. 1970) (government's intraoffice memoranda); Hardy v. Riser, 309 F. Supp. 1234, 1238 (N.D. Miss. 1970) (physician-patient privilege).

critical analysis warrants separate treatment for two reasons. First, it represents the application of that desire to a previously unprotected type of information. Privileges are generally distinguished by the types of materials that they protect; thus, the type of material that falls within the purview of a self-critical analysis privilege should be delineated more fully than it currently is. Second, because the privilege is both nascent and widely applied, it has not been sufficiently defined doctrinally. In general, courts and legislatures have approached the privilege in an ad hoc manner. Indeed, some courts have even criticized the privilege.[16] Nevertheless, these responses involve not several privileges, but one privilege that applies to a number of similar problems and that has generally applicable parameters, some consistent with the rationale of the privilege and some contrary to it, capable of identification and description.

## II. APPLICATIONS OF THE PRIVILEGE

Courts and commentators have acknowledged that the federal district court in *Bredice v. Doctors Hospital, Inc.*[17] put forth the classic statement of the self-critical analysis privilege when it protected the minutes of a committee meeting in which staff members were asked for their frank analyses of hospital procedures. The *Bredice* court emphasized that confidentiality is often essential to the free flow of information and that the free flow of information is essential to promote recognized public interests.[18] Implicit in any application of the privilege

---

[16] One court has suggested that the privilege be carefully limited, given the strong interest in broad discovery. Webb v. Westinghouse Elec. Corp., 81 F.R.D. 431, 433 (E.D. Pa. 1978). Other courts have rejected claims of privilege for certain materials that are often protected by the self-critical analysis privilege. EEOC v. ISC Fin. Corp., 14 Empl. Prac. Dec. (CCH) ¶ 7729, at 5586 (W.D. Mo. 1977); Shibilski v. St. Joseph's Hosp., 83 Wis. 2d 459, 465–66, 266 N.W.2d 264, 267–68 (1978). Still another court has criticized the rationale underlying the privilege. Ligon v. Frito-Lay, Inc., 19 Fair Empl. Prac. Cas. (BNA) 722, 722–23 (N.D. Tex. 1978). These decisions, however, represent only a minority position. *See* cases cited *infra* notes 20 & 21.

[17] 50 F.R.D. 249 (D.D.C. 1970), *aff'd*, 479 F.2d 920 (D.C. Cir. 1973).

[18] *Bredice* and its rationale have been approved by many courts. *See, e.g.*, Gillman v. United States, 53 F.R.D. 316 (S.D.N.Y. 1971); Dade County Medical Ass'n v. Hlis, 372 So. 2d 117 (Fla. Dist. Ct. App. 1979); Oviatt v. Archbishop Bergen Mercy Hosp., 191 Neb. 224, 226–27, 214 N.W.2d 490, 492 (1974). *But see* Shibilski v. St. Joseph's Hosp., 83 Wis. 2d 459, 467, 266 N.W.2d 264, 268 (1978) (refusing to follow *Bredice*); Nazareth Literary & Benevolent Inst. v. Stephenson, 503 S.W.2d 177, 179 (Ky. Ct. App. 1973) (suggesting that *Gillman* may limit *Bredice* to its facts). *See generally* Hall, *Hospital Committee Proceedings and Reports: Their Legal Status*, 1 AM. J.L. & MED. 245 (1975) (discussing discoverability of hospitals' internal committee proceedings and reports).

*HARVARD LAW REVIEW* [Vol. 96:1083

is an acknowledgement of the self-defeating nature of allowing discovery of frank self-analyses: in the long run, denying protection will stifle more information than will applying the privilege. Refusing to recognize the privilege will thus hinder the flow of information not only to parties seeking protection, but also to the courts themselves. Long-term accessibility to vital information must not be sacrificed on the altar of immediate discovery needs.

The principles enunciated in *Bredice* apply equally to other areas in which the privilege arises. For example, railroad companies often investigate accidents to discipline any culpable employees and ultimately to improve the railroad's safety.[19] If the results of such an investigation are later sought in discovery by the injured party, the court may appropriately apply the privilege of self-critical analysis.[20]

Similarly, some courts have shielded from discovery the results of police department investigations when, following an arrest or shooting, a plaintiff has either alleged a civil rights violation or asserted a wrongful death claim.[21] These cases have hinged on the public interest in permitting police departments to conduct thorough investigations to reduce the number of improper police actions by providing the basis for disciplinary action and other necessary changes. In this context, the self-critical analysis privilege and the executive privilege overlap;[22] either would independently shield the investigations involved, and courts should therefore look to both doctrines for guidance in this area.

---

[19] *See, e.g.,* Richards v. Maine Cent. R.R., 21 F.R.D. 590 (D. Me. 1957), *cited in* 4 J. MOORE & J. LUCAS, *supra* note 6, ¶ 26.60[3], at 26-241.

[20] In Richards v. Maine Cent. R.R., 21 F.R.D. 590 (D. Me. 1957), the plaintiff sought information concerning defendant's disciplining of an engineer whose train allegedly injured the plaintiff. The court upheld the defendant's objection to discovery, in part because both railroad workers and the public have such a stake in effective internal discipline that it would be contrary to public policy to inhibit such discipline. *Id.* at 591–92.

*Bredice* and *Richards* contain typical statements of the rationale underlying the privilege of self-critical analysis, but there are many other statements. *See, e.g.,* O'Connor v. Chrysler Corp., 86 F.R.D. 211, 218 (D. Mass. 1980); Stevenson v. General Elec. Co., 18 Empl. Prac. Dec. (CCH) ¶ 8777, at 5148, 5149 (S.D. Ohio 1978); Sanday v. Carnegie-Mellon Univ., 11 Empl. Prac. Dec. (CCH) ¶ 10,659, at 6795, 6796 (W.D. Pa. 1975).

[21] *See, e.g.,* Brown v. Thompson, 430 F.2d 1214 (5th Cir. 1970); Kott v. Perini, 283 F. Supp. 1 (N.D. Ohio 1968).

[22] Cases discussing the chilling effect on police investigations often call the privilege under consideration an executive privilege, "the government's privilege to prevent disclosure of certain information whose disclosure would be contrary to the public interest." Frankenhauser v. Rizzo, 59 F.R.D. 339, 342 (E.D. Pa. 1973); *see* Wood v. Breier, 54 F.R.D. 7, 11 (E.D. Wis. 1972).

Another important application of the privilege arises in suits brought under title VII of the Civil Rights Act of 1964.[23] There exists a tangle of executive orders and regulations promulgated under title VII[24] that require government contractors and subcontractors to file specified documents with federal agencies.[25] Although these contractors and subcontractors are obliged to be candid in appraising their equal employment policies,[26] the government largely relies on voluntary compli-

---

[23] 42 U.S.C. § 2000e (1976 & Supp. V 1981). If an employee believes that he has been the victim of a title VII violation, he should first lodge a complaint with the EEOC, which will conduct an investigation for probable cause. The EEOC will then negotiate with the employer. If an agreement is not reached through this conciliation process, the EEOC can bring suit. If an agreement is reached but the employee is not satisfied with the settlement, he can sue. *Id.* § 2000e-5(b), -5(f)(1) (1976).

[24] Following passage of title VII, President Johnson signed Exec. Order No. 11,246, 3 C.F.R. 339 (1964–1965 comp.), part II of which proscribes employment discrimination by government contractors and subcontractors. Exec. Order No. 11,246 was amended by Exec. Order No. 11,375, 3 C.F.R. 684 (1966–1970 comp.), to include sex discrimination among the proscribed practices. These executive orders have the force of law. United States v. Local 189, United Papermakers, 282 F. Supp. 39, 43 (E.D. La. 1968), *aff'd*, 416 F.2d 980 (5th Cir. 1969), *cert. denied*, 397 U.S. 919 (1970). The regulations promulgated under Exec. Order No. 11,246 are codified at 41 C.F.R. §§ 60-1.1 to -60.8 (1982).

[25] Included in the regulations promulgated under Exec. Order No. 11,246 is the requirement that all contractors and subcontractors file an Affirmative Action Program (AAP). 41 C.F.R. § 60-1.40(a) (1982). The AAP must candidly discuss minority hiring, firing, and promotion practices and goals; it must include statistics, projections, and timetables for minority hiring; and it must be openly self-critical. *Id.* §§ 60-2.10 to -2.12.

Exec. Order No. 11,246 also provides that a Compliance Report (CRR), which must contain "information as to the practices, policies, programs, and employment policies, programs, and employment statistics of the contractor and each subcontractor," must be filed with the contracting agency (or with a delegate of the Secretary of Labor). Exec. Order No. 11,246, § 203(a), 3 C.F.R. 339, 341 (1964–1965 comp.). Courts have given a variety of names to the documents filed with the Office of Federal Contract Compliance Programs (OFCCP). *See, e.g.,* Chrysler Corp. v. Brown, 441 U.S. 281, 286 (1979) (CRR's); Rubbermaid v. Kleppe, 14 Empl. Prac. Dec. (CCH) ¶ 7611, at 5006, 5006 (D. Md. 1976) ("compliance review reports"). Other courts simply refer to the documents as reports filed with the OFCCP. *See, e.g.,* Brown v. Ford Motor Co., 19 Empl. Prac. Dec. (CCH) ¶ 8969, at 6026, 6027 (N.D. Ga. 1978).

The regulations promulgated under Exec. Order No. 11,246 require an employer to file an Employer Information Report (EEO-1) with the OFCCP and the EEOC. *See* Emerson Elec. Co. v. Schlesinger, 609 F.2d 898, 901 (8th Cir. 1979).

[26] Each contracting agency must designate compliance personnel whose duty it is to seek compliance "by conference, conciliation, mediation, or persuasion." Exec. Order No. 11,246, § 205, 3 C.F.R. 339, 342–43 (1964–1965 comp.). If contractors do not comply, the Secretary of Labor or the contracting agency itself can impose sanctions on the contractor, such as recommending a title VII suit by the EEOC or debarring the offender from further government contracts. *Id.* § 209, 3 C.F.R. at 343–44. Aside from the sanctions specifically provided for in Exec. Order No. 11,246, the Secretary of Labor may promulgate his own. *Id.* § 201, 3 C.F.R. at 340. Such sanctions have been validated by the courts: "The government is free to set the terms

ance and therefore must trust the parties filing the forms to
be candid.[27] Plaintiffs in title VII suits often seek to discover
equal employment documents from employers, but some courts
have held the documents to be privileged.[28] The courts have
feared that exposing such documents would diminish the can-
dor with which the documents are produced, and thus would
undermine government initiatives to ensure equal employment
opportunity.[29]

   In sum, courts have forged a privilege of self-critical anal-
ysis for three types of documents: hospital committee reports,
certain internal investigatory reports, and the various equal
employment opportunity forms submitted to the government

---

and conditions of its contracts, and potential contractors are free not to contract with
the government if its terms are undesirable." Crown Zellerbach Corp. v. Marshall,
441 F. Supp. 1110, 1121 (E.D. La. 1977).

   [27] *See, e.g.,* Brown v. Ford Motor Co., 19 Empl. Prac. Dec. (CCH) ¶ 8969, at
6026, 6027–28 (N.D. Ga. 1978); Dickerson v. United States Steel Corp., 12 Empl.
Prac. Dec. (CCH) ¶ 11,095, at 5070, 5071 (E.D. Pa. 1976).

   [28] *See, e.g.,* Stevenson v. General Elec. Co., 18 Empl. Prac. Dec. (CCH) ¶ 8777,
at 5148 (S.D. Ohio 1978); Sanday v. Carnegie-Mellon Univ., 11 Empl. Prac. Dec.
(CCH) ¶ 10,659, at 6795 (W.D. Pa. 1975). The court in Dickerson v. United States
Steel Corp., 12 Empl. Prac. Dec. (CCH) ¶ 11,095, at 5070 (E.D. Pa. 1976), protected
from discovery what it called "critical self-evaluation" material, but did not discuss
privileges. *Id.* at 5071. The case therefore can be used to support the nondiscover-
ability of self-evaluative elements in AAP's, *see supra* note 25, but cannot be taken
to accept the privileged nature of such elements. *Compare* FED. R. CIV. P. 26(b)
(privileges) *with* FED. R. CIV. P. 26(c) (other reasons for denying discovery).

   [29] Because of the complexity of title VII litigation, courts addressing the self-
critical analysis privilege in such suits must weigh considerations not normally present
in other litigation. For example, courts have often expressed the view that discovery
in title VII litigation should be particularly broad. *See* Rich v. Martin Marietta
Corp., 522 F.2d 333, 343 (10th Cir. 1975); Burns v. Thiokol Chem. Corp., 483 F.2d
300, 305 (5th Cir. 1973); Milner v. National School of Health Technology, 73 F.R.D.
628, 632 (E.D. Pa. 1977). Courts have sometimes justified this position by acknowl-
edging that, when plaintiffs are asked to be "private attorneys general" in enforcing
congressional policies, the importance of disclosure is heightened. *See, e.g.,* Wood v.
Breier, 54 F.R.D. 7, 10–11 (E.D. Wis. 1972). Courts have also noted that plaintiffs
often find it difficult to establish the prima facie title VII case. *See, e.g.,* Senter v.
General Motors Corp., 532 F.2d 511, 527 (6th Cir.), *cert. denied,* 429 U.S. 870 (1976).
It is unclear, however, whether the inability of a party to prove his case indicates
that judicial aid is needed or, alternatively, that courts should be more wary of
spurious suits. Courts and commentators have agreed that title VII goals can be
achieved more effectively through broad systematic agreements than through private
actions. *See, e.g.,* Alexander v. Gardner-Denver Co., 415 U.S. 36, 44 (1974); Com-
ment, *Access to EEOC Files Concerning Private Employers,* 46 U. CHI. L. REV. 477,
488–89 (1979). One court has suggested that this preferred method of enforcement
would be jeopardized by disclosure of certain materials in discovery. Johnson v.
Southern Ry. Co., 19 Empl. Prac. Dec. (CCH) ¶ 9076, at 6639, 6645 (N.D. Ga.
1977). *But see* Katz, *Investigation and Conciliation of Employment Discrimination
Charges Under Title VII: Employers' Rights in an Adversary Process,* 28 HASTINGS
L.J. 877, 922–23 (1977) (effect of disclosure on conciliation process unclear).

under title VII. These examples, however, are only illustrative; the privilege itself is applicable to any document that meets the criteria mentioned above,[30] and courts have justifiably denied a privilege in cases in which one of the criteria was absent.[31]

## III. PRINCIPLES OF APPLICATION CONSTITUTING THE MAJORITY APPROACH

To preserve the future flow of information, the privilege of self-critical analysis attempts to reassure future self-analysts and those from whom analysts receive their data. Unfortunately, courts have not consistently examined all of the ways in which these persons are assured or deterred. Courts have, however, frequently articulated three principles in their efforts to further both the rationale behind the privilege and the countervailing policies behind the broad scope of discovery.[32] The principles are related in their attempt to balance these competing interests, and the strength or weakness of each principle can be measured by determining whether a proper balance has been achieved.

### A. *The Dual Chilling Effect of Disclosure*

The chilling effect of disclosure of self-critical analyses has a twofold nature. First, if a plaintiff obtains discovery, there may be a direct chilling effect on the institutional or individual

---

[30] *See supra* p. 1086.

[31] *See; e.g.*, State v. Driscoll, 53 Wis. 2d 699, 706, 193 N.W.2d 851, 856 (1972) ("We think public policy is not so definitely compelling or clear . . . that we should grant testimonial confidentiality by court decision to social workers."); W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 114, at 777 (4th ed. 1971) ("Absolute immunity [for defamation] has been confined to a very few situations where there is an obvious policy in favor of permitting complete freedom of expression."). In Ligon v. Frito-Lay, Inc., 19 Fair Empl. Prac. Cas. (BNA) 722 (N.D. Tex. 1978), the court cited Palma v. Lake Waukomis Dev. Co., 48 F.R.D. 366 (W.D. Mo. 1970), to counter the argument that disclosure of Affirmative Action Programs (AAP's) would inhibit frankness. 19 Fair Empl. Prac. Cas. (BNA) at 723. The court in *Palma* had denied the existence of a privilege for a corporation's interoffice communications. The *Ligon* court reasoned that disclosure of AAP's would inhibit frankness no more than would discovery of the nonprivileged interoffice communications. The court's analogy, however, is flawed: courts have declared that there is a public interest in encouraging frankness in AAP's, but any such interest in encouraging frankness in a corporation's interoffice memos is attenuated at best.

[32] Courts and commentators, usually without discussion, have been prone to list criteria for applying the privilege, some of which are of questionable relevance. *See, e.g.*, Webb v. Westinghouse Elec. Corp., 81 F.R.D. 431, 434 (E.D. Pa. 1978) (three "guideposts" in title VII litigation); Frankenhauser v. Rizzo, 59 F.R.D. 339, 344 (E.D. Pa. 1973) (10 criteria in police investigation litigation).

self-analyst; this effect operates to discourage the analyst from investigating thoroughly and frankly or even from investigating at all. In practice, the self-analyst is usually two distinct entities: the institution that commissions a self-analysis and the individuals who actually conduct the analysis. The chilling effect on the institutional self-analyst's frankness or thoroughness, an effect that results from the threat of liability, has received the most judicial attention.[33] Fear of lawsuits, however, is not the only cause for hesitancy on the part of self-analysts. If an individual self-analyst is asked by his superiors to conduct an internal analysis, the individual may temper his criticism out of a fear that reprisals will result if the analysis ultimately leads to liability or adverse publicity for the employer.

Second, courts should be concerned about the ability of the self-analyst to gather the information that it needs to make its evaluation. Knowledge that a final report may be disclosed will often discourage individuals from coming forward with relevant information. Therefore, courts must be aware of the chilling effect not only on the self-analyst, but also on persons asked to supply the data that make internal analyses possible.

Courts should be as cognizant of this second type of chilling effect as they are of the first; it is equally likely to dam the future flow of important information. If, for example, a witness to a police beating or a railroad accident is a co-worker or friend of the allegedly culpable party, the witness may be unwilling to expose that party to retribution for making the institution vulnerable. As the risk of retribution faced by the alleged transgressor increases, the chance that his friendly co-workers will not provide the information needed by the self-analyst increases as well. Because one would expect the risk of retribution to be a function of an institution's potential liability, the likelihood of witnesses' coming forward with useful information absent a privilege should vary inversely with the likelihood of and amount of damages for which the institution would be liable. In other words, without a privilege, as the risk of liability for the institution increases, the likelihood that witnesses will come forward decreases.

Further, the lodging of the complaints that initiate investigations can be chilled as easily as can the contribution of

---

[33] *See, e.g.,* Gillman v. United States, 53 F.R.D. 316, 318 (S.D.N.Y. 1971) ("[If discovery were allowed, c]onstructive criticism would be suppressed for fear of the consequences. Indeed, the Government suggests that directors of hospitals might find it more expedient, in such event, to have no official inquiry at all to the detriment of the safety of the hospital.").

information to ongoing investigations. If the confidentiality of an employee's complaint about a title VII violation is compromised, similar violations may go unreported in the future. Courts should thus protect the confidentiality of such documents as EEOC complaints.[34] Finally, holding privileged the reports of complainants and witnesses is necessary to avoid giving employers an incentive to weed out potential "whistle blowers." As the risk of liability for an institution increases, so too does the incentive of the employer to weed out individuals who might be a future source of honest information concerning alleged wrongdoing.

Courts have deemphasized the second type of chilling effect in cases in which disincentives to be frank already existed — when, for example, frankness itself might lead to disciplinary action. In such cases, courts have discounted the additional chilling effect that would result from fear of discovery.[35] The preexisting disincentive to be frank, however, operates only on the individual self-analyst; courts must still be concerned with the chilling effect that makes the institutional self-analyst unlikely to commission an analysis. Further, although existing disincentives to be frank will necessarily bear on a court's judgment about the existence or severity of the chilling effect of disclosure, courts should not completely disregard the possibility of an additional chilling effect from disclosure. In some cases, an employee may weigh heavily the additional wrath — no matter how subtly manifested — that would result from a large judgment against his employer. Although an employee may reluctantly submit himself to his employer's internal disciplinary mechanisms, he may be unwilling, because of either institutional loyalty or fear of retribution, to risk exposing his employer to liability.

## B. The Factual-Evaluative Distinction

Courts currently interpret the privilege of self-critical analysis to protect the evaluative but not the factual portions of self-analyses.[36] Yet the self-analyses that institutions generate

---

[34] *See* Johnson v. Southern Ry. Co., 19 Empl. Prac. Dec. (CCH) ¶ 9076, at 6639, 6645 (N.D. Ga. 1977) ("The Fifth Circuit has adopted a strict rule of confidentiality with regard to EEOC complaints, since disclosure might inhibit employees from bringing such charges. . . . The same approach should be taken with regard to internal complaints and government investigations."). *But see* Webb v. Westinghouse Elec. Corp., 81 F.R.D. 431 (E.D. Pa. 1978) (failing to discuss the chilling effect on complainants).

[35] *See* Wood v. Breier, 54 F.R.D. 7, 13 (E.D. Wis. 1972); Jolly v. Superior Court, 112 Ariz. 186, 190, 540 P.2d 658, 662 (1975) (en banc).

[36] Another distinction made in several title VII cases decided in the Northern

1094            *HARVARD LAW REVIEW*            [Vol. 96:1083

are rarely of the purely evaluative kind to which the privilege typically applies. Rather, the self-analyses that plaintiffs seek often also contain purely factual material or material that can be characterized as a hybrid of the factual and the evaluative.

*1. The Merits of the Factual-Evaluative Distinction.* — Courts have seemed to assume that all factual portions of self-analyses fall outside the privilege's rationale.[37] Such an assumption must be qualified, however, because the two chilling effects of disclosure often operate on facts as well as evaluations.[38] Although courts are justified in distinguishing facts from evaluations under certain circumstances in which the rationale underlying the privilege does not operate, application of the distinction should be limited to those situations.

The rationale for the privilege of self-critical analysis does not apply when the factual portions of the self-analyses sought are independently replicable, as is often the case with raw statistics.[39] Replicability reduces the likelihood that the self-analyst will fail to undertake an investigation for fear of reprisals; by definition, the party seeking discovery could reconstruct the self-analyst's work without discovery.

The rationale for the privilege likewise does not apply to discovery of documents whose existence is assured and that are independently verifiable. For example, employers are required under title VII to produce certain documents for submission to the government. The chilling effect of discovery can thus affect only the veracity of these documents, not their original production. If veracity can be double-checked, however, the analyst will be less likely to be untruthful. If the institution in question has the option of not producing the report sought, verifiability, unlike replicability, could inhibit

District of Georgia is between the three types of forms typically sought: AAP's, EEO-1's, and CRR's. *See* Brown v. Ford Motor Co., 19 Empl. Prac. Dec. (CCH) ¶ 8969, at 6026 (N.D. Ga. 1978); Parker v. Kroger Co., 19 Empl. Prac. Dec. (CCH) ¶ 8995, at 6163 (N.D. Ga. 1977); Ylla v. Delta Airlines, 18 Empl. Prac. Dec. (CCH) ¶ 8937, at 5897 (N.D. Ga. 1977). *See generally supra* note 25 (describing the forms). The three cases were all decided by the same judge and follow one another serially; *Brown* relies on *Parker*, and *Parker* relies on *Ylla*. Given the apparently evaluative nature of each of the three types of documents, a relevant distinction cannot be sustained for purposes of the self-critical analysis privilege.

[37] *See, e.g.,* Webb v. Westinghouse Elec. Corp., 81 F.R.D. 431, 434 (E.D. Pa. 1978).

[38] *See, e.g.,* Johnson v. Southern Ry. Co., 19 Empl. Prac. Dec. (CCH) ¶ 9076, at 6639, 6645 (N.D. Ga. 1977) (denying discovery of employees' names).

[39] *See* Dickerson v. United States Steel Corp., 12 Empl. Prac. Dec. (CCH) ¶ 11,095, at 5070, 5071 (E.D. Pa. 1976) ("Allowing discovery of statistical information will not impair the government's affirmative action policies since the quality of statistics does not depend to any great extent on the employer's voluntary cooperation, and statistics can easily be checked on a random basis.").

investigation. An unreplicable damning report that is verifiable is not likely to be produced if it can be discovered, because production will provide the only means possible for plaintiffs to obtain and analyze the information that would go into such a report.

Thus, if the information sought in discovery is independently replicable or of the type whose existence is assured and that is independently verifiable, one of the privilege's essential criteria is not met: permitting discovery will not curtail the flow of important information. In contrast, the quality of factual data that are neither independently replicable nor verifiable could be adversely affected by discovery.

Similarly, factual data not in the control of the defendant, which will be compiled regardless of impending litigation, do not fit the rationale of the privilege.[40] Such information is immune from any chilling effect. Only when this immunity exists should courts continue to assume that the privilege of self-critical analysis does not apply to factual portions of self-analyses.

*2. Difficulties in Applying the Factual-Evaluative Distinction.* — Even in cases in which the distinction between facts and evaluations is justifiable, courts have encountered difficulties in applying it, some of which are endemic to judicial control of the discovery process. Because the distinction is vague, courts have at times improperly drawn the line between

---

[40] *See, e.g.,* United States v. Arthur Young & Co., 33 Fed. R. Serv. 2d (Callaghan) 1628 (2d Cir. 1982). In *Arthur Young,* the Second Circuit ruled on an IRS discovery request for audit workpapers and tax accrual workpapers compiled during an audit of the Amerada Hess Corporation. The court ordered the audit workpapers turned over, because they were primarily factual verifications of financial statements that used spot-checking of bookkeeping entries or confirmations of transactions. Such verifications are an essential part of the auditing process that would be performed regardless of any fear of discovery. *See* American Institute of Certified Public Accountants, Statement on Auditing Standards No. 16 (1977), *reprinted in relevant part in* D. HERWITZ, ACCOUNTING FOR LAWYERS 112–18 (1980). The tax accrual workpapers were distinguished, however, because they evaluated the validity of certain positions taken by Amerada Hess, judgments about company policy, the positions likely to be taken by the IRS, and settlement possibilities should the IRS contest any positions. 33 Fed. R. Serv. 2d (Callaghan) at 1636–37.

The court's statement of the rationale for protecting the tax accrual workpapers mirrors the rationale for the privilege of self-critical analysis: "The prejudice involved in exposing to the Service appraisals of a taxpayer's weaknesses and settlement positions on audit is of such proportions that a prudent organization might not be perfectly candid with independent auditors once it knew that the information revealed would be reachable [by the IRS]." *Id.* at 1637. The privilege granted, however, was not that of self-critical analysis. The court based its decision on the need for an *independent* auditing system, and internal audits have not generally been protected, because there exists no general common law privilege for accountants. *See, e.g.,* Couch v. United States, 409 U.S. 322, 335 (1973).

the factual and the evaluative.[41] Further, they have often found that factual or objective material is contained in a document that also contains evaluative or subjective material.[42] In such cases, the court may inspect the material in camera[43] and order that it be edited, but such an editing scheme can prove complex[44] and hence costly.[45] Of course, pretrial procedure is almost always costly. Courts should seek to minimize expense whenever possible, however, and the substantiality of the cost of a procedure weighs proportionately against its advisability. If applying the distinction between facts and evaluations proves too costly, it should be abandoned.[46]

## C. *Qualifications of the Privilege*

The third principle in the majority approach is the idea that the privilege of self-critical analysis, in cases in which it applies, is not absolute. The privilege is applied generally on

---

[41] *See, e.g.,* Wood v. Breier, 54 F.R.D. 7 (E.D. Wis. 1972). In *Wood*, the plaintiff claimed to have been beaten by a police officer and sought discovery of internal investigation materials. The court examined the materials in camera and ordered the defendant to turn over firsthand reports of the incident prepared by other members of the force, summaries of interviews with police officers conducted by other investigating officers, and related correspondence. *Id.* at 10. Although the material could be termed nonevaluative in the sense that it apparently included no conclusions of the investigators, it included material not factual in the way that statistics are factual: the materials necessarily required the subjective observations of witnesses, many of whom were colleagues of the alleged transgressor. Therefore, the *Wood* conception of what is factual would not prevent the feared chilling effects on which the privilege of self-critical analysis is based.

[42] *See, e.g.,* O'Connor v. Chrysler Corp., 86 F.R.D. 211 (D. Mass. 1980).

[43] In camera inspection has proved a popular judicial device for differentiating between protected and unprotected materials. *See, e.g.,* Dickerson v. United States Steel Corp., 12 Empl. Prac. Dec. (CCH) ¶ 11,095, at 5070, 5070–71; Note, *supra* note 14, at 1039.

[44] The court in *O'Connor* divided all material into three categories. The first was composed of statements of fact and data compilations that the court held discoverable. The second contained evaluative material that the court protected. Finally, if passages were a mixture of the first two categories, the court placed the burden of editing the materials on the disclosing party and ordered that, when deletions were made, two different types of marks be used to indicate whether the editor felt that the material deleted was definitely factual (marked by three asterisks) or questionable (six asterisks). The court was to make spot checks to ensure compliance. O'Connor v. Chrysler Corp., 86 F.R.D. 211, 218–19 (D. Mass. 1980).

[45] Not only must the court use valuable resources, but generally the same judge who inspects documents during discovery will also be the finder of fact at trial. Use of a magistrate to review documents, albeit an attractive option, also consumes valuable resources. For a discussion of these problems, see *id.* at 218.

[46] Naturally, these limitations on discovery apply only to factual portions of self-analyses and should not be applied to facts in general, which are discoverable. Neither should factual materials that are otherwise discoverable be protected merely because they also happen to be contained in a critical self-analysis.

a case-by-case basis, and courts have indicated that it can be overcome by a showing of exceptional need by the party seeking discovery. Neither of these limitations is commendable.

*1. Case-by-Case Determination.* — With the adoption of rule 501 of the Federal Rules of Evidence, Congress mandated that privileges be developed on a case-by-case basis,[47] and the Supreme Court has taken this directive quite seriously.[48] The directive does not, however, imply that privileges must be *applied* on a case-by-case basis. In fact, to apply the privilege of self-critical analysis in such a manner is to risk its evisceration.

Because this privilege is forward-looking, courts must be concerned with how future self-analysts will react to the privilege and to any exceptions that are established. To have its desired effect, the privilege must assure the self-analyst that his product will not be used to his legal detriment. Similarly, the privilege must assure potential witnesses and complainants that their statements will remain confidential. Analysts, witnesses, and complainants are likely to take little comfort from an assurance that a court will balance the equities should discovery be sought. Therefore, as courts have acknowledged, a case-by-case analysis by which judges in each case weigh anew the competing equities is undesirable.[49]

---

[47] "[O]ur action [deleting the enumeration of specific privileges proposed by the advisory committee and the Supreme Court] should be understood as reflecting the view that the *recognition* of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis." S. REP. No. 1277, 93d Cong., 2d Sess. 13 (1974) (emphasis added).

[48] *See, e.g.,* Upjohn Co. v. United States, 449 U.S. 383 (1981); Trammel v. United States, 445 U.S. 40, 47 (1980). In *Upjohn* (which involved the attorney-client privilege), Justice Rehnquist, having first expressed his disapproval of case-by-case determination of privileges, went on to note that courts must take such an approach, and pointed out that "it obeys the spirit of the Rules." 449 U.S. at 397.

In *Upjohn,* the Supreme Court held privileged from discovery certain materials relating to a corporation's internal investigation of suspected illegal payments to foreign government officials. The Court, however, apparently did not consider the privilege of self-critical analysis; the investigation had been conducted by Upjohn's general counsel and thus was protected by the attorney-client privilege. *Id.* at 395.

[49]

    If this Court were to accept petitioner's contention that this privilege should be approached in an *ad hoc* manner, being dissolved when necessity for the privileged information is shown, and no specific reasons for the upholding of the privilege advanced, then the underlying reasons for the existence of the privilege would be thwarted just as fully as if it did not exist. The members of a police department must be able to rely upon their confidential records and notations being preserved for their internal use in *all* cases, for if it were otherwise, the knowledge that some of the confidential information recorded might be later exposed to outside parties would have a certain and chilling effect upon the internal use of such record making.

Kott v. Perini, 283 F. Supp. 1, 2 (N.D. Ohio 1968); *see* Upjohn v. United States, 449 U.S. at 393. *But see* Frankenhauser v. Rizzo, 59 F.R.D. 339, 344 n.8 (E.D. Pa. 1973) (declining to follow *Kott*'s rejection of the case-by-case balancing test).

Under a more reasoned approach, courts would apply the privilege of self-critical analysis in the manner in which they apply more established privileges; with established privileges, the temptation to examine the equities in each case is not as pronounced as it is with nascent privileges. The attorney-client privilege provides a typical example of the way in which privileges were applied under the common law of evidence. Courts did not weigh the equities in each case to determine whether protection would be appropriate.[50] Rather, they made a syllogistic application of the privilege: courts asked whether the elements of an attorney-client privilege were present, and if they were, the privilege applied.[51] Judges should take the same approach to the privilege of self-critical analysis. Rather than weigh the equities in each case, they should simply determine if the material under consideration is of the type generally protected by the privilege.

Indeed, the language of rule 501 indicates that this method is desirable.[52] Rule 501 mandates a continuation of the common law approach to privileges. Congress adopted rule 501 specifically to facilitate the recognition — as opposed to the application — of new privileges on a case-by-case basis as the need arose,[53] not to require de novo examination of the continued desirability of a recognized privilege. Thus, a syllogistic application of the self-critical analysis privilege seems to comport with the intent of Congress.

2. *Exceptional Need.* — The qualification that plaintiffs may counter the privilege of self-critical analysis by demonstrating exceptional need is similar to the notion that courts should balance the equities on a case-by-case basis. Both qualifications of the privilege pit the interests of the plaintiff against those of the defendant and the public. But allowing a qualification for exceptional need is different from conducting a balancing test. The exceptional-need qualification provides an opportunity for the plaintiff to show, once the court has determined that circumstances give rise to the privilege, that equitable considerations demand that the privilege not be applied. A balancing test focuses on two competing interests simultaneously, whereas allowing the plaintiff an opportunity to show exceptional need focuses only on the interests of one party.

---

[50] *See, e.g., In re* LTV Sec. Litig., 89 F.R.D. 595, 600–06 (N.D. Tex. 1981); United States v. United Shoe Mach. Corp., 89 F. Supp. 357 (D. Mass. 1950).

[51] *See* cases cited *supra* note 50.

[52] *See supra* note 7.

[53] *See supra* note 47.

The opportunity for the plaintiff to demonstrate exceptional need has become part of the standard doctrine surrounding the privilege of self-critical analysis. Presumably, this qualification evidences general judicial[54] and legislative[55] reluctance to weave blanket privileges, a reluctance that stems in turn from the pervasively negative attitude toward screening pertinent evidence from view.[56] But this reluctance has its costs. Allowing plaintiffs to overcome the privilege by showing exceptional need has the same deleterious effect as that produced by a case-by-case weighing of the privilege's equities: each qualification leaves self-analysts uncertain of their protection.

In fact, the importance of the material sought by the plaintiff actually makes the operation of the privilege's rationale more likely and thus makes application of the privilege more desirable. The more crucial the material is to the plaintiff's case, the more likely it is to be the type of material that the privilege was designed to protect. If a plaintiff could obtain the material elsewhere or if the material were not particularly probative, future self-analyses would be less likely to be chilled by the potential of disclosure. In other words, for unimportant or readily available information, courts need not be concerned with the possible interruption of informational flow. To give the privilege its desired effect, therefore, courts should not consider a plaintiff's claim of exceptional need.

The syllogistic approach that should be used in applying the privilege of self-critical analysis also creates a strong presumption in favor of protecting documents that meet the privilege's criteria. Whereas the risk of evisceration is a forward-looking concern, a court applying the privilege of self-critical analysis should also remember that syllogistic application embodies the policy choice of the institution that decided to adopt the privilege. In adopting the privilege, a determination was made that the public interest weighed in favor of confidentiality. Whether this decision was made by a higher court, the

---

[54] *See, e.g.*, Bredice v. Doctors Hosp., Inc., 50 F.R.D. 249, 250 (D.D.C. 1970), *aff'd*, 479 F.2d 920 (D.C. Cir. 1973); Dade County Medical Ass'n v. Hlis, 372 So. 2d 117, 121 (Fla. Dist. Ct. App. 1979).

[55] *See, e.g.*, NEB. REV. STAT. § 71-2048 (1981).

[56] *See* Webb v. Westinghouse Elec. Corp., 81 F.R.D. 431, 433–34 (E.D. Pa. 1978) ("Carried to its logical extreme, such a privilege [of self-critical analysis] would foreclose discovery of material which might be most strongly probative of discriminatory intent."). Such a statement can best be viewed as a recommendation that a plaintiff's needs for probative material not be overlooked. If the court meant to disparage privileges generally insofar as they hide such material, the consequences for the privilege of self-critical analysis and other privileges would be extensive and deleterious; discovery privileges by nature mask the relevant.

same court at an earlier time, or a legislature, judges should give due weight to the binding effect of a prior determination that the privilege furthers the public interest.

Individual courts will continue to determine the point at which a plaintiff's need becomes "exceptional," and to the extent that judges continue to permit claims of exceptional need to narrow the scope of the self-critical analysis privilege, courts should at least scrutinize these claims to avoid eviscerating the privilege.[57] Indeed, a proper recognition of the long-range effects of denying the privilege when the three criteria are met will often lead to the same result that would be produced by eliminating the exceptional-need qualification altogether.

## IV. CONCLUSION

Courts and legislatures have begun to create a discovery privilege for self-critical analyses. This privilege has been used to protect documents in three different situations. The problems with the three principles generally enunciated in applying the privilege, however, demonstrate that courts have failed to give the privilege sufficiently broad application to effectuate the important policies underlying it. To further these policies, courts should recognize the privilege of self-critical analysis as a single multifaceted privilege rather than as many unrelated qualified privileges. Courts should also recognize all of the various ways in which self-analysis may be chilled, and protect factual portions of self-analyses that meet the privilege's criteria. Finally, courts should adopt the syllogistic approach to applying the privilege, and abandon the exceptional-need qualification. Although courts have been primarily responsible for developing privileges,[58] legislatures have increasingly assumed some of this responsibility.[59] Neither courts nor legislatures

---

[57] If a plaintiff has no alternative method to prove his case aside from using a self-critical analysis, courts are more likely to find exceptional need. Such a need may arise in situations in which it is impractical to allow discovery of the raw data that make up the self-evaluative report. For example, in Ylla v. Delta Airlines, 18 Empl. Prac. Dec. (CCH) ¶ 8937, at 5897 (N.D. Ga. 1977), a title VII discovery case, the court denied on the ground of undue burden discovery of all job applications and transfer requests over a period going back approximately 10 years. *Id.* at 5901. Plaintiff was thereby foreclosed from discovery of the raw data upon which defendant's compilations were based.

[58] *See, e.g.,* Trammel v. United States, 445 U.S. 40, 53 (1980) (judicial modification of spousal privilege).

[59] *See* sources cited *supra* note 11; *see also* Davison v. St. Paul Fire & Marine Ins. Co., 75 Wis. 2d 190, 203–04, 248 N.W.2d 433, 440–41 (1977) (claiming that

1983]                    *SELF-CRITICAL ANALYSIS*                    1101

should hesitate to act in situations in which the rationale un-
derlying the privilege of self-critical analysis operates. Only
through such developments will the privilege of self-critical
analysis properly perform its function.

---

judicially created privileges are giving way to legislative privileges; citing authorities);
2 D. LOUISELL & C. MUELLER, *supra* note 9, § 202 app. (listing statutes); C. Mc-
CORMICK, McCORMICK'S HANDBOOK OF THE LAW OF EVIDENCE § 77, at 156–60,
§ 112, at 238–39 (2d ed. 1972) (same).